UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**JUDGE LYNCH**

| | |
|---|---|
| NETHERBY LIMITED, | |
| Plaintiff, | |
| -against- | |
| JONES APPAREL GROUP, INC., | |
| Defendant. | |

**04 CV 07028**

**COMPLAINT**

RECEIVED
SEP 0 1 2004
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Netherby Limited ("Netherby"), by its attorneys Chadbourne & Parke LLP, as and for its complaint herein against defendant Jones Apparel Group, Inc. ("Jones"), respectively alleges as follows:

## THE PARTIES

1.      Plaintiff Netherby is a corporation duly organized and existing under the laws of Jersey, Channel Islands with its principal place of business in Jersey, Channel Islands. Netherby is the owner of the worldwide rights to the Gloria Vanderbilt and related trademarks, including but not limited to any logos, variations and spin-offs, such as "Gloria Glo" and "GV," as defined in the 1988 Agreement (defined below) (the "Gloria Marks"), except in the United States, Canada, Brazil, Australia and New Zealand (the "Five Countries").

2.      Defendant Jones is a Pennsylvania corporation with its principal place of business at 250 Rittenhouse Circle, Bristol, Pennsylvania 19007.  Jones is the owner of the Gloria Marks in the Five Countries.

## JURISDICTION AND VENUE

3.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that the action arises from a dispute between a citizen of a foreign state and a citizen of a State and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

## NATURE OF THE DISPUTE

5.     The instant dispute arises from Jones' breaches of the parties 1988 Agreement, as amended, under which Jones is the "Buyer" of the Gloria Marks in the Five Countries.  Pursuant to this 1988 Agreement, Jones is obligated, among other things, to make ongoing royalty payments to Netherby for use of the Gloria Marks in the Five Countries and to provide Netherby, the "Seller" of the Gloria Marks, information about licensees, materials and samples of Gloria Vanderbilt products ( the "Licensing Package").  Jones has breached at least three separate aspects of the 1988 Agreement.  First, Jones is again artificially diverting the flow of revenues from the Gloria Marks in an effort to circumvent the royalty payments due to Netherby under the 1988 Agreement.  Second, Jones has failed to provide Netherby with information to which it is entitled under the 1988 Agreement.  Third, Jones has failed to provide the Licensing Packages to which Netherby is entitled under the 1988 Agreement.  By this action, Netherby seeks damages for breach of contract and specific performance.

## THE 1988 AGREEMENT

### A.    The Ownership of the Marks

6.    Beginning in the early 1980s, a company known as Murjani Worldwide B.V. ("Murjani Worldwide"), Netherby's predecessor-in-interest, created and launched the Gloria Marks and related businesses.

7.    Pursuant to an Acquisition Agreement dated December 23, 1988 (the "1988 Agreement") (Exhibit 1), Murjani Worldwide conveyed to Gitano Worldwide, Jones' predecessor-in-interest, the rights to the Gloria Marks in the Five Countries (the "Five Country Rights").  Under the 1988 Agreement, the Buyer is obligated to pay ongoing royalties, called "Contingent Payments," to Netherby based on sales of products bearing the Gloria Marks in the Five Countries.

8.    Following the execution of the 1988 Agreement, Murjani Worldwide assigned its rights thereunder to Netherby.

9.    Since 1988, the corporate structure of the "Buyer" that owns the Five Country Rights under the 1988 Agreement has changed several times, including by way of assignment of the 1988 Agreement.  The Buyer was originally Gitano, and now is Jones.  However, despite these corporate changes, the ownership and/or management of the Buyer was always involved with Isaac Dabah ("Dabah") and members of his family (collectively the "Dabahs").  Dabah is a convicted felon.

10.    Prior to April 2002, Gloria Vanderbilt Trademark B.V. ("GVBV") was the owner of the Marks and the Buyer under the 1988 Agreement.  While GVBV was the Buyer,

the operational aspects of the Gloria Vanderbilt business in the Five Countries was conducted by Gloria Vanderbilt Apparel Corp. ("GVAC") pursuant to a Trademark Assistance Agreement with GVBV.

11.     In or about April 2002, Jones acquired 100% of the common stock of GVAC and 100% of the assets of GVBV (including the Gloria Marks in the Five Countries). Since that time, Jones has been the Buyer under the 1988 Agreement (as amended) and, as such, has all of the Buyer's obligations under that Agreement.

12.     In December 2002, Dabah was appointed CEO of various divisions of Jones, including, but not limited to, Jones' Gloria Vanderbilt division. Jack Gross, the former President of GVAC and long time colleague of Dabah, was appointed CEO of Gloria Vanderbilt and, as such, continues to report to Dabah.

**B.     Contingent Payments To Which Netherby Is Entitled**

13.     The Contingent Payments that Buyer is obligated to pay Netherby quarterly are based both on percentages of revenues of the Buyer's own sales of Gloria Vanderbilt products in the Five Countries, in addition to revenues the Buyer receives from the licensing of the Gloria Marks in the Five Countries (Exhibit 1 ¶ 3).

14.     Under this formula, when the Buyer licenses to others the right to manufacture and sell goods bearing the Gloria Marks in any of those Five Countries, Netherby is entitled to receive a percentage of the revenues paid by that licensee for the use of the Gloria Marks. The actual percentage to be applied depends on the type of goods sold.

4

15.     The 1988 Agreement further obligates the Buyer to provide Netherby with certified quarterly reports, containing a breakdown by product and country, detailing the revenues received based on the specific type of product sold (Exhibit 1 ¶ 3.6).  These reports are crucial, as they permit Netherby to determine if the correct amount of Contingent Payments have been paid.

**THE PRIOR LITIGATIONS AND
THE 1995 MODIFICATION**

**A.    The Prior Litigations**

16.     Since 1988, Netherby's relationship with the Dabahs has been strained as they have repeatedly defaulted on their obligations to Netherby and have consistently forced Netherby to bring lawsuits to recover payments rightfully due to Netherby.

17.     Since 1992 (not including the present litigation), Netherby has been forced to bring at least seven actions against the Buyer, all of which resulted in a substantial recovery (by settlement or otherwise) to Netherby.  Many of those prior actions arose after the Buyer diverted and concealed from Netherby revenue streams on which Netherby was entitled to receive Contingent Payments.

18.     Indeed, in one recent action tried in July 2002 before Justice Ira Gammerman in New York Supreme Court, the Court found that the Buyer had engaged in a "scheme, cleverly thought of . . . to deny to [Netherby] a royalty or a portion of the royalty to which it is entitled."

**B.     The 1995 Settlement Agreement and Modification**

19.     The settlement of one of Netherby's lawsuits in December 1995 resulted in the parties executing a Settlement and Release Agreement dated December 8, 1995 (the "1995 Settlement Agreement") (Exhibit 2), and a Modification to the 1988 Agreement (the "1995 Modification") (Exhibit 3).

20.     Prior to executing the 1995 Modification, Netherby was contemplating pursuing worldwide licensing opportunities in the countries in which it owned the Gloria Marks.

21.     To attract and secure quality licensees with advantageous licensing agreements, Netherby needed to provide potential licensees with a Licensing Package for each season, similar to what the Buyer and licensors of other major brands generally provide their licensees.  This Licensing Package, as is commonly known in the industry, includes, but is not limited to, samples of other licensees' activities as they relate to the brand (e.g. information on brand management, colors, fit, logos, signage, photos line plans, trends, etc.) and designs and sample products of the different lines.  This Licensing Package is provided to licensees to aid them in selling items bearing the licensed marks.

22.     Netherby estimated that the cost of developing this Licensing Package, including samples for each season, would be in excess of $1 million per year.

23.     At the time of the 1995 Modification, Jones' predecessor had an active, ongoing apparel and licensing business in the United States.  As part of its routine business activities in licensing the Gloria Marks in the Five Countries, Jones' predecessor produced a Licensing Package for its Gloria Marks on at least a quarterly (i.e., seasonal) basis.

Accordingly, Netherby felt that Jones' predecessor could comfortably provide it with the Licensing Package, which would significantly reduce the cost to Netherby in developing its own Licensing Package.

24.     Because Netherby did not have the substantial, surplus funds necessary to develop the Licensing Package on its own, and because Netherby felt that Jones' predecessor could comfortably provide the same, it negotiated for the receipt of the Licensing Package, instead of receiving additional funds, as part of the 1995 Settlement Agreement and the 1995 Modification.

25.     Accordingly, the 1995 Modification obligates the Buyer (now Jones) to provide Netherby with samples of all Gloria Vanderbilt designs and products (i.e., part of the Licensing Package) within 30 days after such samples are available, in addition to information about the Buyer's licensees, as further detailed below.  Specifically, Paragraph 8 of the 1995 Modification provides:

> "***Buyer shall use its best efforts to provide to Seller, at no cost to Seller, one set of samples of Gloria Vanderbilt designs and products within 30 days after such samples are available to Buyer***.  Additional samples shall be supplied by Buyer, at a cost to Seller of no more than the Buyer's actual cost, if requested by Seller.  ***Buyer further agrees to use its best efforts to keep Seller generally informed of the activities of Buyer's licensees***, including providing Seller with copies of such licenses presently in existence and licenses that are executed in the future" (Exhibit 3 ¶ 8) (emphasis added).

26.     Without this Licensing Package, and without the substantial funds needed to produce this Licensing Package on its own, Netherby has been effectively unable to pursue quality licensees with advantageous licensing opportunities in the countries in which it owns the Gloria Marks.

27.     Paragraph 8 of the 1995 Modification also obligates the Buyer to use its best efforts to keep Netherby informed of the activities (e.g., contracts, amendments, payments, brand management, colors, fit, logos, signage, photos, binders, line plans, trends, etc.) of Buyer's licensees of the Gloria Marks and to provide Netherby with copies of all licenses the Buyer executes with licensees (Exhibit 3 ¶ 8).  Jones has breached this provision as well.

### THE CURRENT DISPUTE

28.     The current dispute involves Jones' breaches of three separate aspects of the 1988 Agreement, as amended.  First, Jones is ***again*** artificially diverting the flow of its Gloria Vanderbilt revenues in an effort to by-pass the Contingent Payment formula.  Second, Jones has failed to provide Netherby with information to which it is entitled under the 1988 Agreement and the 1995 Modification.  Third, Jones has failed to provide the Licensing Packages to which Netherby is entitled under the 1995 Modification.  Despite over fifteen requests made over a two year period, to date Jones has utterly failed to provide Netherby with any explanation regarding the reduction and/or termination of royalty payments, any of the information requested or any aspect of the Licensing Packages to which Netherby is entitled.

29.     As early as 2000 and 2001, Netherby's accountant began noticing significant changes in the royalties Jones was paying to Netherby under the 1988 Agreement.  Specifically, the accountant noticed that HBC/Zellers, Inc. ("Zellers"), Jones' Canadian licensee of the Gloria Marks, had reduced the royalty percentage it was paying to Jones on certain Gloria Vanderbilt products ***by half***, from 1.25% to 0.625%.  In addition, Zeller ***completely ceased*** paying royalties to Jones on Jones's sale of Gloria Vanderbilt products to Zellers.

8

30.    Upon noticing these abnormalities, Netherby's accountant sent a letter and spoke numerous times with Itzhak Weinstock ("Weinstock"), the Chief Financial Officer of certain of the Dabah Entities.  These discussions were unhelpful and Weinsock failed to provide any of the information Netherby requested.

31.    Also in 2001, Netherby's counsel sent a letter to counsel for the Dabah Entities, reiterating the obligation to provide samples under the 1995 Modification.  In this letter, Netherby's counsel explained that:

> "The obligation to provide samples is quite material to Netherby.  As you know, Netherby owns the worldwide rights to the Gloria Vanderbilt trademark. Receipt of samples from the domestic and Canadian owner of the mark would significantly assist Netherby in its worldwide design and marketing operations. The failure to provide these samples has significantly frustrated Netherby in this regard" (Exhibit 4).

32.    After receiving no information from Weinstock or counsel to the Dabah Entities, Netherby's accountant began writing to Jones' Assistant Treasurer, Robin Mandell ("Mandell") in or about October 2002.  Although Netherby's accountant communicated with Mandell many times and made numerous requests for information, little, if any of the requested information was actually provided.

33.    As of July 2003, Netherby's accountant was still requesting information from Mandell.  On July 10, 2003, Netherby's accountant e-mailed Mandell and requested, among other things, copies of any agreements authorizing Zellers to decrease its royalty rate on certain products and copies of any agreements authorizing Zellers to cease paying royalties on Gloria Vanderbilt products it purchased from Jones (Exhibit 5).

34.     Receiving no response, Netherby's accountant sent Mandell a reminder e-mail on July 21, 2003 (Exhibit 5), and Mandell responded that she would try to provide some answers by the end of the month (Exhibit 6).  When no information was received by early August 2003, Netherby's accountant sent Mandell another e-mail reminder (Exhibit 6).

35.     After almost two months of requests, Netherby's accountant finally spoke to Mandell on August 22, 2003.  During this discussion, Mandell indicated that she would need to gather some of the requested information from others at Jones and would provide the information to Netherby shortly.

36.     By e-mail dated August 25, 2003, Mandell explained that she was waiting for authorization from Ira Dansky ("Dansky"), Jones' General Counsel, to release certain information, and that he would not be back until after Labor Day weekend.

37.     As no information was received following the Labor Day weekend, Netherby's counsel wrote to Dansky directly.  By letter dated October 6, 2003, Netherby's counsel requested information relating to the decrease in the royalty rate paid by Zellers with respect to certain products and the failure of Zellers to pay royalties to GVAC for good sold to Zellers.  Netherby's counsel also notified Dansky that Jones was in breach of the 1995 Modification for failure to provide samples, failure to provide copies of licenses and failure to keep Netherby informed of activities of Gloria Vanderbilt licensees (Exhibit 7).

38.     Receiving no response, by letters dated October 30, 2003 (Exhibit 8) and December 17, 2003 (Exhibit 9) Netherby's counsel reiterated the requests for information.

39.     By letter dated December 23, 2003, Bill Slater ("Slater") responded on behalf of Jones that he would provide Netherby with the appropriate documentation during the week of January 5, 2004 (Exhibit 10).

40.     By letter dated January 24, 2004, over two years from Netherby's initial request, Jones only provided Netherby with copies of five license agreements (three of which Netherby had never before seen), and no other information.  Notably absent were other license agreements, any documents or agreements relating to the decrease in royalties paid by Zellers for certain products, or the failure of Zellers to pay any royalties on certain goods, including goods purchased from Jones.  Also absent from this package were aspects of the Licensing Package to which Netherby is entitled pursuant to the 1995 Modification or any explanation as to why such materials/samples were not provided.

41.     By letter dated February 4, 2004, Netherby's counsel responded to Slater noting that Jones had not been paying Netherby royalties on some of the licenses just provided. Netherby further requested, pursuant to Paragraph 3.6 of the 1988 Agreement, a detailed statement of all Canadian sales made under these licenses and all payments made by these licensees as they relate to Canada (Exhibit 11).

42.     After receiving no response, Netherby's counsel sent Slater a reminder letter on February 27, 2004.  Again, no response was received.

43.     By letter dated May 19, 2004, Netherby again reiterated its requests for information regarding the three new licenses as well as the decrease in royalties paid by Zellers on certain products and the failure of Zellers to pay royalties on goods purchased from Jones.

44.     In or around June 2004, Netherby noticed **_another discrepancy_** in the royalties being paid by Zellers.  With respect to certain categories of products, specifically sunglasses and watches (and possibly others), Zellers was not paying any royalty to Jones, but rather, the royalty was being paid by certain vendors Jones apparently licensed to manufacture and supply these goods.  This arrangement, again, appears to have been cleverly designed by Jones to camouflage a royalty payment as something else, so as to avoid paying to Netherby a percentage of the royalty received.  Netherby, to date, has neither been advised of these additional vendors/licensees, nor provided copies of such license agreements, nor paid its share of the Contingent Payments, to which it is rightfully entitled.

45.     In light of this new information, by letter dated June 2, 2004 Netherby's counsel requested an explanation from Slater and again reiterated their prior requests for information (Exhibit 12).

46.     To date, over two years after Netherby began making requests, despite additional recent reminder letters sent to Jones on June 30, 2004 and July 13, 2004, and despite an oral promise from Slater to Netherby's counsel that information would be provided, Netherby has received none of the requested information, material or samples.

### AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract/Failure to Pay Royalties)

47.     Netherby repeats and realleges each and every allegation contained in paragraphs 1 through 46 above.

12

48.     Upon information and belief, Jones has diverted and continues diverting the flow of funds from its Gloria Vanderbilt licensees and others so as to deprive Netherby of Contingent Payments rightfully due Netherby under the 1988 Agreement.

49.     Jones is in breach of its obligations under the 1988 Agreement.

50.     As a result, Netherby seeks the recovery of compensatory damages in an amount to be determined.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract/Failure to Provide Accurate Quarterly Statements)

51.     Netherby repeats and realleges each and every allegation set forth in paragraphs 1 through 50 above.

52.     Pursuant to Paragraph 3.6 of the 1988 Agreement, Jones is obligated to provide Netherby with quarterly statements accurately detailing royalty income received by the Buyer with respect to sales of Gloria Vanderbilt products as well as quarterly statements detailing he Buyer's own sales of Gloria Vanderbilt products (Exhibit 1 ¶ 3.6).

53.     Jones has breached this obligation, including by artificially diverting revenue flows and failing to report them accurately to Netherby.

54.     As a result, Netherby seeks the recovery of compensatory damages in an amount to be determined.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Breach of Contract/Failure to Provide Licensee Information)

55.     Netherby repeats and realleges each and every allegation set forth in paragraph 1 through 54 above.

13

56.     Pursuant to Paragraph 8 of the 1995 Modification, Netherby is entitled to received information concerning the activities of Buyer's Gloria Vanderbilt licensees, including copies of all licenses and amendments thereto (Exhibit 3 ¶ 8).

57.     Jones has breached Paragraph 3.6 of the 1988 Agreement by, inter alia, its failure to provide Netherby with requested information regarding the royalty income received from Zellers and the three new licensees.

58.     Jones has breached Paragraph 8 of the 1995 Modification by failing to keep Netherby informed of the activities of its licensees, even after years of requests for information.

59.     Jones has breached Paragraph 8 of the 1995 Modification, including by failing to provide Netherby amendments to existing licenses and copies of all license agreements.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of Contract/Failure to Provide Samples)

60.     Netherby repeats and realleges each and every allegation contained in paragraphs 1 through 59 above.

61.     In negotiating the 1995 Modification, Netherby contracted for the right to receive Licensing Packages from Buyer, which would have enabled Netherby to secure quality licenses and negotiate favorable licensing terms.

62.     The value of these Licensing Packages to Netherby was in excess of $1 million per year.

63.     Despite repeated requests, Buyer has not provided Netherby with any aspect of the Licensing Packages to which it is entitled pursuant to Paragraph 8 of the 1995 Modification.

64.     Due to Jones' breach of Paragraph 8 of the 1995 Modification, Netherby has been damaged in an amount to be determined.

### AS AND FOR A FIFTH CAUSE OF ACTION
### (Specific Performance)

65.     Netherby repeats and realleges each and every allegation contained in paragraphs 1 through 64 above.

66.     The 1988 Agreement is valid and binding.

67.     Netherby at all times has performed its obligations under the 1988 Agreement and continues to do so.

68.     Any conditions precedent to Jones' obligation to perform have been satisfied.

69.     Jones' wrongful and unlawful conduct in (1) artificially diverting the flow of its Gloria Vanderbilt revenues in an effort to by-pass the Contingent Payment formula, (2) failing to provide Netherby with information to which it is entitled under the 1988 Agreement and the 1995 Modification, and (3) failing to provide the Licensing Packages to which Netherby is entitled under the 1995 Modification, is causing and has caused irreparable harm to Netherby.

70.     Despite numerous requests over several years, Jones has refused to provide Netherby with the information or samples to which Netherby is entitled.

71.     Because of the nature of these breaches, Netherby has no adequate remedy at law, cannot be wholly remedied by an award of money damages and is faced with irreparable harm.

72.     As a result, Netherby is entitled to an award of specific performance pursuant to the 1988 Agreement directing Jones to satisfy its obligations under the 1988 Agreement, as modified, providing Netherby with (a) accurate quarterly reports, (b) information on licenses and (c) the Licensing Packages.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Recovery of Attorneys' Fees)

73.     Netherby repeats and realleges each and every allegation contained in paragraphs 1 through 72 above.

74.     This action has been brought due to Jones' breaches of the 1988 Agreement and the 1995 Modification thereto.

75.     Paragraph 17 of the 1995 Settlement Agreement provides for the recovery of reasonable attorneys' fees to the prevailing party in any action to enforce the 1995 Settlement Agreement or the 1988 Agreement:

> "In any action to enforce this Agreement and/or the 1988 Acquisition Agreement, the prevailing party shall be entitled to recover its reasonable and actual attorneys' fees from the non-prevailing party" (Exhibit 2 ¶ 17).

76.     The 1995 Settlement Agreement is binding on Jones (Exhibit 2 ¶ 14).

77.     Netherby is entitled to recover its reasonable attorneys' fees, cost, expenses and disbursements incurred in connection with this action.

WHEREFORE, Netherby Limited respectfully requests the entry of a judgment as follows:

(a)   on its first and second claim, awarding Netherby compensatory damages based on the diversion and/or withholding of royalties in violation of the 1988 Agreement in an amount to be determined at trial;

(b)   on its third claim, awarding Netherby access to the information sought pursuant to Paragraph 3.6 of the 1988 Agreement and Paragraph 8 of the 1995 Modification;

(c)   on its fourth claim, awarding Netherby compensatory damages based on defendant's failure to provide Jones with the Licensing Packages as required by Paragraph 8 of the 1988 Modification;

(d)   on its fifth claim, awarding Netherby specific performance pursuant to the 1988 Agreement directing Jones to satisfy its obligations under the 1988 Agreement, as modified, providing Netherby with (a) accurate quarterly reports, (b) information on licenses and (c) the Licensing Packages;

(e)   on its sixth claim, awarding Netherby its legal fees, costs, expenses and disbursements;

(f)   on all causes of action, awarding Netherby pre-judgment interest;

(g)   awarding Netherby its costs and disbursements of this action; and

(h)   granting Netherby such other and further relief as this Court deems just and proper.

CHADBOURNE & PARKE LLP

By _____

Thomas J. Hall (TH-3398)
A Member of the Firm
Attorneys for Plaintiff Netherby Limited
30 Rockefeller Plaza
New York, New York  10112
(212) 408-5100

18