## ACQUISITION AGREEMENT

Agreement dated as of December 23, 1988 between G.V. Gitano, Inc., a Delaware corporation ("Buyer") having an office at 501 Silverside Road, Suite No. 22, Wilmington, Delaware 19809, and Murjani Worldwide B.V., a Netherlands corporation ("Seller") having an office at Coolsingel 101, 7th Floor, 3012 AG Rotterdam, Netherlands.

Seller has adopted, used and, through its licensees, is using in its business certain marks in the United States, Canada and certain other countries, and has granted certain rights and licenses to use such marks.

The parties desire to provide for Seller's sale to Buyer of all right, title and interest of Seller (and, to the extent Mellon Bank, N.A. ("Mellon") has any right, title or interest, Mellon) in and to such marks in such territory, and in and to such licenses, on the terms and conditions of this Agreement.

The parties hereby agree as follows:

1.  Definitions.

As used in this Agreement, the following terms have the meanings specified or referred to in this Section 1.

"Additional Contingent Payment" -- See Section 2.2(c).

"Additional Royalty Income," with respect to designated products, means all payments (including advances) received from any non-Affiliate of Buyer by Buyer (or any Affiliate thereof) that are paid for use of the Marks in connection with such products in the Additional Territory; provided, however, that (a) payments received by Buyer (or any Affiliate thereof) for services actually rendered by Buyer or its Affiliates (in amounts reasonably related to such services), and (b) Pre-Closing Payments of the type referred to in Section 2.4(b)(i) shall not fall within this definition.

"Additional Sales," effected during any period, with respect to designated products, means an amount equal to the sum of (a) the gross amounts received by Buyer during such period for all such products sold, at wholesale, under any of the Marks, by Buyer (or any Affiliate of Buyer) to any non-Affiliate of Buyer, plus (b) the wholesale prices then in effect for all such products sold by Buyer under any of the Marks during such period through retail outlets controlled by Buyer

or any Affiliate thereof, less, in the case of each of clauses (a) and (b), the total of the following: (i) cash and trade discounts, (ii) credits, returns, refunds, allowances and bad debts (actually incurred), (iii) freight and insurance charges, (iv) any sales, use, excise or similar taxes, and (v) advertising allowances.

"Additional Territory" -- Brazil, Australia and New Zealand.

"Affiliate" of any Person means any other Person that, directly or indirectly, controls or is controlled by that Person, or is under common control with that Person. "Control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Business Day" -- Any day that is not a Saturday or Sunday or a day on which banks located in the City of New York are authorized or required to be closed.

"Buyer" -- See the first paragraph of this Agreement.

"Canadian Contingent Payment" -- See Section 2.2(b).

"Canadian Licenses" --  See Section 7.7(a).

"Canadian Royalty Income," with respect to designated products, means all payments (including advances) received from any non-Affiliate of Buyer by Buyer (or any Affiliate thereof) that are paid for use of the Marks in connection with such products in Canada; provided, however, that (a) payments received by Buyer (or any Affiliate thereof) for services actually rendered by Buyer or its Affiliates (in amounts reasonably related to such services), and (b) Pre-Closing Payments of the type referred to in Section 2.4(b)(i) shall not fall within this definition.

"Canadian Sales," effected during any period, with respect to designated products, means an amount equal to the sum of (a) the gross amounts received by Buyer during such period for all such products sold at wholesale under any of the Marks, by Buyer (or any Affiliate of Buyer) to any non-Affiliate of Buyer, plus (b) the wholesale prices then in effect for all such products sold by Buyer under any of the Marks during such period through retail outlets controlled by Buyer or any Affiliate thereof, less, in the case of each of clauses (a) and (b), the total of the following: (i) cash and trade discounts, (ii) credits, returns, refunds, allowances and bad

debts (actually incurred), (iii) freight and insurance charges, (iv) any sales, use, excise or similar taxes, and (v) advertising allowances.

"Certified Statement" -- a full and accurate statement, certified correct by the principal financial officer of the party delivering such statement, in such reasonable detail as the party to whom such statement is delivered may request.

"Closing" -- See Section 4.1.

"Closing Date" -- The date and time of the Closing.

"Contemplated Transactions" -- The sale by Seller to Buyer, and the purchase by Buyer from Seller, pursuant to this Agreement, of all right, title and interest in and to the Marks in accordance with the terms of this Agreement, and all right, title and interest in and to the Licenses, and the performance of and compliance with all agreements contained in this Agreement.

"Contingent Payment" -- See Section 2.2(c).

"Cosmair" -- Cosmair, Inc.

"Cosmair Amendment" -- See Section 10.3.

"Cosmair Items" -- men's and women's fragrances and scents, cosmetic preparations, personal hygiene products, toiletries, hair products and treatment products, including, without limitation, those products listed on Exhibit A hereto.

"Cosmair License" -- License Agreement dated as of May 31, 1985 between Seller and Cosmair.

"Damages" -- See Section 13.2.

"Disclosure Letter" -- A letter dated the date of this Agreement, executed by Seller, addressed and delivered to Buyer and containing information required by this Agreement. All statements in the Disclosure Letter shall constitute representations and warranties contained in this Agreement.

"Encumbrance" -- Any security interest, mortgage, lien, charge, adverse claim or restriction of any kind, including, without limitation, any restriction on the use, transfer, receipt of income or other exercise of any attributes of ownership.

"First Payment Period" -- the period commencing on the Payment Commencement Date and terminating on the First Termination Date.

"First Termination Date" -- the eighth anniversary of the date on which Buyer first ships to its customers in the US Territory commercial quantities of Gitano Products.

"Gitano Products" -- jeanswear (in all fabrications), sportswear, bodywear, outerwear, dresses, woven shirts and blouses, activewear, sweaters and sweat suits, separates, related separates, coordinates, weekend wear, knitwear and knit tops, for men, women and children of all ages.

"Governmental Body" -- Any domestic or foreign national, state or municipal or other local government or multinational body (including, without limitation, the European Economic Community), any subdivision, agency, commission or authority thereof, or any quasi-governmental or private body exercising any regulatory or taxing authority thereunder.

"Instruments of Assumption" -- Such duly executed instruments in forms reasonably satisfactory to Seller and its counsel, as are necessary or appropriate to effect the assumption by Buyer of the liabilities to be assumed by Buyer under the Licenses pursuant to this Agreement.

"Instruments of Transfer" -- Such duly executed assignments and other instruments of conveyance and transfer, in forms reasonably satisfactory to Buyer and its counsel, as are necessary or appropriate to vest in Buyer all right, title and interest in and to the Marks and the Licenses in accordance with Sections 7.6 and 7.7, respectively.

"Licenses" -- The US Licenses, the Canadian Licenses, the Additional Licenses and the Cosmair License.

"Marks" -- (a) the name "Gloria Vanderbilt" both in stylized signature form and all other manner of representation, (b) the initials "GV" both in stylized signature form and all other manner of representation, (c) all registrations of Seller or its Affiliates (or Mellon) for (and applications of such Persons for registration of) representations of swan designs, and all representations of swan designs used at any time by Seller or its Affiliates or their respective licensees, (d) the stylized signature of Gloria Vanderbilt in a rectangular box, (e) any and all variations of any of the foregoing, including, without limitation, "Vanderbilt," "Gloria" and any other manner of representation to the extent that Seller or its Affiliates or their respective licensees have or subsequently obtain a right thereto, (f) any other mark associated with Gloria Vanderbilt, (g) all logos and distinctive configurations used in connection with any of the foregoing, (h) any copyright (common law or statutory) bearing any of the Marks, and (i) all registrations for and applications for registration of any of the foregoing (including, without limitation, the Mark (as defined

in the Netherby Agreement) and all of the Marks set forth in Section 7.6A-7.6E of the Disclosure Letter).

"Mellon" -- See the first paragraph of this Agreement.

"Netherby Agreement" -- Agreement dated as of April 1, 1980 between Netherby Ltd. and Gloria Vanderbilt Cooper.

"Non-US Payment Period," with respect to Canada, Brazil, Australia or New Zealand, as the case may be, means the period commencing on the Closing Date and terminating on the tenth anniversary of the date on which Buyer or any of its Affiliates first ships to its customers in such country commercial quantities of Gitano Products.

"Payment Commencement Date" -- See Section 3.1(a).

"Person" -- Any individual, corporation, partnership, joint venture, trust, association, unincorporated organization, other entity, or Governmental Body.

"Pre-Closing Payments" -- See Section 2.4(b).

"Primary Marks" -- (a) the name "Gloria Vanderbilt" both in stylized signature form and all other manner of representation (including all registrations for and applications for registration of any of the foregoing), and (b) the representation of the floating swan design (United States Registration No. 1,371,374 and Canadian Application No. 532,115) as set forth in Section 7.6A and 7.6C of the Disclosure Letter.

"Relevant Percentage" -- 5%, except that, in the case of products currently sold under the Marks pursuant to an exclusive License, a percentage equal to the average percentage royalty paid by the licensee under such License during the last 12 month period of such License, but only as to the dollar amount of such net sales equal to the net sales of such licensee during such 12 month period, and 5% as to net sales, if any, in excess thereof.

"Relevant Products" --

(a)  All wearing apparel and accessories for men, women and children of all ages, as categorized as of April 1, 1980 by The Standard Industrial Classification Manual (Executive Office of the President, Office of Management and Budget) in Industry Nos. 2251, 2252, 2253 and 2254 of Major Group 22; Major Group 23 with the exception of Industry Nos. 2391, 2392, 2393, 2394, 2395, 2396, 2397 and 2399; Group No. 302 of Major Group 30; Group No. 314, 315, 317 of Major Group 31; Group No.

387 (provided that such items in Group No. 387 retail for an amount equal to or less than $200, multiplied by one plus the percentage of increase of the Consumer Price Index from August 1, 1978 to the relevant date (the "CPI Adjustment")) of Major Group 38; and Industry No. 3911, 3961 (provided that such items in Industry Nos. 3911 and 3961 retail for an amount equal to or less than $200 plus the CPI Adjustment) and 3963 of Major Group 39 (which categories are attached hereto as Exhibit B), including, without limitation, those products within the categories set forth on Exhibit C, as well as any other items, now or hereafter known, that, if they had been classified today would have been classified in any of the categories referred to in this paragraph (a); and

(b) the following items:

(i)  cosmetics and health and beauty aids, which shall mean all products that are used externally for, or relate to, the care and beautifying of the human body and hair.  Such products shall include, without limitation, body and face powder, bath salts, colognes, concentrated perfumes, natural and synthetic perfumes, creams, lotions and oils, hair products (other than those that do not contain or include any fragrance of any kind), lipsticks, eye liners and shadows, mascara, face foundation, manicure preparations, rouge, sachet, toothpastes and powders, and all other Cosmair Items (if any).  The sole exclusion from this definition of cosmetics are health items for internal consumption.

(ii)  Denims and jean fabrics for use in Relevant Products;

(iii)  Aprons;

(iv)  Emblems made of fabric to be applied to apparel;

(v)  Hand crocheted hats;

(vi)  Hand woven apparel;

(vii)  Plastic heels, boot and shoe;

(viii)  Umbrellas and all parts thereof, other than beach and patio umbrellas;

(ix)  Cigar and cigarette holders;

(x)  Barrettes and decorative hair combs;

-6-

      (xi)  Lighters - cigar and cigarette;

      (xii)  Beaded novelties and beads unassembled;

      (xiii)  Hair wigs and artificial curls;

      (xiv)  Matches and match books;

      (xv)  Shoe patterns; and

      (xvi)  Straw goods as apparel or accessories; and

      (c)  all other products of any kind or description, to the extent that Seller has or may subsequently obtain any right (fixed, reversionary, contingent or otherwise) to use any of the Marks in connection therewith.

"Royalty Income" -- US Royalty Income, Canadian Royalty Income and Additional Royalty Income.

"Sales" -- US Sales, Canadian Sales and Additional Sales.

"Second Payment Period" -- the period commencing on the later of the Payment Commencement Date and the First Termination Date, and terminating on September 30, 1997.

"Seller" -- See the first paragraph of this Agreement.

"Territory" -- The US Territory, Canada, and the Additional Territory.

"US Contingent Payment" -- See Section 2.2(a).

"US Licenses" -- See Section 7.7(a).

"US Royalty Income," with respect to designated products, means all payments (including advances) received from any non-Affiliate of Buyer by Buyer (or any Affiliate thereof) that are paid for use of the Marks in connection with such products in the US Territory; provided, however, that (a) payments received by Buyer (or any Affiliate thereof) for services actually rendered by Buyer or its Affiliates (in amounts reasonably related to such services), and (b) Pre-Closing Payments of the type referred to in Section 2.4(b)(i) shall not fall within this definition.

"US Sales," effected during any period, with respect to designated products, means an amount equal to the sum of (a)

the gross amounts received by Buyer during such period for all such products sold at wholesale under any of the Marks, by Buyer (or any Affiliate of Buyer) to any non-Affiliate of Buyer, plus (b) the wholesale prices then in effect for all such products sold by Buyer under any of the Marks during such period through retail outlets controlled by Buyer or any Affiliate thereof, less, in the case of each of clauses (a) and (b), the total of the following: (i) cash and trade discounts, (ii) credits, returns, refunds, allowances and bad debts (actually incurred), (iii) freight and insurance charges, (iv) any sales, use, excise or similar taxes, and (v) advertising allowances.

"US Territory" -- The United States of America and its possessions, territories and associated commonwealths (including Puerto Rico, the Virgin Islands and Guam).

2.  The Acquisition.

2.1  Purchase and Sale.  Subject to the terms and conditions of this Agreement, at the Closing to be held as provided in Section 4, Seller shall sell, assign and transfer (or cause to be sold, assigned and transferred) to Buyer, and Buyer shall purchase from Seller,

(a) for the aggregate purchase price set forth in Section 2.2(a) (the "US Purchase Price"), (i) all right, title and interest of Seller (and Mellon) in and to the Marks for use in the US Territory in connection with Relevant Products, together with the goodwill of the business connected with such use of the Marks or represented thereby, (ii) all of Seller's right, title and interest in and to the US Licenses, and (iii) all right, title and interest of Seller in and to the Cosmair License with respect to the Territory.

(b) for the aggregate purchase price set forth in Section 2.2(b) (the "Canadian Purchase Price"), all right, title and interest of Seller (and Mellon) in and to the Marks for use in Canada in connection with Relevant Products, together with the goodwill of the business connected with such use of the Marks or represented thereby, and (ii) all of Seller's right, title and interest in and to the Canadian Licenses.

(c) for the aggregate purchase price set forth in Section 2.2(c) (the "Additional Purchase Price"), all right, title and interest in and to the Marks for use in the Additional Territory in connection with Relevant Products, together with the goodwill of the business connected with such use of the Marks or represented thereby.  The Additional Purchase Price is also being paid for the rights granted by Seller to Buyer pursuant to Section 11.

-8-

2.2   <u>Purchase Price</u>.

(a)   The US Purchase Price shall be (i) $12 million, which shall be paid by Buyer to Seller at the Closing in the manner provided in Section 4.3(a), plus (ii) such additional amounts, if any, as shall be payable by Buyer to Seller pursuant to Section 3.1 (the "US Contingent Payments"), <u>less</u> (iii) the aggregate amount that Buyer is entitled to deduct herefrom pursuant to Section 2.4(c).

(b)   The Canadian Purchase Price shall be (i) $2 million, which shall be paid by Buyer to Seller at the Closing in the manner provided in Section 4.3(a), plus (ii) such additional amounts, if any, as shall be payable by Buyer to Seller pursuant to Section 3.2 (the "Canadian Contingent Payments").

(c)   The Additional Purchase Price shall be (i) $1 million, which shall be paid by Buyer to Seller at the Closing in the manner provided in Section 4.3(a), plus (ii) such additional amounts, if any, as shall be payable by Buyer to Seller pursuant to Section 3.3 (the "Additional Contingent Payments," and together with the US Contingent Payments and the Canadian Contingent Payments, the "Contingent Payments").

2.3   <u>Liabilities Assumed</u>.

(a)   As additional consideration hereunder, subject to the terms and the conditions of this Agreement, at the Closing to be held as provided in Section 4, Buyer shall assume all of Seller's obligations arising after the Closing Date (excluding any liabilities or other obligations, contingent or otherwise, known or unknown, arising from or in connection with any breaches or defaults by Seller or with respect to any condition, state of facts or event existing at or prior to the Closing Date) under the Licenses (other than the Cosmair License) and, with respect to the Territory, the Cosmair License. Seller agrees to punctually perform or pay when due all of the liabilities or other obligations of Seller under the Licenses not assumed by Buyer.  If Seller shall fail to pay or perform any of such obligations, Buyer shall have the right, without prejudice to any other right or remedy Buyer may have under this Agreement (including Buyer's right to indemnification from Seller for Damages arising in connection herewith), to pay or perform such obligations on Seller's behalf.

(b)   Except as expressly provided in Section 2.3(a), Buyer shall have no obligation to assume, and shall not assume, any liabilities or obligations of Seller of any kind or nature whatsoever, whether now existing or asserted after the date hereof, or otherwise.

2.4   Royalty Adjustments as of December 31, 1988.

(a)  Within three Business Days following the Closing
Date, Seller shall give notice, in form and substance reason-
ably satisfactory to Buyer, to the licensees under each of the
Licenses (other than the Cosmair License), disclosing Seller's
assignment to Buyer as of the Closing Date of all of Seller's
right, title and interest in and to such Licenses and directing
such licensees to pay to Buyer all royalties and other payments
required to be paid under such Licenses by such licensees.

(b)  On and after the Closing Date, Seller shall pay
over to Buyer in accordance herewith (i) all amounts advanced
to Seller by the licensees under the Licenses, which amounts
are refundable to such licensees upon termination or expiration
of such Licenses, (ii) Buyer's pro-rata portion of all royal-
ties or other similar payments (including minimum royalty pay-
ments) received by Seller from the licensees under the Licenses
in respect of any period terminating after (and commencing on
or prior to) December 31, 1988, and (iii) all royalties or
other similar payments (including minimum royalty payments)-
received by Seller from the licensees under the Licenses in
respect of any period commencing after December 31, 1988; and
all such advances, royalties and similar payments (or Buyer's
pro-rata portion thereof) to be paid over to Buyer by Seller in
accordance herewith (the "Pre-Closing Payments") shall be
deemed to be held by Seller in trust for the benefit of Buyer
until so paid.  For the purposes hereof, Buyer's pro-rata por-
tion of any payment received in respect of any period shall
equal the aggregate amount of such payment, multiplied by a
fraction, the numerator of which shall equal the number of days
during such period on or after December 31, 1988, and the de-
nominator of which shall equal the total number of days during
such period.

(c)  The aggregate amount of all Pre-Closing Payments
referred to in Section 2.4(b)(i) heretofore received by Seller
(as set forth in Schedule 7.8 of the Disclosure Letter) shall
be deducted by Buyer in accordance with Section 2.2(a) from the
US Purchase Price that would otherwise be payable pursuant to
Section 4.3(a).  On or prior to January 10, 1989, and promptly
thereafter upon receipt by Seller of additional Pre-Closing
Payments, Seller shall deliver to Buyer a Certified Statement
setting forth any and all Pre-Closing Payments theretofore
received by Seller (and not previously paid to Buyer), together
with payment in full thereof.

(d)  On or prior to January 31, 1989, and promptly
thereafter upon receipt by Buyer of royalties or other similar
payments (including minimum royalty payments) in respect of any
period commencing prior to December 31, 1988, Buyer shall de-
liver to Seller a Certified Statement setting forth Seller's

-10-

pro-rata portion of all such payments theretofore received by Buyer (and not previously paid to Seller), together with payment in full in the amount of Seller's pro-rata portion thereof.  For the purposes hereof, Seller's pro-rata portion of any such payment received in respect of any such period shall equal the aggregate amount of such payment, multiplied by a fraction, the numerator of which shall equal the number of days during such period prior to December 31, 1988 and the denominator of which shall equal the total number of days during such period.

    2.5  <u>Advertising and Promotional Materials</u>.  The rights to be transferred to Buyer at the Closing shall include all of Seller's right, title and interest in and to all advertising or promotional materials used by Seller at any time prior to the Closing (and Seller shall deliver such materials to Buyer at the Closing in accordance with Section 4.2(c)); provided, however, that Seller makes no representation or warranty to Buyer that Seller has any right, title or interest in or to such materials.

3.  <u>Contingent Payments</u>.

    3.1  <u>US Contingent Payments</u>.

    (a)  No US Contingent Payment shall be payable on or prior to the date, if any (the "Payment Commencement Date"), on which 80% of the sum of (i) 100% of all US Royalty Income received by Buyer (or any Affiliate thereof) during the period following the Closing Date and terminating on the Payment Commencement Date with respect to Relevant Products (other than Gitano Products), <u>plus</u> (ii) 50% of all US Royalty Income received by Buyer (or any Affiliate thereof) during such period with respect to Gitano Products, <u>plus</u> (iii) 2-1/2% of all US Sales of Gitano Products effected by Buyer (or any Affiliate thereof) during such period, <u>plus</u> (iv) the Relevant Percentage of all US Sales of Relevant Products (other than Gitano Products) effected by Buyer (or any Affiliate thereof) during such period, reaches $12 million.  Buyer shall give notice to Seller of the Payment Commencement Date as soon as practicable thereafter.

    (b)  If the Payment Commencement Date occurs prior to the First Termination Date, Buyer shall pay to Seller a US Contingent Payment equal to one-half of the sum of (i) 100% of all US Royalty Income received by Buyer (or any Affiliate thereof) during the First Payment Period with respect to Relevant Products (other than Gitano Products), <u>plus</u> (ii) 50% of all US Royalty Income received by Buyer (or any Affiliate thereof) during the First Payment Period with respect to Gitano Products, <u>plus</u> (iii) 2-1/2% of all US Sales of Gitano Products effected by Buyer (or any Affiliate thereof) during the First

Payment Period, plus (iv) the Relevant Percentage of all US
Sales of Relevant Products (other than Gitano Products)
effected by Buyer (or any Affiliate thereof) during the First
Payment Period.

(c)  If the Payment Commencement Date occurs prior to
September 30, 1997, Buyer shall pay to Seller a US Contingent
Payment equal to one-half of the sum of (i) 100% of all US
Royalty Income received by Buyer (or any Affiliate thereof)
during the Second Payment Period with respect to Relevant Prod-
ucts (other than Gitano Products), plus (ii) the Relevant Per-
centage of the US Sales of Relevant Products (other than Gitano
Products) effected by Buyer (or any Affiliate thereof) during
the First Payment Period.

3.2  Canadian Contingent Payments.  Buyer shall pay
to Seller a Canadian Contingent Payment equal to one-half of
the sum of (i) 100% of all Canadian Royalty Income received by
Buyer (or any Affiliate thereof) with respect to Relevant Prod-
ucts (other than Gitano Products), plus (ii) 50% of all Cana-
dian Royalty Income received by Buyer (or any Affiliate
thereof) with respect to Gitano Products, plus (iii) 5% of all
Canadian Sales of Gitano Products effected by Buyer (or any
Affiliate thereof), plus (iv) the Relevant Percentage of all
Canadian Sales of Relevant Products (other than Gitano Prod-
ucts) effected by Buyer (or any Affiliate thereof); provided,
however, that no Canadian Contingent Payments shall be payable
with respect to Canadian Royalty Income or Canadian Sales after
termination of the Non-US Payment Period with respect to
Canada.

3.3  Additional Contingent Payment.  Buyer shall pay
to Seller an Additional Contingent Payment equal to one-half of
the sum of (i) 100% of all Additional Royalty Income received
by Buyer (or any Affiliate thereof) with respect to Relevant
Products (other than Gitano Products), plus (ii) 50% of all
Additional Royalty Income received by Buyer (or any Affiliate
thereof) with respect to Gitano Products, plus (iii) 2-1/2% of
all Additional Sales of Gitano Products effected by Buyer (or
any Affiliate thereof), plus (iv) the Relevant Percentage of
all Additional Sales of Relevant Products (other than Gitano
Products) effected by Buyer (or any Affiliate thereof); pro-
vided, however, that no Additional Contingent Payments shall be
payable with respect to Royalty Income or Sales relating to any
country after termination of the Non-US Payment Period with
respect to such country.

3.4  Default by US Licensees.  If the licensees under
the US Licenses, for any reason other than a default by Buyer
thereunder, shall fail to pay royalties (including minimum
royalty payments) in respect of 1989, 1990 and 1991 in the
aggregate amount of $5,100,000 (i.e., the minimum amount of
royalties required to be paid, in the aggregate, by such li-

censees pursuant to the US Licenses in respect of such years),
then, notwithstanding anything contained in this Section 3,
Buyer shall have the right, at any time or from time to time
after December 31, 1991, to deduct the amount of such defi-
ciency from any US Contingent Payments due to be paid to Seller
pursuant to this Section 3 in the order in which such US Con-
tingent Payments become due.

3.5  Additional Right of Setoff.  Notwithstanding
anything contained in this Section 3, Buyer shall have the
right, without prejudice to any other right or remedy Buyer may
have under this Agreement, to deduct, from any Contingent Pay-
ments due to be paid to Seller pursuant to this Section 3 in
the order in which such Contingent Payments become due, the
amount of any Damages arising from or in connection with any of
the matters set forth in clauses (a), (b), (c), (d) or (e) of
Section 13.2, or any suit, action or claim alleging any of the
matters set forth in such clauses.

3.6  Statements.  Within 90 days after the end of
each calendar quarter following the Closing Date, Buyer shall
deliver to Seller a Certified Statement showing separately (a)
the US Royalty Income, the Canadian Royalty Income and the
Additional Royalty Income received by Buyer (or any Affiliate
thereof) during such quarter with respect to Gitano Products,
(b) the US Royalty Income, the Canadian Royalty Income and the
Additional Royalty Income received by Buyer (or any Affiliate
thereof) during such quarter with respect to Relevant Products
(other than Gitano Products), (c) the US Sales, the Canadian
Sales and the Additional Sales of Gitano Products effected by
Buyer (or any Affiliate thereof) during such quarter, (d) the
US Sales, the Canadian Sales and the Additional Sales of Rele-
vant Products (other than Gitano Products) effected by Buyer
(or any Affiliate thereof) during such quarter, and (e) the US
Contingent Payment, the Canadian Contingent Payment and the
Additional Contingent Payment due to Seller, if any, pursuant
to this Section 3 in respect of such quarter.

3.7  Payments.  Buyer shall pay all Contingent Pay-
ments due to Seller as shown on each statement delivered to
Seller pursuant to Section 3.6, on or prior to the date on
which such statement is due, in the manner hereinafter pro-
vided.  All payments and calculations required to be made pur-
suant to this Agreement shall be made in United States Dollars,
and all such payments shall be made to such location as Seller
shall reasonably request.  If any Sale or Royalty Income is
effected or paid in a foreign currency, such amount shall be
converted to United States Dollars at the buying sight rate for
dollars at any first class bank in the country in which such
Sale or Royalty Income was so effected or paid, on the last
Business Day of the period for which the Contingent Payment is
to be calculated.

-13-

3.8  Withholding.  Buyer shall have the right to deduct, from any Contingent Payment otherwise required to be paid to Seller pursuant to this Section 3, the amount of any and all withholding taxes for which Seller may be liable on such Contingent Payment, and to pay for Seller all such taxes, unless Seller provides to Buyer evidence satisfactory to Buyer that Seller is exempt from such withholding taxes.

3.9  Inspection.  To verify the accuracy of statements delivered by Buyer to Seller pursuant to Section 3.6, Buyer shall, upon not less than three Business Days prior notice from Seller, permit a "big eight" or other nationally recognized firm of certified public accountants designated by Seller to inspect, at any time during reasonable business hours, Buyer's books of account relating to Sales effected, or Royalty Income received, during the four calendar quarters preceding such inspection, provided that such firm shall report to Seller only whether or not such statements are correct and, if incorrect, the nature and amount of such error.  Notwithstanding anything contained herein, (a) Buyer shall have no obligation hereunder to permit any such firm to inspect Buyer's books of account relating to Canadian Royalty Income, Canadian Sales, Additional Royalty Income or Additional Sales more than once during each calendar quarter, and (b) Buyer shall have no obligation hereunder to permit any such firm to inspect Buyer's books of account relating to US Sales or US Royalty Income more than once during any year (or portion thereof) prior to the Payment Commencement Date or more than once during any calendar quarter following the Payment Commencement Date.

4.  The Closing.

4.1  Place and Time.  The closing of the sale and purchase of the Marks and the Licenses pursuant to this Agreement (the "Closing") shall take place at the offices of Kronish, Lieb, Weiner & Hellman, 1345 Avenue of the Americas, New York, New York at 10:00 a.m. (New York City time) on December 23, 1988, or at such other place, date and time as the parties may agree in writing, subject to the following:

(a)  If any of the conditions set forth in Sections 5.1, 5.4, 5.5, 5.6 or 6.1 has not been satisfied on the date on which the Closing would otherwise occur, Buyer may from time to time, by notice to Seller, defer the Closing to a Business Day specified in such notice, but not later than _____, 1989.

(b)  If any of the conditions set forth in Sections 5.1, 5.4 or 6.1 has not been satisfied on the date on which the Closing would otherwise occur, Seller may from time to time, by notice to Buyer, defer the Closing to a Business Day specified in such notice, but not later than _____, 1989.

(c) If both of the preceding Sections 4.1(a) and (b) are applicable, the Closing shall take place on the later of the dates determined in accordance with such Sections.

4.2 <u>Deliveries by Seller</u>. At the Closing, Seller shall deliver (or cause to be delivered) to Buyer, in addition to any other documents, instruments and writings required by this Agreement to be delivered by Seller at the Closing, the following:

(a) The Instruments of Transfer.

(b) An Indemnity dated the Closing Date executed by Mohan Murjani in favor of Buyer in the form of Exhibit 4.2(b).

(c) All advertising and promotional materials that Seller has used at any time prior to the Closing Date to the extent that such materials are currently (or as of the Closing Date will be) in Seller's possession or can be obtained by Seller without expense (provided that, to the extent such materials are not delivered at Closing, they shall be delivered within ten Business Days thereafter).

(d) A counterpart of the Cosmair Amendment executed by Seller.

(e) The documents contemplated by Section 5.

4.3 <u>Deliveries by Buyer</u>. At the Closing, Buyer shall deliver to Seller, in addition to any other documents, instruments and writings required by this Agreement to be delivered by Buyer at the Closing, the following:

(a) Wire transfers of immediately available funds to such of Seller's account numbers and in such amounts as set forth on Exhibit 4.3(a) (the aggregate amount of such wire transfers being equal to (x) $15 million (i.e., the sum of the amounts payable to Seller pursuant to Sections 2.2(a)(i), (b)(i) and (c)(i)), less (y) the aggregate amount that Buyer is entitled to deduct pursuant to Section 2.4(c)).

(b) A guarantee dated the Closing Date executed by The Gitano Group, Inc. in favor of Seller in the form of Exhibit 4.3(b), providing for the guarantee by The Gitano Group, Inc. of the truth of the representations and warranties of Buyer set forth in this Agreement and the due and punctual performance and observance by Buyer of each of the covenants and agreements made by Buyer in, and the punctual payment when due of each of the obligations required to be paid under, this Agreement.

-15-

(c)  The Instruments of Assumption, together with a counterpart of the Cosmair Amendment executed by Buyer.

(d)  The documents contemplated by Section 6.

5.  Conditions to Buyer's Obligations.

The obligations of Buyer to effect the Closing shall be subject to the satisfaction at or prior to the Closing of the following conditions, any one or more of which may be waived by Buyer:

5.1  No Injunction.  There shall not be in effect any injunction, order or decree of a court of competent jurisdiction that prohibits or delays any or all of the Contemplated Transactions, or that will require any divestiture as a result of any or all of the Contemplated Transactions or that will require all or any part of the business of Buyer to be held separate.

5.2  Representations, Warranties and Agreements.  (a) The representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at such time, (b) Seller shall have performed and complied in all material respects with the agreements contained in this Agreement required to be performed and complied with by it prior to or at the Closing, and (c) Buyer shall have received a certificate to the effect set forth in clauses (a) and (b) above signed by an authorized representative of Seller.

5.3  Legal Opinions.  Buyer shall have received (a) an opinion from Sonnenschein Carlin Nath & Rosenthal, counsel to Seller, dated the Closing Date and in substantially the form of Exhibit 5.3A, which opinion may rely as to matters of Netherlands law on an opinion dated the Closing Date and addressed to Buyer from Netherlands counsel in substantially the form of Exhibit 5.3B, and (b) an opinion of Liddy Sullivan Galway Begler & Peroff, P.C., special trademark counsel to Seller, dated the Closing Date and in substantially the form of Exhibit 5.3C.

5.4  Litigation.  Except as set forth in Section 5.4 of the Disclosure Letter, no action or proceeding shall have been instituted or, to the best of Seller's knowledge, threatened by or before any Governmental Body, court or other Person and, at what would otherwise have been the Closing Date, remain pending before any court, Governmental Body or other Person or remain threatened to restrain or prohibit or to recover substantial damages in respect of any or all of the Contemplated Transactions or seeking any divestiture or seeking to require that all or any part of the business of Buyer be held separate

-16-

or to revoke or suspend any license, permit, order or approval
by reason of any or all of the Contemplated Transactions; nor
shall any Governmental Body, court or other Person have noti-
fied any party to this Agreement or any of their respective
Affiliates that any or all of the Contemplated Transactions
would constitute a violation of the laws of any jurisdiction or
that it intends to commence an action or proceeding to restrain
or prohibit or to recover substantial damages in respect of any
or all of the Contemplated Transactions or to require such
divestiture, holding separate, revocation or suspension, unless
such Governmental Body, court or other Person shall have with-
drawn such notice and abandoned such action or proceeding.

5.5  Consent and Releases.  Buyer shall have received
from Seller each of the releases and the executed copy of the
Cosmair Amendment referred to in Section 10.3, which shall be
in full force and effect.

5.6  Regulatory Approvals.  All licenses, authoriza-
tions, consents, orders and regulatory approvals of Govern-
mental Bodies necessary in the reasonable good faith judgment
of Buyer for the consummation of the Contemplated Transactions
shall have been obtained on terms satisfactory to Buyer and its
counsel and shall be in full force and effect.

5.7  Compliance Evidence.  Buyer shall have received
such certificates, opinions, documents and information as it
may reasonably request to establish satisfaction of the condi-
tions set forth in this Section 5.

5.8  Proceedings Satisfactory.  All certificates,
opinions and other documents to be delivered by Seller and all
other matters to be accomplished prior to or at the Closing
shall be satisfactory in the reasonable judgment of Buyer and
its counsel.

6.  Conditions to Seller's Obligations.

The obligations of Seller to effect the Closing shall
be subject to the satisfaction at or prior to the Closing of
the following conditions, any one or more of which may be
waived by Seller:

6.1  No Injunction.  There shall not be in effect any
injunction, order or decree of a court of competent jurisdic-
tion that prohibits or delays the sale to Buyer of all of
Seller's right, title and interest in and to the Marks in the
Territory, or in and to the Licenses, pursuant to the terms of
this Agreement.

6.2  Representations, Warranties and Agreements.  (a)
The representations and warranties of Buyer set forth in this

-17-

Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at such time, (b) Buyer shall have performed and complied in all material respects with the agreements contained in this Agreement required to be performed and complied with by it prior to or at the Closing, and (c) Seller shall have received a certificate to the effect set forth in clauses (a) and (b) above signed by the President of Buyer.

6.3  Legal Opinion.  Seller shall have received an opinion from Kronish, Lieb, Weiner & Hellman, counsel to Buyer, dated the Closing Date and in substantially the form of Exhibit 6.3.

7.  Representations and Warranties of Seller.

Seller represents and warrants (both as of the date of this Agreement and as of the Closing Date) to, and agrees with, Buyer as follows:

7.1  Organization of Seller; Authorization.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the Netherlands with full corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  The execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate action (including, without limitation, approval by the Board of Directors and, if necessary, stockholders) of Seller and this Agreement constitutes a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.  At the Closing, Seller shall deliver to Buyer certified copies of the resolutions adopted by its Board of Directors (and, if necessary, stockholders) to authorize the execution, delivery and performance of this Agreement.  Seller has delivered to Buyer copies of Seller's certificate of incorporation and by-laws (or other governing instruments), as currently in effect.

7.2  No Conflict as to Seller.  Neither the execution and delivery of this Agreement nor the consummation of any or all of the Contemplated Transactions will (a) violate any provision of the certificate of incorporation or by-laws (or other governing instrument) of Seller or (b) violate, be in conflict with, or constitute a default (or an event that, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or excuse performance by any Person of any of its obligations under, or cause the acceleration of the maturity of any debt or obligation pursuant to, or result in the creation or imposition of any Encumbrance upon any property or assets of Seller under, any agreement or commitment to which Seller is a party or by which any of its property or assets is bound, or to

-18-

which any of the property or assets of Seller is subject, or (c) violate any statute or law or any judgment, decree, order, regulation or rule of any court, arbitrator or Governmental Body applicable to Seller.

7.3  <u>Consents and Approvals of Governmental Authorities</u>.  Except for such filings of the Instruments of Transfer with the United States Patent and Trademark Office and the Canadian Trade Marks Office and other appropriate Governmental Bodies in the Territory as shall be necessary to record the sale of the Marks by Seller to Buyer hereunder, no consent, approval or authorization of, or declaration, filing or registration with, any Governmental Body is required in connection with the execution, delivery and performance of this Agreement or the consummation of any or all of the Contemplated Transactions.

7.4  <u>Other Consents</u>.  Except for the releases and the consent referred to in Section 10.3, no consent of any Person (other than a Governmental Body) is necessary to the execution, delivery and performance of this Agreement or the consummation of any or all of the Contemplated Transactions.

7.5  <u>Litigation</u>.  Except as set forth in Section 7.5 and 7.6F of the Disclosure Letter, there is no action, suit, inquiry, proceeding or investigation by or before any court or Governmental Body pending or, to the best knowledge of Seller, threatened against or involving any of the Marks in the US Territory or Canada or the Licenses or which questions or challenges the validity of this Agreement or any action taken or to be taken by Seller pursuant to this Agreement or in connection with the Contemplated Transactions, nor is there any valid basis for any such action, proceeding or investigation.  Seller is not in default under or in violation of any agreement, commitment or restriction, to which Seller is a party or by which it or its assets is bound, that might adversely affect any action taken or to be taken by Seller pursuant to this Agreement or in connection with any or all of the Contemplated Transactions.

7.6  <u>Ownership of the Marks</u>.

(a)  Section 7.6A of the Disclosure Letter contains a true and complete list of all registrations of the Marks in the US Territory (and all applications therefor) owned by Seller, Mellon, or any Affiliate of Seller or Mellon, all of which registrations exist, are subsisting and are validly registered except as provided therein.  Section 7.6B of the Disclosure Letter contains a true and complete list of all Marks used, on the date hereof or at any time since January 1, 1987, in the US Territory by Seller or any Affiliate thereof, for which Marks neither registrations have been issued nor applications filed

for registration.   Section 7.6C of the Disclosure Letter contains a true and complete list of all registrations of the Marks in Canada (and applications therefor) owned by Seller, Mellon or any affiliate of Seller or Mellon, all of which registrations exist, are subsisting and are validly registered. Section 7.6D of the Disclosure Letter contains a true and complete list of all Marks, used on the date hereof or at any time since January 1, 1987, or proposed to be used, in Canada by Seller or any Affiliate thereof, for which Marks neither registrations have been issued nor applications filed for registration.   Section 7.6E of the Disclosure Letter contains a true and complete list, to the best of Seller's present knowledge (such list to be supplemented as soon as practicable hereafter, if necessary), of all registrations of the Marks in the Additional Territory (and applications therefor) owned by Seller, Mellon or any Affiliate thereof, which registrations exist, are subsisting and are validly registered except as provided therein.   All of the Marks set forth in Sections 7.6A, 7.6C and 7.6E of the Disclosure Letter, except to the extent otherwise provided therein, are currently in use on the goods set forth in the registrations for, and applications for registration of, such Marks, and have been continuously in use since the dates of use cited therein.

(b)   All of the Marks owned by Mellon (as set forth on Section 7.6A, 7.6C or 7.6E of the Disclosure Letter) are owned by Mellon solely as security for the repayment by Seller of certain indebtedness owed by Seller to Mellon (which indebtedness will be satisfied in full concurrently with the Closing), and Mellon has no other right, title or interest in or to such Marks.   Except as set forth in Section 7.6EE of the Disclosure Letter, to the best of Seller's knowledge, Gloria Vanderbilt Cooper owns all right, title and interest in and to the "Gloria Vanderbilt" trademark for use in the Territory in connection with products other than Relevant Products.

(c)   Notwithstanding anything contained in Section 7.6F of the Disclosure Letter, (i) Seller owns all right, title and interest in and to the Primary Marks for use in the US Territory and Canada in connection with Gitano Products; (ii) Seller has the full and exclusive right, subject to the Licenses, to use and to license the use of the Primary Marks in the US Territory and Canada in connection with Gitano Products; and (iii) the consummation of the Contemplated Transactions will not alter or impair any of the foregoing such rights.   The use by Seller in the US Territory and Canada of the Primary Marks does not infringe on the rights of any Person.   The use by Seller in the Territory of the Marks does not, to Seller's best knowledge, infringe on the rights of any Person.

(d)   Except as provided in Section 7.6F of the Disclosure Letter, no claim has been asserted against Seller or

any Affiliate thereof by any Person to the use of, and Seller has no knowledge of the use by any Person (other than the licensees under the Licenses) of, any of the Marks in the US Territory and Canada in connection with Relevant Products, and there is no valid basis for any such claim with respect to Primary Marks and, to Seller's best knowledge, with respect to other Marks in the US Territory and Canada.

(e)  Each of the Primary Marks is, and immediately after the Closing will be, valid, subsisting and enforceable in the US Territory and Canada in connection with Gitano Products. The delivery of the Instruments of Transfer to Buyer pursuant to Section 4.2, the filing of the Instruments of Transfer with the United States Patent and Trademark Office, the Canadian Trade Marks Office and the appropriate other Governmental Bodies in the Territory, and the release of the liens referred to in Section 10.3 will result in Buyer's immediate acquisition, subject to the Licenses, of (i) all right, title and interest in and to the Primary Marks for use in the Territory in connection with Gitano Products, free and clear of all Encumbrances (other than such Encumbrances as may arise from actions or inactions of Buyer), and (ii) all right, title and interest of Seller and its Affiliates (and Mellon) in and to (A) the Primary Marks for use in the Territory in connection with Relevant Products (other than Gitano Products), and (B) the Marks (other than the Primary Marks) for use in the Territory in connection with Relevant Products, in each case free and clear of all security interests, mortgages, liens or charges (other than those that may arise from actions or inactions of Buyer).

7.7  Licenses.

(a)  Section 7.7A of the Disclosure Letter lists all licenses and other agreements relating to the use of the Marks in the US Territory (other than the Cosmair License, the "US Licenses"), all licenses and other agreements relating to the use of the Marks in Canada (other than the Cosmair License, the "Canadian Licenses") and all licenses and other agreements relating to the use of the Marks in the Additional Territory (other than the Cosmair License, the "Additional Licenses"). All of the Licenses are valid and in full force and effect; except as set forth in Section 7.7A of the Disclosure Letter, there are no existing defaults (or events that, with notice or lapse of time or both, would constitute a default) by Seller or any other party, thereunder; and copies thereof have been (and within ten Business Days after the Closing Date, to the best of Seller's ability, original copies thereof will be) delivered to Buyer. No claim has been asserted by any Person challenging or questioning the validity or effectiveness of any of the Licenses and there is no valid basis for any such claim. Seller has not, other than pursuant to the Licenses, licensed or authorized any other Person to use the Marks in the Territory, or

granted to any other Person any other right with respect
thereto.  No agreement to which Seller is a party or by which
its assets are bound (other than the Licenses and the Agreement
dated June ___, 1981 between Murjani International Ltd. and
Springfoot, Inc.) restricts or in any way affects the Marks or
the right to use the Marks in the Territory.  The delivery of
the Instruments of Transfer to Buyer pursuant to Section 4.2
will result in Buyer's immediate acquisition of all right,
title and interest of Seller in and to the Licenses (other than
the Cosmair License) and, with respect to the Territory, the
Cosmair License, free and clear of all Encumbrances other than
such Encumbrances as may arise from actions or inactions of
Buyer.

    (b)  Seller has examined, monitored or otherwise
policed the activities of all of the licensees (including
Cosmair) under the Licenses, to verify that the products manu-
factured, sold or offered for sale under the Marks by such
licensees meet the quality control standards set forth in such
licenses and all other such standards promulgated by Seller.

    7.8  Financial Information.  Section 7.8 of the Dis-
closure Letter sets forth, for each of 1985, 1986, 1987 and
1988 (through the date of this Agreement), (a) the aggregate
amount expended by Seller, its Affiliates and the licensees
under the Licenses to advertise or otherwise promote the Marks
in the Territory, (b) the aggregate amount of royalties or
other similar payments (including minimum royalty payments)
received by Seller pursuant to the Licenses, and (c) the aggre-
gate amount (in United States Dollars) of sales made by each of
Seller, and each licensee under the Licenses, of products sold
in the Territory under any of the Marks.  Section 7.8 of the
Disclosure Letter also sets forth (i) any and all Pre-Closing
Payments referred to in Section 2.4(b)(i) received by Buyer on
or prior to the date hereof, and (ii) the minimum amount of
royalties required to be paid by each of the licensees under
the Licenses pursuant to the terms thereof in respect of sales
of products made during 1989, 1990 and 1991.

    7.9  Tax Status.  Seller has no permanent establish-
ment in the United States within the meaning of the Income Tax
Treaty between the Netherlands and the United States.  Accord-
ingly, all payments to Seller pursuant to Sections 3 and 4.3(a)
will constitute income not effectively connected with a perma-
nent establishment of Seller within the United States, and will
therefor be exempt from United States taxation under such
Treaty.  Seller has delivered to Buyer the appropriate state-
ment on IRS Form 1001 stating that Buyer is exempt from tax
pursuant to such Treaty as required by Treas. Reg. Sec.
1.441-6(c).

-22-

7.10 <u>Canadian Licensees</u>.  To Seller's best knowledge, the licensees under the Canadian Licenses have not sold products bearing the Marks in the United States pursuant to the Canadian Licenses.

7.11 <u>No Brokers or Finders</u>.  Neither Seller, nor any of its officers, directors or employees, has employed any broker or finder or, directly or indirectly, incurred any liability for any brokerage or finder's fees or commissions or similar payments in connection with any of the Contemplated Transactions.

7.12 <u>Disclosure</u>.  No representations or warranties by Seller in this Agreement and no statement contained in any document, certificate or other writing furnished or to be furnished to Buyer or any of its representatives pursuant to the provisions hereof or in connection with the Contemplated Transactions, contains or will contain any untrue statement of material fact or omits or will omit to state any material fact necessary, in light of the circumstances under which it was made, in order to make the statements herein or therein not misleading.  Documents delivered or to be delivered to Buyer pursuant to this Agreement are or will be true and complete copies of what they purport to be.  There is no fact known to the officers, directors or salaried exempt employees of Seller and not previously disclosed to Buyer in writing that may affect or does affect in a materially adverse manner Buyer's ability to use the Marks in the Territory.

8. <u>Representations and Warranties of Buyer</u>.

Buyer represents and warrants (both as of the date of this Agreement and as of the Closing Date) to, and agrees with, Seller as follows:

8.1 <u>Organization of Buyer; Authorization</u>.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of Delaware, with full corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  The execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate action (including, without limitation, approval by the Board of Directors) of Buyer and this Agreement constitutes a valid and binding obligation of Buyer, enforceable against it in accordance with its terms.  At the Closing, Buyer shall deliver to Seller certified copies of the resolutions adopted by its Board of Directors to authorize the execution, delivery and performance of this Agreement.

8.2 <u>No Conflict as to Buyer</u>.  Neither the execution and delivery of this Agreement nor the performance of Buyer's obligations hereunder will (a) violate any provision of the

-23-

certificate of incorporation or by-laws of Buyer, (b) violate, be in conflict with, or constitute a default (or an event that, with notice or lapse of time or both, would constitute a default) under any agreement or commitment to which Buyer is party or by which its assets are bound or (c) violate any statute or law or any judgment, decree, order, regulation or rule of any court or Governmental Body applicable to Buyer.

8.3   No Brokers or Finders.   Neither Buyer nor any of its officers, directors or employees, has employed any broker or finder or, directly or indirectly, incurred any liability for any brokerage or finder's fees or commissions or similar payments in connection with any of the Contemplated Transactions.

8.4   Disclosure.   No representations or warranties by Buyer in this Agreement and no statement contained in any document, certificate or other writing furnished or to be furnished to Seller or any of its representatives pursuant to the provisions hereof or in connection with the Contemplated Transactions, contains or will contain any untrue statement of material fact or omits or will omit to state any material fact necessary, in light of the circumstances under which it was made, in order to make the statements herein or therein not misleading.

9.   Publicity; Exclusivity.

9.1   Publicity.   Between the date of this Agreement and the Closing Date, Seller and Buyer shall not issue any press release or otherwise make any public statement or disclosure with respect to the Contemplated Transactions, except as agreed upon by Seller and Buyer.   On or about the Closing Date, the parties shall discuss and coordinate with respect to any public statement or disclosure with respect to the Contemplated Transactions.   Notwithstanding the foregoing, nothing contained in this Section 9.1 shall prevent any party from making any public statement or disclosure as may be required by law or any listing agreement with a national securities exchange.

9.2   Exclusivity.   Seller shall not solicit, cooperate with, negotiate or communicate with (or permit or suffer any Person acting on its behalf to do so) any other Person with respect to or in furtherance of any proposal for the acquisition (whether by merger or otherwise) of any interest in the Marks in the Territory or the Licenses, except for the Contemplated Transactions.

10.   Obligations Prior to Closing.

10.1   Operation of Seller in Ordinary Course.   Between the date of this Agreement and the Closing Date, (a) Seller

-24-

shall conduct its business connected with the use of the Marks
and the Licenses only in the ordinary course and consistent
with past practice, (b) Seller shall not take any action that
might impair the value of any of the Marks or rights to be
acquired by Buyer hereunder, and (c) Seller shall not license
or otherwise grant to any Person any right or other interest in
or to the Marks.

10.2  Business Organization of Seller.  Between the
date of this Agreement and the Closing Date, Seller shall use
its best efforts to preserve substantially intact the present
business relationships of Seller with the licensees under the
Licenses and the goodwill relating to the business of Seller
connected with the use of the Marks and the Licenses.

10.3  Consent; Releases of Liens.  On or prior to the
Closing Date, (a) Seller shall cause Cosmair to execute and
deliver to each of Buyer and Seller a Partial Assignment and
Amendment in the form of Exhibit 10.3 (the "Cosmair Amend-
ment"), among other things, consenting to the assignment by
Seller to Buyer in accordance herewith of the Cosmair License
with respect to the Territory, and (b) Seller shall obtain from
each of Mellon and BT Commercial Corp. a release of its lien or
other Encumbrance with respect to the Marks, in form satisfac-
tory to Buyer and its counsel, and such consent and releases
shall be in full force and effect as of the Closing Date.

10.4  Other Actions of Seller.  Between the date of
this Agreement and the Closing Date, Seller shall not take or
omit to take any action the result of which would be the fail-
ure to satisfy any condition specified in Section 5.

11.  Right of First Refusal.

11.1  General.  Seller shall not (and shall cause its
Affiliates not to) at any time after the date hereof, except as
provided in this Section 11,

(a) grant to any Person a license or other right to
use any of the Marks in West Germany, the United Kingdom,
Japan, France or Mexico in connection with jeanswear or
sportswear (a "Relevant License"); or

(b)  transfer to any Person, whether by sale, merger,
gift or otherwise ("Transfer"), the right to use any of
the Marks outside the Territory;

provided, however, that (i) for purposes hereof a license or
other right solely to manufacture products in any country shall
not be deemed to be a Relevant License or a Transfer, and (ii)
(ii) a license of any rights to use the Marks that provides for
the payment of royalties by the licensee throughout its term

and does not transfer title to any of the Marks (including upon default of the licensor), shall not be deemed a Transfer for the purposes hereof, and (iii) Seller may grant to any of its Affiliates a Relevant License, or Transfer to any of its Affiliates the right to use any of the Marks outside the Territory, provided that, in either such case, such Affiliate agrees in writing with Buyer to be bound by the provisions of this Section 11 with the same force and effect as if each reference to Seller herein were deemed to be a reference to such Affiliate.

11.2  Offer.  If, at any time or from time to time after the date hereof, Seller or any Affiliate thereof desires to grant to any Person a Relevant License, or to Transfer to any Person the right to use any of the Marks outside the Territory, Seller shall (or shall cause such Affiliate to) give notice to Buyer (a) setting forth the terms and conditions of the proposed Relevant License or Transfer, including the rights to be granted or transferred, the nature of such grant or Transfer and the consideration to be paid in connection with such grant or Transfer, all in detail reasonably satisfactory to Buyer, and (b) offering to grant to Buyer such Relevant License, or to Transfer to Buyer the right to use such Marks, as the case may be, for the consideration and on the other terms and conditions contemplated by the proposed grant or Transfer (as set forth in such notice).  If any part of the consideration would be payable in a form other than cash, however, Buyer shall have the right to pay the fair market value of such non-cash consideration in cash.  If, within seven Business Days after Buyer receives such notice, Buyer fails to accept such offer or Buyer gives notice to Seller that Buyer does not accept such offer, Seller (or its Affiliate) shall have the right, at any time within 90 days after the giving of the notice referred to above by Seller, to grant to the proposed licensee such Relevant License, or Transfer to the proposed transferee the right to use such Marks outside the Territory, for the consideration and on the other terms and conditions of the proposed grant or Transfer (as set forth in such notice).  If Seller fails to grant such Relevant License or effect such Transfer in accordance therewith within such 90-day period, Seller may not thereafter grant to any Person any such Relevant License, or Transfer to any Person the right to use any of such Marks outside the Territory, without again complying with this Section 11.

11.3  Additional Prior Right.  Before any transfer, in a single transaction or series of transactions, and whether by gift, merger or otherwise, of a majority of the voting securities of Seller or all or substantially all of the assets of Seller, written notice of the proposed transfer and the terms thereof shall be given to Buyer and Buyer shall have an option, exercisable at any time within seven Business Days after receipt of such notice, in addition to any other right of Buyer

-26-

pursuant to this Section 11, to purchase such securities or assets (as the case may be), for the consideration to be received by Seller or the stockholders of Seller (as the case may be) in such transfer, payable at the time or times applicable to such transfer.  If any part of such consideration would be payable in a form other than cash, Buyer shall have the right to pay the fair market value of such non-cash consideration in cash.  The closing of the purchase and sale of securities or assets (as the case may be) pursuant to the exercise of the foregoing option shall be held at the place and on the date and time specified in the notice of exercise of such option, but not less than 30 days nor more than 90 days after the date on which such notice is given, except that if any governmental permits are required for such closing, the closing shall not take place until such permits have been obtained.

12.   Post-Closing Matters.

        12.1   Infringement Actions.  After the Closing Date, Buyer shall have the right, at its expense, to take any and all legal actions as it may deem necessary or appropriate with respect to any infringements (including past infringements) of the Marks in the Territory, or any administrative proceedings, and shall be entitled to recover for all such infringements or pursuant to all such proceedings.  To the extent that the co-operation of Seller is required to commence or prosecute such legal actions or administrative proceedings, Seller hereby agrees to so cooperate (at the expense of Buyer for all out-of-pocket expenses reasonably incurred by Seller in connection therewith upon receipt of evidence thereof satisfactory to Buyer).  To the extent that the cooperation of Gloria Vanderbilt Cooper, Netherby Ltd. or any Affiliate of Buyer is required in connection with the commencement, prosecution or defense of any legal actions respecting any such infringements, Seller shall use its best efforts to obtain for the benefit of Buyer (at the expense of Buyer for all out-of-pocket expenses reasonably incurred by Seller in connection therewith upon receipt of evidence thereof satisfactory to Buyer) such assistance of any of them as Buyer may reasonably request.

        12.2   Use of Marks.  Seller shall not, directly or indirectly, at any time on or after the Closing Date, use or license or permit or encourage or aid in the use of any of the Marks in the Territory (except solely in connection with the manufacture of products) in any manner whatsoever; provided, however, that, during the six-month period commencing on the Closing Date, Seller shall have the right to sell under the Marks in the Territory, through such channels of distribution consistent with Seller's past practice in the ordinary course of its business, not more than $2 million of its inventory (including goods in transit) as of the date hereof.  Seller shall use its best efforts in connection with any such sale of

-27-

inventory not to damage the prestige of the Marks or the good-
will pertaining thereto.  Consistent with antitrust and other
appropriate laws, at all times on and after the Closing Date,
(a) Seller shall (and shall cause each of its Affiliates to)
use its best efforts to restrict the customers of it and its
licensees from reselling Relevant Products bearing any of the
Marks to other Persons in the Territory, (b) Seller shall not
(and shall cause each of its Affiliates not to) sell or dis-
tribute (or permit its licensees to sell or distribute) any
Relevant Product bearing any of the Marks to any Person if
Seller (or such Affiliate) knows or should know that such Per-
son will resell or distribute such Relevant Product or cause
such Relevant Product to be resold or distributed in the Terri-
tory, (c) Buyer shall (and shall cause each of its Affiliates
to) use its best efforts to restrict the customers of it and
its licensees from reselling Relevant Products (other than
Cosmair Items) bearing any of the Marks to other Persons out-
side the Territory, and (d) Buyer shall not (and shall cause
each of its Affiliates not to) sell or distribute (or permit
its licensees to sell or distribute) any Relevant Product
(other than Cosmair Items) bearing any of the Marks to any
Person if Buyer (or such Affiliate) knows or should know that
such Person will resell or distribute such Relevant Product or
cause such Relevant Product to be resold or distributed outside
the Territory.

12.3  _Manufacture by Buyer_.  Notwithstanding anything
contained in this Agreement, on and after the Closing Date,
Buyer shall have the right, and may grant to any other Person
the right to manufacture, anywhere in the world, on behalf of
Buyer, its Affiliates or their respective licensees, Relevant
Products, and, upon the request of Buyer, Seller will, at
Buyer's cost, use its best efforts to register the Marks out-
side the Territory for the benefit of Buyer so as to permit
Buyer to manufacture Relevant Products outside the Territory.

12.4  _Impairment_.  On or after the Closing Date,
Seller shall not in any manner represent to anyone that Seller
has any ownership interest in any of the Marks in the Terri-
tory, nor shall Seller, directly or indirectly, at any time
after the date hereof or thereafter, do or cause to be done any
act or thing contesting or in any way impairing or tending to
impair the validity of the Marks or any part of Buyer's exclu-
sive rights thereto.

12.5  _Other Assistance_.  Seller assigns to Buyer, and
agrees upon Buyer's request (at the expense of Buyer for all
out-of-pocket expenses reasonably incurred by Seller in connec-
tion therewith upon receipt of evidence thereof satisfactory to
Seller) to take any and all action necessary to enforce any and
all rights that Netherby Ltd. may have had pursuant to the
Netherby Agreement (to the extent that such rights are now

exercisable by Seller), to protect any of the rights transferred or otherwise granted to Buyer hereunder from interference or violations by Gloria Vanderbilt Cooper. All such action taken by Seller at Buyer's request shall be at Buyer's cost (other than actions taken as a result of any breach of representation or warranty by Seller hereunder). Seller shall, at Buyer's request, use its best efforts to obtain for the benefit of Buyer from Gloria Vanderbilt Cooper, Netherby Ltd. or any Affiliate of Seller, such written consents, approvals and other assistance of Gloria Vanderbilt Cooper, Netherby Ltd. or any Affiliate of Seller as may be required in connection with the registration of any of the Marks in the Territory or, with respect to Cosmair Items, anywhere in the world (including, without limitation, maintaining any such registration, or filing or prosecuting any application for such registration). Buyer shall, upon the request of Seller, execute and deliver all documents as may be reasonably required in connection with the registration and maintenance of the Marks outside the Territory. To the extent that cooperation of Buyer is required to commence or prosecute legal or administrative proceedings outside the Territory, Buyer agrees to so cooperate (at the expense of Buyer for all out-of-pocket expenses reasonably incurred by Seller in connection therewith upon receipt of evidence thereof satisfactory to Buyer).

12.6  **Additional Acts.**  Each of the parties hereto shall hereafter, at the reasonable request of the other party, execute and deliver such other instruments of transfer and further documents and agreements, and do such further acts and things as may be necessary or expedient to carry out the provisions of this Agreement, including, without limitation, the transfer to Buyer of all right, title and interest in and to the Marks as provided in this Agreement. Seller shall execute and deliver any and all documents required in connection with the filing of any applications to register the Marks in the Territory for use in connection with Relevant Products, and to assist in such other ways as may be reasonably asked of Seller in connection with any such filing (including the prosecuting any such application and the maintaining of any such registrations), and, if Seller fails to take any such action, Buyer may as attorney-in-fact take such action for Seller.

13.  **Survival of Representations and Warranties; Indemnification.**

13.1  **Survival.**  All representations, warranties and agreements contained in this Agreement or in any certificate delivered pursuant to this Agreement shall survive the Closing notwithstanding any investigation conducted, or knowledge acquired, with respect thereto.

13.2  **Indemnification by Seller.**  Seller shall indemnify and hold harmless Buyer, and shall reimburse Buyer for,

-29-

any loss, liability, claim, damage, expense (including, without limitation, costs of investigation and defense and reasonable attorneys' fees) or diminution of value (collectively, "Damages") arising from or in connection with (a) any material inaccuracy in any of the representations and warranties of Seller in this Agreement or in any certificate delivered by Seller pursuant to this Agreement, or any actions, omissions or state of facts inconsistent with any such representation or warranty, (b) any liability or other obligation of Seller not expressly assumed by Buyer pursuant to this Agreement, (c) any material failure by Seller to perform or comply with any agreement in this Agreement, (d) the actions entitled <u>Formflex Foundations, Inc.</u> v. <u>Murjani Worldwide B.V.</u> and <u>Hirsh</u> v. <u>Murjani Worldwide, B.V.</u> filed in the Supreme Court of the State of New York, New York County, or any of the claims asserted in or arising out of such actions, and (e) any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by any such Person with Seller (or any Person acting on its behalf) in connection with any of the Contemplated Transactions.

13.3  <u>Indemnification by Buyer</u>.  Buyer shall indemnify and hold harmless Seller, and shall reimburse Seller for, any Damages arising from or in connection with (a) any material inaccuracy in any of the representations and warranties of Buyer in this Agreement or in any certificate delivered by Buyer pursuant to this Agreement, or any actions, omissions or state of facts inconsistent with any such representation or warranty, (b) any material failure by Buyer to perform or comply with any agreement in this Agreement, (c) any liability or other obligation of Seller expressly assumed by Buyer pursuant to this Agreement; and (d) any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by such Person with Buyer (or any Person acting on its behalf) in connection with any of the Contemplated Transactions.

13.4  <u>Procedure for Indemnification</u>.  After receipt by an indemnified party under Section 13.2 or 13.3 of notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against an indemnifying party under such Section, give notice to the indemnifying party of the commencement thereof, but the failure so to notify the indemnifying party shall not relieve it of any liability that it may have to any indemnified party except to the extent the indemnifying party demonstrates that the defense of such action is materially prejudiced thereby.  If any such action shall be brought against an indemnified party and it shall give notice to the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, to assume the defense

thereof with counsel satisfactory to such indemnified party
and, after notice from the indemnifying party to such indemni-
fied party of its election so to assume the defense thereof,
the indemnifying party shall not be liable to such indemnified
party under such Section for any fees of other counsel or any
other expenses, in each case subsequently incurred by such
indemnified party in connection with the defense thereof, other
than reasonable costs of investigation.  If an indemnifying
party assumes the defense of such an action, (a) no compromise
or settlement thereof may be effected by the indemnifying party
without the indemnified party's consent (which shall not be
unreasonably withheld) unless (i) there is no finding or admis-
sion of any violation of law or any violation of the rights of
any Person and no effect on any other claims that may be made
against the indemnified party and (ii) the sole relief provided
is monetary damages that are paid in full by the indemnifying
party and (b) the indemnifying party shall have no liability
with respect to any compromise or settlement thereof effected
without its consent (which shall not be unreasonably withheld).
If notice is given to an indemnifying party of the commencement
of any action and it does not, within ten days after the indem-
nified party's notice is given, give notice to the indemnified
party of its election to assume the defense thereof, the indem-
nifying party shall be bound by any determination made in such
action or any compromise or settlement thereof effected by the
indemnified party.  Notwithstanding the foregoing, if an indem-
nified party determines in good faith that there is a reason-
able probability that an action may adversely affect it or its
Affiliates other than as a result of monetary damages, such
indemnified party may, by notice to the indemnifying party,
assume the exclusive right to defend, compromise or settle such
action, but the indemnifying party shall not be bound by any
determination of an action so defended or any compromise or
settlement thereof effected without its consent (which shall
not be unreasonably withheld).

14.  Termination.

        14.1  Termination.  This Agreement may be terminated
before the Closing occurs only as follows:

        (a)  By written agreement of Seller and Buyer at any
time.

        (b)  By Seller, by notice to Buyer at any time, if
one or more of the conditions specified in Section 6 is
not satisfied at the time at which the Closing (as it may
be deferred pursuant to Section 4.1) would otherwise occur
or if satisfaction of such a condition is or becomes im-
possible.

(c)  By Buyer, by notice to Seller at any time, if one or more of the conditions specified in Section 5 is not satisfied at the time at which the Closing (as it may be deferred pursuant to Section 4.1) would otherwise occur or if satisfaction of such a condition is or becomes impossible.

(d)  By Buyer or Seller, by notice to the other at any time after _____, 1989.

14.2  <u>Effect of Termination</u>.  If this Agreement is terminated pursuant to Section 14.1, this Agreement shall terminate without any liability or further obligation of any party to another.  However, a termination under Section 14.1 shall not relieve any party of liability for any intentional failure to perform or comply with any agreement prior to the date of termination or any intentional misrepresentation or breach of warranty or constitute a waiver of any claim with respect thereto.

15.  <u>Miscellaneous</u>.

15.1  <u>Notices</u>.  All notices, consents and other communications under this Agreement shall be in writing and shall be deemed to have been duly given when (a) delivered by hand, (b) sent by telex or telecopier (with receipt confirmed), provided that a copy is mailed the same day by registered mail, return receipt requested, or (c) received by the addressee, if sent by Express Mail, Federal Express or other express delivery service (receipt requested), in each case to the appropriate addresses, telex numbers and telecopier numbers set forth below (or to such other addresses, telex numbers and telecopier numbers as a party may designate as to itself by notice to the other parties):

(i)  If to Buyer, to it at:

501 Silverside Road
Suite No. 22
Wilmington, Delaware  19809
Attention:  President

with copies to:

The Gitano Group, Inc.
1411 Broadway
New York, New York 10018
Telecopier No.:  (212) 730-0319
Attention: Steven M. Gerber, Esq.

-32-

Kronish, Lieb, Weiner & Hellman
1345 Avenue of the Americas
New York, New York 10105
Telecopier No.: (212) 765-8943
Attention:  Peter J. Mansbach, Esq.

(ii) If to Seller, to it at:

Coolsingel 101, 7th Floor
3012 AG
Rotterdam, Netherlands
Telecopier No.:
Attention:

with a copy to:

Sonnenschein Carlin Nath & Rosenthal
900 Third Avenue, Suite 1600
New York, New York 10022
Telecopier No.: 212-759-6351
Attention: Michael A. Bamberger, Esq.

15.2  Jurisdiction; Service of Process.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the County and State of New York, or, if it has or can acquire jurisdiction, in the United States District Court for the Southern District of New York, and each of the parties hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any obligation to venue laid therein.  Process in any such action or proceeding may be served on any party anywhere in the world, whether within or without the State of New York, and may also be served upon any party in the manner provided for giving of notices to it in Section 15.1 or, in the case of Seller, by personal service on any partner of Sonnenschein Carlin Nath & Rosenthal or any successor firm (Seller hereby irrevocably designates such firm its agent for such service).  The parties hereto waive their respective rights to trial by jury in any action or proceeding arising out of or relating to this Agreement.

15.3  Assignment.  Seller may not assign all or any part of its right or delegate all or any part of its obligations under this Agreement except that Seller may assign to any Person Seller's right to be paid Contingent Payments in accordance with the terms of this Agreement.  Buyer may assign all or any part of its right or delegate all or any part of its obligations under this Agreement to any Affiliate of Buyer. Nothing contained in this Agreement shall in any way restrict Buyer from selling or otherwise transferring to any Person any and all right, title or interest in or to the Marks acquired

-33-

pursuant to this Agreement, which assignment shall not relieve Buyer of its obligations hereunder.

15.4  Expenses.  Each party shall bear its own expenses incident to the preparation, negotiation, execution and delivery of this Agreement and the performance of its obligations hereunder.

15.5  Specific Performance.  The parties acknowledge that the subject matter of this Agreement (i.e., the Marks and the Licenses) is unique and that no adequate remedy of law would be available for breach of this Agreement.  Accordingly, each party agrees that the other parties will be entitled to an appropriate decree of specific performance or other equitable remedies to enforce this Agreement (without any bond or other security being required) and each party waives the defense in any action or proceeding brought to enforce this Agreement that there exists an adequate remedy at law.

15.6  Captions.  The captions in this Agreement are for convenience of reference only and shall not be given any effect in the interpretation of this Agreement.

15.7  No Waiver.  The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.  Any waiver must be in writing.

15.8  Exclusive Agreement; Amendment.  This Agreement supersedes all prior agreements among the parties with respect to its subject matter, is intended (with the documents referred to herein) as a complete and exclusive statement of the terms of the agreement among the parties with respect thereto and cannot be changed or terminated except by a written instrument executed by Seller and Buyer.

15.9  Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be considered an original, but all of which together shall constitute the same instrument.

15.10  Governing Law.  This Agreement and (unless otherwise provided) all amendments hereof and waivers and consents hereunder shall be governed by the internal law of the

-34-

State of New York, without regard to the conflicts of law principles thereof.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

MURJANI WORLDWIDE B.V.

By _____

Name: *Mohan B. Murjani*

Title: *Attorney-in-fact*


G.V. GITANO, INC.

By _____

Name: *Hoin Dabah*

Title: *President*