UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NETHERBY LIMITED,

         Plaintiff,

-against-

JONES APPAREL GROUP, INC. and JONES INVESTMENT CO., INC.,

         Defendants.

---

04 CV 07028 (GEL)

**AFFIRMATION IN SUPPORT**

  MELISSA J. LaROCCA, an attorney duly admitted to practice in the Courts of the State of New York and before this Court, affirms under the penalties or perjury as follows:

  1.  I am associated with the firm of Chadbourne & Parke LLP, attorneys for plaintiff Netherby Limited ("Netherby"). I submit this affirmation in support of Netherby's motion for the issuance of letters rogatory pursuant to Federal Rule of Civil Procedure 28(b)(2) and 28 U.S.C. § 1781(b)(2), to permit (1) the production of documents from the Canadian company Hudson's Bay Company and its subsidiary, Zellers, Inc. (together "Zellers") and (2) the taking of depositions of certain Zellers personnel.

## BACKGROUND[1]

  2.  Netherby is the owner of the worldwide rights to the Gloria Vanderbilt and related trademarks as defined in the 1988 Agreement (defined below) (the "Gloria Marks").

---

[1] The background information is taken from plaintiff's Amended Complaint.

Pursuant to the 1988 Agreement, Netherby sold its rights to the Gloria Marks in the United States, Canada, Brazil, Australia and New Zealand (the "Five Countries") (Cmplt. ¶ 1).

3. Either defendant Jones Apparel Group, Inc. ("Jones Apparel") and/or Jones Investment Co., Inc. ("Jones Investment") (together "Jones") is the current owner of the rights to the Gloria Marks in the Five Countries (Cmplt. ¶ 15), and is the obligor under the 1988 Agreement to make royalty payments thereunder to Netherby.

4. The instant dispute arises from Jones' breaches of the parties' 1988 Agreement, including its failure to make payments to Netherby (Cmplt. ¶ 6).

## THE 1988 AGREEMENT

**A.   The Ownership of the Gloria Marks**

5. Pursuant to an Acquisition Agreement dated December 23, 1988 (the "1988 Agreement") (Exh. 1), Netherby's predecessor in interest conveyed to Jones' predecessor in interest, the rights to the Gloria Marks in the Five Countries (the "Five Country Rights") (Cmplt. ¶ 9).

6. In or about April 2002, Jones acquired the rights to Gloria Marks in the Five Countries. Presently and since April 2002, Jones is and has been the Buyer under the 1988 Agreement and, as such, has all of the Buyer's obligations under the Agreement (Cmplt. ¶ 15).

7. Under the 1988 Agreement, the Buyer (Jones) is obligated to pay ongoing royalties, called "Contingent Payments," to the Seller (Netherby) based on sales of products bearing the Gloria Marks in the Five Countries (Cmplt. ¶ 11).

### B.     Contingent Payments To Which Netherby Is Entitled

8.     The Contingent Payments that Buyer, now Jones, is obligated to pay Netherby quarterly are based both on percentages of the revenues from Buyer's own sales of products bearing the Gloria Marks in the Five Countries, and the revenues the Buyer receives from the licensing of the Gloria Marks in the Five Countries (Cmplt. ¶ 17; Exh. 1 ¶ 3).

9.     Under this formula, when the Buyer licenses to others the right to manufacture and sell goods bearing the Gloria Marks in any of those Five Countries, Netherby is entitled to receive a percentage of the revenues paid by that licensee for the use of the Gloria Marks. Under the 1988 Agreement, the actual percentage to be applied in determining the Contingent Payment due depends on the type of goods sold (Cmplt. ¶ 18).

10.    The 1988 Agreement further obligates the Buyer to provide Netherby with accurate certified quarterly reports, containing a breakdown by product and country, detailing the revenues received based on the specific type of product sold (Exh. 1 ¶ 3.6). These reports are crucial, as they permit Netherby to determine if the Contingent Payments due have been correctly calculated and paid (Cmplt. ¶ 19).

### ZELLERS: THE EXCLUSIVE CANADIAN LICENSEE OF THE GLORIA MARKS

11.    Zellers has been Jones' exclusive Canadian licensee of the Gloria Marks (with the exception of jewelry) for approximately the past six years (Exhs. 2, 3).

12.    In August 1998, the Buyer of the Five Country Rights licensed the exclusive right to sell products bearing the Gloria Marks in Canada to Zellers pursuant to a License Agreement dated August 21, 1998 (the "License Agreement") (Exh. 2). Under the License

Agreement, Zellers is obligated to pay the Buyer a quarterly Sales Royalty in the amount of 1-1/4% of the Retail Sales of the licensed products (Exh. 2 § 8.2).

13. Simultaneously with the execution of the License Agreement, Zellers entered into a Services Agreement with the Buyer, dated August 21, 1998 (the "Services Agreement") (Exh. 3) pursuant to which the Buyer was to provide certain services to Zellers. Under the Services Agreement, Zellers is obligated to pay the Buyer a quarterly Sales Royalty in the amount of 1-1/4% of the Retail Sales of the licensed products (Exh. 3 § 8.2).

14. Initially, Netherby only received royalties based on amounts received by the Buyer under the License Agreement. By diverting half of the payments to a Services Agreement, the Buyer reported to Netherby only half of the revenues paid to it by Zellers and correspondingly paid Contingent Payments to Netherby on only half of those revenues.

15. After a trial in 2002 (commenced due to the Buyer's improper diversion of royalties from Netherby), Justice Gammerman of the Supreme Court of the State of New York, County of New York, held that the Buyer had engaged in a "scheme, cleverly thought of . . . to deny to [Netherby] a royalty or a portion of the royalty to which it is entitled" and, as such, that Netherby was entitled to receive royalties based on amounts received by the Buyer under both the License and Services Agreements (Cmplt. ¶ 25).

### THE CURRENT DISPUTE

16. Much of the current dispute revolves around Jones' diversion of royalties received from Zellers based on Zellers sales of products bearing the Gloria Marks (Cmplt. ¶¶ 6, 35-63).

17. As early as 2000 and 2001, Netherby's accountant began noticing significant changes in the figures on the quarterly statements Jones provided to Netherby and in the royalties Jones paid Netherby under the 1988 Agreement (Cmplt. ¶ 35).

18. Among other things, the accountant noticed that (1) Zellers had reduced the royalty percentage it was paying to Jones on certain products bearing the Gloria Marks **by half**, from 1.25% to 0.625%, (2) Zellers had **completely ceased** paying royalties to Jones on Jones's sales of products bearing the Gloria Marks to Zellers and (3) Jones and Zellers marketed and sold products bearing the "GLO" mark (marketed as a youthful division of the Gloria Vanderbilt line) and Jones failed to pay Netherby Contingent Payments from these sales (Cmplt. ¶¶ 35, 60).

19. Upon noticing these and other abnormalities, Netherby's accountant sent a letter and spoke numerous times with the Chief Financial Officer ("CFO") of Jones' predecessor. These discussions were unhelpful and Netherby was not provided with any of the information it requested (Cmplt. ¶ 36).

20. After receiving no information from the CFO, in or about October 2002 Netherby's accountant began writing to Jones' Assistant Treasurer, Robin Mandell ("Mandell"). Although Netherby's accountant communicated with Mandell many times and made numerous requests for information, little, if any, of the requested information was actually provided (Cmplt. ¶ 38).

21. Over the course of several years, Netherby and/or its counsel made over fifteen written requests and placed numerous phone calls to various individuals at Jones and received little or no information in response (Cmplt. ¶¶ 35-51).

## THE NEED FOR LETTERS ROGATORY

22. Netherby has consistently been forced to bring lawsuits to recover payments rightfully due to Netherby under the 1988 Agreement. Almost all of the prior litigations arose after the Buyer diverted and concealed from Netherby revenue streams on which Netherby was entitled to receive Contingent Payments (Cmplt. ¶¶ 23-25). In fact, this is the eighth action Netherby has been forced to bring against the Buyer since 1992 (Cmplt. ¶ 24).

23. Based on the Buyer's repeated efforts to conceal royalty streams due to Netherby and to conceal relevant information from Netherby, Netherby requires independent information and verification by Zellers in the form of documents and deposition testimony.

24. Specifically, Netherby will need the following documentation from Zellers:

- Documents concerning any and all agreements or understandings concerning the marketing or sale of any products bearing the Gloria Marks, including but not limited to agreements, amendments, drafts, e-mails, correspondence, memoranda and notes.

- Documents concerning the Zellers License Agreement or Services Agreement, including, but not limited to, renewals, amendments, drafts, e-mails, correspondence, memoranda and notes.

- Documents concerning the purchase of any products bearing the Gloria Marks by Zellers from any entity, including, but not limited to, documents reflecting: (a) the source of the goods purchased, (b) the types of goods purchased, (c) the quantities of goods purchased (d) the dates of such purchases, (e) any amounts paid by Zellers, (e) the party to whom payment was made, (f) the dates of such payments and (g) the direct or indirect relationship, if any, between the Buyer and these entities.

- Documents concerning any changes in the percentages or amounts of compensation, e.g., royalties, fees, etc., paid by Zellers to any entity for the sales of any products bearing the Gloria Marks, including but not limited to any e-mails, correspondence, memoranda and notes.

- Documents concerning Zellers non-renewal of the License Agreement and Services Agreement and any agreement or arrangement presently in effect with Zellers concerning the Gloria Marks after December 31, 2004.

- Documents provided to Zellers from any entity or provided by Zellers to any entity concerning the Gloria Marks and the GLO Mark, including but not limited to information concerning brand management, colors, fit, logos, signage, advertising, photos, line plans, trends, designs and samples, including but not limited to, any e-mails, correspondence, memoranda and notes.

- Documents concerning any compensation, i.e., royalties, fees, etc., paid by Zellers resulting from the sales of products bearing the GLO Mark.

25. The receipt of these documents will enable Netherby to track the payments made by Zellers to Jones, which will enable Netherby to calculate the additional Contingent Payments due to it, the recovery of which is sought in this action.

26. Netherby also anticipates that it will need to take the depositions of one or more of the following Zellers officers, directors and/or employees: (1) James A. Ingram, Secretary, (2) Tom Sampson, Vice President, Brand Management, (3) Thomas Haig, Executive Vice President, Merchandising & Marketing, and (4) Brian Davies, and (5) Jose Stein, Director of Retail Financial Services.

27. As Canada is not a party to the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, letters rogatory are required.

28. Upon the granting of the request for issuance of letters rogatory Netherby will submit the appropriate documentation to effectuate the Court's Order in Canada.

Dated: New York, New York
       March 3, 2005

                                          _____
                                          Melissa J. LaRocca (ML 8807)