SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GLORIA VANDERBILT TRADEMARK B.V.
and G.V. TRADEMARK INVESTMENT, LTD.,

                         Plaintiffs and
                         Counterclaim Defendants,

              -against-

NETHERBY LIMITED,

                         Defendant and
                         Counterclaimant.

NETHERBY LIMITED,

                         Third-Party Plaintiff,

              -against-

GLORIA VANDERBILT APPAREL, INC.,

                         Third-Party Defendant.

Index No. 113339/01
(IAS Part 27)
(Gammerman, J.)

**AMENDED ANSWER,
COUNTERCLAIMS AND
THIRD-PARTY
COMPLAINT**

          Defendant Netherby Limited ("Netherby"), as and for its amended answer to the

complaint herein, its counterclaims against Gloria Vanderbilt Trademark B.V. ("GVBV") and

G.V. Trademark Investments, Ltd. ("GVTI") and its third-party complaint against Gloria

Vanderbilt Apparel, Inc. ("GVAC"), asserts as follows:

          1.     Denies having knowledge or information sufficient to form a belief as to

the truth of the allegations set forth in paragraph 1 of the complaint, except denies that GVBV is

the beneficial owner of the Gloria Vanderbilt trademarks and asserts that, if GVBV holds record

title to certain Gloria Vanderbilt Trademarks, it does so on behalf and for the benefit of GVTI and its wholly owned subsidiary GVAC.

2.      Denies having knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 2 of the complaint.

3.      Admits the allegations set forth in paragraph 3 of the complaint.

4.      The first sentence of paragraph 4 of the complaint is a legal conclusion as to which no response is required.  Netherby denies the second sentence of paragraph 4 as stated, and refers to the Settlement Agreement for the full terms thereof.

5.      Denies the allegations set forth in paragraph 5 of the complaint as stated, except refers to the 1988 Acquisition Agreement and the subsequent assignment and related documents for the terms thereof.

6.      Denies the allegations set forth in paragraph 6 of the complaint.

7.      Denies the allegations set forth in paragraph 7 of the complaint and asserts that GVTI continues to be the beneficial owner of the trademarks.

8.      Denies the allegations set forth in paragraph 8 of the complaint as stated, and refers to the complaint in the Netherby Action for the allegations therein.

9.      Denies the allegations set forth in paragraph 9 of the complaint as stated, except admits that Exhibit A to the complaint is a copy of the Settlement Agreement and refers to the Settlement Agreement for the terms thereof.

10.     Denies the allegations set forth in paragraph 10 of the complaint.

11.     Denies the allegations set forth in paragraph 11 of the complaint as stated, except refers to the Settlement Agreement, the Promissory Note and the Confessions of Judgment for the terms thereof.

12.     Denies the allegations set forth in paragraph 12 of the complaint, except admits that Exhibit B to the complaint is a copy of a June 12, 2001 letter sent to plaintiffs and refers to that letter for the contents thereof.

13.     Denies the allegations set forth in paragraph 13 of the complaint, except admits that prior to June 2001, Netherby had not declared a default under the Promissory Note.

14.     Denies the allegations of paragraph 14 of the complaint as stated, except admits that Netherby has not withdrawn the default notice.

15.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 15 of the complaint which concern what might happen in the future.

16.     Denies the allegations set forth in paragraph 16 of the complaint.

17.     Denies the allegations set forth in paragraph 17 of the complaint.

18.     Denies the allegations set forth in paragraph 18 of the complaint.

19.     Denies the allegations set forth in paragraph 19 of the complaint.

20.     Denies the allegations set forth in paragraph 20 of the complaint, except refers to the Promissory Note for the terms thereof.

21.     Denies the allegations set forth in paragraph 21 of the complaint as stated, except admits that Exhibit C to the complaint is a copy of a May 25, 2001 notice from Netherby's counsel and refers to that notice for the terms thereof.

22.     Denies the allegations set forth in paragraph 22 of the complaint as stated, except admits that the May 25, 2001 notice was withdrawn.

23.     Admits the allegations set forth in paragraph 23 of the complaint.

24.     Denies the allegations set forth in paragraph 24 of the complaint, except admits that it provided to plaintiffs a schedule of allocations.

25.     Denies the allegations set forth in paragraph 25 of the complaint as stated, except refers to the schedules for the contents thereof.

26.     Denies the allegations set forth in paragraph 26 of the complaint.

27.     In response to the allegations set forth in paragraph 27 of the complaint, refers to the responses to paragraphs 1-26 of the complaint set forth above.

28.     Denies the allegations set forth in paragraphs 28, 29, 30 and 31 of the complaint.

29.     In response to the allegations set forth in paragraph 32 of the complaint, refers to its responses to paragraphs 1-26 and 28-31 of the complaint set forth above.

30.     Denies the allegations set forth in paragraphs 33, 34 and 35 of the complaint.

31.     In response to the allegations set forth in paragraph 36 of the complaint, refers to its responses to paragraphs 1-26, 28-30 and 31-34 of the complaint set forth above.

32.     Denies the allegations set forth in paragraph 37, 38 and 39 of the complaint.

## FIRST AFFIRMATIVE DEFENSE

33.     The claims are barred by the doctrine of unclean hands.

## SECOND AFFIRMATIVE DEFENSE

34.     No actual case or controversy exists in the third cause of action. The third cause of action is premature as the Confessions of Judgment have not been filed.

## COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

As and for its counterclaims against counterclaim defendants GVBV and GVTI, and as and for its third-party complaint against third-party defendant GVAC, Netherby asserts as follows:

## THE PARTIES

1.     Counterclaimant and third-party plaintiff Netherby is a corporation duly organized and existing under the laws of Jersey, Channel Islands.  Netherby is presently the owner of the worldwide rights to the Gloria Vanderbilt Trademarks, except for a few countries such as the United States and Canada.

2.     Upon information and belief, counterclaim defendant GVTI is a corporation organized and existing under the laws of the British Virgin Islands.  GVTI has its principal place of business at 50 Hartz Way, Secaucus, New Jersey, and is a closely-held corporation owned and/or controlled by Isaac Dabah and members of his family.

3.     Upon information and belief, counterclaim defendant GVBV is a corporation organized and existing under the laws of the Netherlands and doing business in the State of New York.  GVBV is a closely-held corporation directly or indirectly owned and/or controlled by Isaac Dabah and members of his family.

4.     Upon information and belief, third-party defendant GVAC is a corporation organized and existing under the laws of Delaware, with its principal place of

DK1

D except
A that
GVTI is a
corporation duly
organized under
laws of BVI and
that Isaac Dabah
as ownership
interest.

D except
A upon information
and belief that
GVBV is a
corporation organized
under the laws of
the Netherlands

DK1 + D
except
A that
GVAC is organized under
laws of Delaware and
is wholly owned subsidiary
of GVTI

6

business at 50 Hartz Way, Secaucus, New Jersey.  GVAC is a wholly-owned subsidiary of GVTI and is owned and/or controlled by Isaac Dabah and members of his family.

## FACTS COMMON TO ALL COUNTERCLAIMS
### AND THIRD-PARTY CLAIMS

A.     The 1988 Agreement

*DK1*

5.     Beginning in the early 1980s, a company known as Murjani Worldwide B.V. ("Murjani Worldwide"), Netherby's predecessor in interest, created and launched the Gloria Vanderbilt trademarks (the "Marks") and related businesses.

*D except A*
*that by the*
*December 23, 1988*
*agreement,*
*Murjani Worldwide*
*conveyed interest*
*in trademarks of*
*GV to an entity*
*from which GVTI*
*subsequently acquired*
*such rights and*
*sold to GVBV*
*those rights*
*conclusion*
*of law*

6.     On December 23, 1988, Murjani Worldwide conveyed to the plaintiffs' predecessor-in-interest the rights to the Marks in the United States, Canada, Brazil, Australia and New Zealand (the "Five Country Rights").  This was done pursuant to an Acquisition Agreement (the "1988 Agreement"), a copy of which is annexed hereto as Exhibit 1.

7.     Following the execution of the 1988 Agreement, Murjani Worldwide's rights under the 1988 Agreement were assigned to Netherby.

8.     Since 1988, the corporate structure of the corporation that owns the Five Country Rights has changed from time to time, including by way of assignment of the 1988 Agreement.  However, at the time of the 1988 Agreement, and continuing ever since then, the owners of the Five Country Rights, including the plaintiffs herein, have been corporations owned and/or controlled by Isaac Dabah and members of his family, including his father Morris Dabah (collectively the "Dabah Entities").  For example, the 1988 Agreement was signed by

*D*

Haim Dabah, Isaac's brother, and the 1999 Settlement Agreement annexed as Exhibit A to the complaint herein was signed by Isaac Dabah on behalf of GVTI.



9.      Public records indicate that, in 1993, Isaac Dabah and Haim Dabah pled guilty in the United States District Court for the Southern District of New York to the felony of customs fraud.  In 1996, Morris Dabah settled charges of insider trading brought by the Securities Exchange Commission.

10.      Under the 1988 Agreement, the consideration for the Five Country Rights took two forms.  First, a lump sum up-front payment was made.  In addition, Netherby was to be paid certain quarterly Contingent Payments over time.  The Contingent Payments were to be calculated according to formulas set forth in the 1988 Agreement based, in part, on percentages of income received in the future from the licensing of the Marks in the five countries (Ex. 1 § 3).  Under this formula, when the owner of the Five Country Rights licensed to others the right to manufacture and sell goods bearing the Marks in any of those countries, Netherby was entitled to receive a percentage of the revenues paid by that licensee for the use of the Marks.  The percentage to be applied depends on the type of goods sold.



11.      The 1988 Agreement requires that the Contingent Payments be paid to Netherby within 90 days after the end of each calendar quarter (Ex. 1 ¶ 3.6).

B.      **The Phony "Sale" of the Marks**

12.      In August 1997, the then-owner of the Five Country Rights, GVTI, allegedly transferred the trademarks to GVBV, an off-shore corporation.



8

DK1

13.     GVBV was and is operated by, and out of the office of, a company known as Holland Trust Management B.V. ("Holland Trust"), which is a management firm in the business of off-shore tax structuring and other such related activities.  Upon information and belief, GVBV is a shell with no active employees and no business operations.

D

14.     At the request of Isaac Dabah, and/or members of his family, Holland Trust formed GVBV for the purpose of creating the appearance of a sale of the Marks so as to enable GVTI to avoid U.S. taxes and to further isolate the Mark from creditors.  Holland Trust is holding the shares of GVBV, along with other relevant agreements, in its safe in the Netherlands for the benefit of GVTI and its direct and/or indirect owners, Isaac Dabah and members of his family including his wife, Yvette Dabah, and his father-in-law, Moishe Khafif.  To the outside world, including U.S. tax authorities, because Holland Trust keeps the documents reflecting the true ownership in its safe in the Netherlands, it appears as if this transfer was to an unaffiliated third party.  In fact, it is an elaborate tax-evasion scheme.

D except
A that GVBV
is owner of
Gloria Vanderbilt
trademarks
and that there
is a Trademark
Agreement
between
GVBV and
GVAC

15.     Presently, GVBV purports to be the owner of the Five Country Rights.  However, the business of the Five Country Rights is conducted by GVAC pursuant to a Trademark Assistance Agreement with GVBV, a copy of which is annexed hereto as Exhibit 2.  The plaintiffs describe GVAC as "the entity with which Gloria Vanderbilt Trademark B.V. has contracted to service and maintain those marks."  Thus, while ownership of the Five Country Rights allegedly moved from GVTI and GVBV, GVTI and GVAC conduct themselves concerning the Five Country Rights the same after the "sale" of the Five Country Rights as they did before.

D except
A to extent that
allegations refer
to GVAC



16.   Isaac Dabah acts as CEO of GVAC and Morris Dabah, Isaac's father, is the Vice President of GVAC.

C.   **The Prior Litigation**

17.   Since 1988, Netherby's relationship with the Dabah Entities has not been a good one, as they have repeatedly defaulted on their payment obligations to Netherby.  Since 1992, and not including the present case, Netherby has been forced to bring five separate lawsuits against the Dabah Entities for recovery of amounts legitimately due under the 1988 Agreement, as follows:

*1992*:   Netherby Limited v. G.V. Gitano Inc., et al. (S.D.N.Y.), 92 Civ. 4239 (MBM);

*1993*:   Netherby Limited v. G.V. Gitano Inc., et al. (N.Y. Co.), Index No. 103710/94;

*1996*:   Netherby Limited v. G.V. Trademark Investments, Ltd., et al. (N.Y. Co.), Index No. 606237/96;

*1997*:   Netherby Limited v. G.V. Trademark Investments, Ltd., et al. (N.Y. Co.), Index No. 601205/97; and

*1997*:   Netherby Limited v. G.V. Trademark Investments, Ltd., et al. (N.Y. Co.), Index No. 605382/97.

18.   Each of these lawsuits was eventually settled with the Dabah Entities agreeing to make substantial payments to Netherby.  Some of these cases involved allegations of fraud and fraudulent conveyances, including during the Dabahs' bankruptcy and as against the wives of Isaac Dabah and Morris Dabah, both named Yvette Dabah.

10

D.   **The Current Dispute**

19.   Since the 3rd Quarter of 1999, plaintiffs were obligated to pay Netherby a total of $1,924,860.09 ($1,176,686.09 in Contingent Payments under the 1988 Agreement and $748,174 under a 1999 Promissory Note) plus interest. But Netherby has received from plaintiffs payments totaling only $1,413,662.82, leaving a balance due for this period of $511,197.27, not including certain interest.

20.   Netherby has allocated the payments received from plaintiffs since the 3rd Quarter 1999 as follows: $1,176,686.09 to Contingent Payments due under the 1988 Agreement and $236,976.73 (less interest) towards plaintiffs' obligations under a 1999 Promissory Note.

21.   As a result of Netherby's allocation, plaintiffs underpayment of $511,197.27, plus interest, constitute an underpayment applicable to the Promissory Note. Accordingly, Netherby has declared plaintiffs in default under the Promissory Note.

E.   **Plaintiffs' Canadian Revenues**

22.   Plaintiffs assert that they owe no monies to plaintiffs for the period since 3rd Quarter 1999 as they have fully paid all of their obligations to Netherby. In determining the amount due for this period, plaintiffs have diverted half of the payments from their calculation of Contingent Payments monies paid under a Services Agreement between GVAC and Hudson's Bay Company, the owner of the Zellers retail store chain in Canada (collectively, "HBC/Zellers"), a copy of which is annexed hereto as Exhibit 3.



D

D

D except
A That Netherby
wrongfully purported
to declare a default
under a promissory
note.

D except
A That plaintiffs
assert that
no monies are
due to defendant
and that they
have fully paid
all obligations
to Netherby

11

*D*

*D* except

*A* on information
on belief that
GVBV entered
into a License
Agreement with
HBC

*D* except

*A* on information
onl belief that
GVBV entered into
a License Agreement
with HBC

*DKI* to
extent refers to
GV Apparel Inc
and *D* to
extent refers to
GVAC, except
*A* that on
August 21, 1998,
GVAC and HBC
entered into a
Services Agreement

23.     By transparently diverting half of the payments to a Services Agreement, plaintiffs have thus reported to Netherby only half of the revenues paid to them by HBC/Zellers and have paid Contingent Payments to Netherby on only half of those revenues.  The Services Agreement is a sham designed to disguise and artificially divert and reduce royalty receipts.

24.     GVBV entered into a License Agreement with HBC/Zellers dated August 21, 1998 (the "License Agreement"), a copy of which is annexed as Exhibit 4, pursuant to which HBC was licensed the right to use the Marks on goods sold in HBC/Zellers' retail stores in Canada.

25.     Under the License Agreement, HBC/Zellers is obligated to pay GVBV a quarterly Sales Royalty in the amount of 1-1/4% of the Retail Sales of the licensed products (Ex. 3 § 8.2).  It is industry custom that a licensor of a trademark provide certain services and/or information to its licensees, including information concerning designs, but GVBV, being a shell, has neither the personnel nor the ability to perform such functions.

26.     Simultaneously with the execution of the License Agreement, HBC/Zellers entered into a Services Agreement with GVAC, dated August 21, 1998 (Ex. 3) pursuant to which GVAC was to provide certain services to HBC/Zellers.  But the Services Agreement obligates GVAC to do nothing.  Furthermore, even where HBC/Zellers requests material and/or information, GVAC is obligated under the Services Agreement to provide it only if it deems it significantly important and necessary to HBC/Zellers.  Thus, the Services

Agreement allows the provider of the services, GVAC, to decide what, if any, services to provide.



Dkt to extent refers to GV Apparel Inc and D to extent refers to GVAC, except A that on August 21, 1998, GVAC and HBC entered into a Services Agreement

27.     The fees paid by HBC/Zellers to GVAC under the Services Agreement are not in any manner tied to the type or level of services provided. For one, under that Agreement, HBC/Zellers is obligated to pay guaranteed minimum payments, amounting to millions of dollars, regardless of whether any services are provided (Ex. 3 ¶ 4.1). In addition, HBC/Zellers is obligated to pay GVAC the amount of 1-1/4% of HBC/Zellers' Retail Sales of the licensed products (Ex. 3 ¶ 4.2(a)), regardless of what services GVAC provides and *even if no services are provided at all*.

28.     Adding the 1-1/4% payment under the License Agreement to the 1¼% amount paid under the Services Agreement, the total amount paid quarterly by HBC/Zellers for the use of the Marks is equal to 2½% of Retail Sales of licensed products. But plaintiffs have reported only half that amount to Netherby and have paid Netherby Contingent Payments on only half that amount.



29.     The link between the Services Agreement and the License Agreement is undeniable. For example:

(a)     the two agreements were signed on the same dates;

(b)     the amendments to both were signed on the same day;

(c)     the Notice List attached to the Services Agreement is exactly the same as the Notice List attached to the License Agreement; and

(d)     paragraph 3 of the Services Agreement provides that it shall have the same term as the License Agreement: "This Agreement shall be co-terminus with the License Agreement and shall automatically terminate upon the termination of the License Agreement."

*D to extent refers to GV Apparel Inc and DKI to extent refers to GVAC*

30.     The Services Agreement is signed by Morris Dabah, Isaac Dabah's father, who is identified therein as a Vice President of GVAC.

### F.     Contingent Payments Are To Be Paid On All Revenues

*D*

31.     Section 3.2 of the 1988 Agreement (Ex. 1) obligates plaintiffs to make Contingent Payments to Netherby based on their "Canadian Royalty Income." Canadian Royalty Income is defined as "*all payments* (including advances) received from any non-Affiliate of Buyer by Buyer (or any Affiliate thereof) that are paid for use of the Marks in connection with such products in Canada." Id. p. 2 (emphasis added).

32.     The definition of Canadian Royalty Income in the 1988 Agreement provides that payments for "services", as contrasted with payments for the use of the Marks, may be excluded from the Contingent Payment calculation only for services "actually rendered by Buyer or its Affiliates" and only "in amounts reasonably related to such services." (Id.)

*D*

GVAC has not provided any meaningful services to HBC/Zellers and, in any event, no services that a licensor would normally provide. Moreover, as payments under the Services Agreement are calculated at 1¼% of HBC/Zellers' Retail Sales, these payments are not "in amount reasonably related to such services."

### G.     G.V. Apparel Is An Affiliate of GVBV

33.     The term "Affiliate" is defined in the 1988 Agreement as follows:



"Affiliate of any person means any other person that, directly or indirectly, controls or is controlled by that person, or is under, control with that person. 'Control' (including correlative meaning, the terms 'controlled by' and 'under, control with' as used with respect to any person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person, whether through the ownership or voting securities, by contract or otherwise."

34.     GVAC is an Affiliate of GVBV.  For one, GVBV and GVAC are both



owned and controlled by Isaac Dabah and or members of his family, including his wife, Yvette

Dabah, and his father-in-law, Moishe Khafif.

35.     In addition, GVAC is an Affiliate of GVBV because GVBV controls the



activities of GVAC, including with regard to the HBC/Zellers relationship, including pursuant

to the Trademark Assistance Agreement dated as of August 8, 1997, a copy of which is annexed

hereto as Exhibit 2.

36.     The preliminary statement to the Trademark Assistance Agreement

provides that GVBV intended to grant licenses to third parties to utilize the Gloria Vanderbilt

trademarks.  It further provides that "the Owner [GVBV] does not have a permanent business

establishment in the United States of America" and, accordingly requires GVAC's services to

effectuate and service such license agreements.

37.     Following the execution of the Trademark Assistance Agreement, GVBV

entered into the License Agreement with HBC/Zellers and GVAC entered into the Services

Agreement with HBC/Zellers.

*[handwritten left margin: D to extent refers to GV Apparel Inc and A to extent refers to GV Apparel Corp.]*

15

38.     It is a widely accepted practice in the apparel licensing industry for licensors to provide, at no charge to the licensee, certain services with the licensing of their trademark, such as designs, production assistance, various types of know-how, quality control, marketing and promotional material.

39.     The License Agreement between GVBV and HBC/Zellers requires GVBV's approval to the overall quality and distribution standards for products bearing the trademark manufactured and sold by HBC/Zellers (Ex. 4 ¶ 5.1(b), 5.2) and requires the licensor, GVBV, to appoint a brand manager to work with the Licensee, HBC/Zellers (¶ 9.2).

40.     GVBV has delegated these approval functions under the License Agreement and other normal licensor functions to GVAC.

41.     Section 1.3 of the Trademark Assistance Agreement, under the heading "Duties of Servicer," obligates GVAC (defined therein as "Servicer") to GVBV (defined therein as "Owner") as follows:

> "Servicer [GVAC] shall, from time to time, take such actions and do such things as Owner [GVBV] may request in order to (1) assist Owner in exercising its rights under the license agreements with regard to monitoring royalties and sales reports and *monitoring the overall quality* and distribution standards *for products which bear the trademarks and to ensure that all license users have any such trademark use consistent standards of quality and distribution . . . .*"

42.     The services to be provided by GVAC under the Services Agreement between GVAC and HBC/Zellers are the same as those normally provided by a licensor. For example, it sets forth as one of the services that GVAC will provide:  "Information and

16

assistance with GVAC, acting reasonably, deemed significantly important with respect to the production of licensed products, such as advertising and sales promotion, samples, methods or techniques of production and *quality control*."

### H.    Service Payments To Any Dabah Company Cannot Be Excluded

43.    In addition to the foregoing reasons why payments under the Services Agreement must be included in the Contingent Payment calculation, a 1995 Modification to the 1988 Agreement, a copy of which is annexed hereto as Exhibit 5 (the "Modification"), also makes clear that payments to GVAC under the Services Agreement cannot be excluded from the Contingent Payment calculation.

44.    For one, the Modification, which was signed by Isaac Dabah on behalf of GVTI, capped the plaintiffs' right to exclude such payments by licensees at 1% of each licensee's sales (Ex. 5 ¶ 2(iii)).  As the payment under the HBC/Zellers' Services Agreement is calculated at 1-1/4% of sales, it exceeds this limitation.

45.    In addition, the 1995 Modification provides that the plaintiffs cannot exclude *any part* of such several payments made to an Isaac Dabah company:

". . . Buyer's right to exclude from this definition payments for such services actually rendered, is expressly limited as follows:

\*     \*     \*

ii.    Expenses for advertising and/or other services paid for by a licensee *may be excluded only if such services were rendered by a third party which* is not an Affiliate of Buyer and *is not owned or controlled by Isaac Dabah and/or his family*."  (Ex. 5 ¶ 2(ii) (emphasis added)).



46.    Upon information and belief, the service fees paid by HBC/Zellers under the Services Agreement have been paid to GVAC, which is owned and/or controlled by Isaac Dabah and/or his family.  Under the 1995 Modification, those payments cannot be excluded from the Contingent Payment calculation.

## FIRST COUNTERCLAIM AND FIRST THIRD-PARTY CLAIM
### (Declaratory Judgment)

47.    Netherby repeats and realleges each and every allegation set forth in paragraphs 1 through 46 above.

48.    Netherby seeks and is entitled to a declaratory judgment by this Court declaring that all payments made and to be made in the future under the Services Agreement with HBC/Zellers are properly included in the Contingent Payment calculation under the 1988 Agreement, as amended.

## SECOND COUNTERCLAIM AND SECOND THIRD-PARTY CLAIM
### (Breach of Contract)

49.    Netherby repeats and realleges each and every allegation contained in paragraphs 1 through 48 above.

50.    Plaintiffs have asserted in this action that Netherby had no right to allocate certain payments to plaintiffs' Contingent Payment obligations and should alternatively have allocated monies to plaintiffs' Promissory Note obligations.  Netherby disagrees with this assertion, and believes that it had the right to allocate the payments as it did and that the allocation was otherwise proper.

*[Handwritten margin notes: "D", "RAR", "D except A that Netherby purports to seek a declaratory judgment", "RAR", "D"]*



51.     In the event that plaintiffs are successful in their argument set forth in the prior paragraph, then plaintiffs are obligated to Netherby for additional Contingent Payments based on revenues paid under the Services Agreement by HBC/Zellers and plaintiffs would be in default of their obligations under the 1988 Agreement.

52.     As HBC/Zellers continues to make payments to GVAC under the Services Agreement, and as plaintiffs have deprived Netherby of its contractual right to audit plaintiffs' books and records, Netherby cannot state with certainty what the amount of this claim will be at the conclusion of this case, but asserts that it may exceed $1 million.  As a result, in the event plaintiffs prevail on their argument with regard to allocation of payments, Netherby is entitled to compensatory damages from plaintiffs plus interest thereon.



### THIRD COUNTERCLAIM
### (Breach of Guarantee)

53.     Netherby repeats and realleges each and every allegation contained in paragraphs 1 through 52 above.



54.     At the time the 1988 Agreement was signed, a Guarantee was executed pursuant to which a Guarantor guaranteed the payment of all Contingent Payments and other obligations due to Netherby under the 1988 Agreement.  Specifically, Paragraph 1 of the Guarantee, a copy of which is annexed hereto as Exhibit 6, provides that the Guarantor:

> "irrevocably and unconditionally guarantees to Guaranteed Party [Netherby] . . . the due and punctual performance and observance by Buyer of each of the covenants and agreements made by Buyer in, and the punctual payment when due of each of the obligations required to be paid by Buyer under, the [Acquisition] Agreement . . . .  If any or all of the Obligations are not

performed, observed or paid by Buyer, when and as due, the undersigned [Guarantor] shall, without notice or demand, immediately perform, observe or pay such delinquent Obligations."

55. The obligations of Guarantor under a Guaranty were assumed by GVTI on or about August 3, 1993. Upon information and belief, GVBV has also assumed the obligations of Guarantor under the Guaranty.

56. Paragraph 2 of the Guarantee provides that the guarantor:

"further agrees to pay any and all costs and expenses (including court costs and reasonable attorneys' fees) paid or incurred by [plaintiff] in enforcing any rights under this Guarantee."

57. GVTI and GVBV, as Guarantors, are obligated to pay Netherby for all of its losses and damages suffered as a result of all breaches of the 1988 Agreement and breaches of the Guarantee, including, but not limited to, any payments due under the 1988 Agreement. In addition, under the Guarantee plaintiffs are obligated to pay and/or reimburse Netherby for its legal fees and related expenses incurred in connection with the dispute.

WHEREFORE, Netherby Limited respectfully requests the entry of a final judgment in this action (a) dismissing the complaint in its entirety, (b) granting Netherby declaratory judgment as requested in the first counterclaim and first third party claim, (c) awarding Netherby compensatory damages as requested in the second counterclaim and second third-party claim in an amount to be proven, (d) awarding Netherby compensatory damages as requested in the third counterclaim in an amount to be proven, (e) awarding Netherby its legal

fees and related expenses, (f) awarding Netherby its costs and disbursements of this action, and

(g) granting Netherby such other and further relief as this Court deems just and proper.

Dated: New York, New York
      August 6, 2001


                        CHADBOURNE & PARKE LLP

                        By _____
                              Thomas J. Hall
                            A Member of the Firm
                      Attorneys for Defendant, Counterclaimant
                          and the Third-Party Plaintiff
                      30 Rockefeller Plaza
                      New York, New York  10112
                      (212) 408-5100