# LICENSE AGREEMENT

## GLORIA VANDERBILT TRADEMARK B.V.

### AND

## HUDSON'S BAY COMPANY

LICENSE AGREEMENT, dated as of August 2/ , 1998, and between Gloria Vanderbilt Trademark B.V., a Netherlands corporation having an address at Karspeldreef 2, 1101 CJ Amsterdam-Z.O., The Netherlands, ("Licensor") and Hudson's Bay Company, a Canadian corporation having an address at 401 Bay Street, Toronto, Ontario, Canada M5H 2YR ("Licensee").

WHEREAS, Licensor is the owner, by assignment from G.V. Trademark Investments, Ltd., of certain trademarks in Canada (the "Territory") which are set forth on Schedule A (the "Trademarks") with respect to certain products and has the right to use and grant licenses to utilize the Trademarks in the Territory; and

WHEREAS, Licensee is desirous of obtaining a license to utilize the Trademarks in connection with the manufacture, sale and marketing of the merchandise set forth on Schedule B (the "Licensed Products") in the Territory.

NOW, THEREFORE, in consideration of the mutual representations, warranties and covenants hereinafter set forth, the parties hereby agree as follows:

1.   Grant of License

1.1   Upon the terms and subject to the conditions hereinafter set forth, Licensor hereby grants to Licensee during the term of this Agreement, the exclusive right (except as set forth on Schedule B) and license to use the Trademarks, including approved variations and stylized forms thereof, in connection with the manufacture and sale of the Licensed Products solely within Licensee's subsidiary's Zellers retail stores

C:\WPDOCS\GV\HUDSON'SBAY.LIC
Final

within the Territory.  Licensor agrees that during the term of this Agreement, it shall not license the Trademarks to any other person or entity with respect to the distribution or sale of Licensed Products within the Territory.

1.2     Licensee shall not make, or authorize to be made, any use, directly or indirectly, of any variation of the Trademarks (except in accordance with Section 6.2 herein), or make, authorize to be made, or use the Trademarks in its retail stores in any geographical area other than the Territory, or on any articles of any description other than Licensed Products (except in accordance with Section 1.4 herein). Notwithstanding the foregoing, Licensee shall be permitted to manufacture or cause to be manufactured Licensed Products outside of the Territory.

1.3     Except as provided herein, Licensee shall not, directly or indirectly, sell Licensed Products outside of the Territory or sell Licensed Products to any person or entity which it knows, or has reason to believe, intends to sell Licensed Products outside of the Territory.

1.4     In the event Licensee wishes to produce as a Licensed Product any article not set forth on Schedule B, Licensee must obtain the express approval of Licensor.  Licensor agrees to discuss in good faith with Licensee any request by Licensee to produce as a Licensed Product any article not set forth on Schedule B, but Licensor's approval or disapproval shall be within its sole discretion.  In the event of any question regarding the definition of Licensed Products to be manufactured and sold by Licensee, the final decision shall rest with Licensor, acting reasonably.

1.5     Licensee shall not manufacture, or cause to be manufactured, for sale Licensed Products which have been approved by Licensor pursuant to Section 5 herein under a trademark or label other than the Trademarks if such Licensed Products are uniquely distinctive in design and features from other similar products.  The foregoing shall not apply with respect to designs of Licensed Products which have previously been "knocked-off" in the marketplace for at least one (1) selling season following use of such design for a Licensed Product.

1.6     Anything in this Agreement to the contrary notwithstanding, Licensor and any of its other licensees shall have the right at any time to manufacture in the Territory, Licensed Products for sale outside of the Territory.

2.    Consent of Cosmair

2.1    Licensee understands that Licensor has purchased the Trademarks from G.V. Trademark Investments, Ltd., a successor to G.V. Licensing, Inc., a successor to Murjani Worldwide B.V. ("Murjani"), and that pursuant to a license agreement between Cosmair, Inc. ("Cosmair") and Murjani dated May 31, 1985, Cosmair has the right to approve all licenses of the Trademarks, which approval Cosmair may not unreasonably withhold.  Upon the execution of this Agreement, Licensor shall immediately take all steps necessary to obtain such consent promptly so that Licensee is not delayed from enjoying the rights afforded to Licensee under this Agreement, and, upon the grant of such consent by Cosmair, Licensor shall immediately deliver notice in writing to Licensee stating that such consent has been granted.  Licensee shall cooperate with Licensor in obtaining such consent and shall promptly furnish Licensor with any and all information reasonably requested by Cosmair in connection therewith.  In no event shall Licensor or Licensee be required to pay any money to Cosmair to obtain such consent, and in no event shall Licensee be obligated to make any payments to Licensor hereunder unless and until Cosmair's consent shall have been obtained.  In the event that Licensor does not obtain such consent and give such notice within thirty (30) days after the date hereof, either Licensor or Licensee may elect to terminate this Agreement by notice in writing to the other, in which event this Agreement shall be null and void and of no force or effect.  Evidence of Cosmair's consent shall be given in writing by or on behalf of Licensor, and may consist solely of a letter from Licensor's attorney stating that such consent has been granted.

3.    Sublicensing; Assignment

3.1    Licensee shall not at any time, without the prior written consent of Licensor, assign, transfer or in any manner convey the rights, obligations or benefits of this Agreement to any other party, and such consent shall be granted or denied in Licensor's sole discretion.  In the event that there should occur a change of control of Licensee (including, but not limited to, a merger, consolidation, or sale of all or substantially all of the assets of Licensee) Licensor shall have the right to terminate this Agreement, at its sole option, upon thirty (30) days written notice effective upon receipt thereof.  The transfer of ownership pursuant to a public offering of the stock of Licensee shall not, for purposes of this Section, constitute a change of control of Licensee.  Nothing herein shall prohibit a transfer of this Agreement in connection

with a change of control of Licensee, where such control has been transferred to a non-retailer equity investor or investors in Licensee. Further, nothing herein shall prohibit Licensee from assigning this Agreement to a parent or subsidiary of Licensee, provided Licensee remains fully liable hereunder, and the Licensed Products continue to be sold exclusively in Zellers retail stores.

3.2     Licensee shall have no right to sublicense any of the rights granted to Licensee herein.

4.     Term of Agreement

4.1     Unless sooner terminated as provided herein, the initial term of this Agreement (the "Initial Term") shall be for a period of approximately three and one-half (3 ½) years commencing on the date hereof and ending on December 31, 2001. Licensee shall have the right to renew this Agreement for an additional term of three (3) years (commencing on January 1, 2002 and ending on December 31, 2004) (the "Renewal Term") by giving notice to Licensor of its desire to so renew not less than four (4) months prior to January 1, 2002, provided that Licensee's Retail Sales (as that term is defined in Section 8.2(b) herein at the time of the renewal notice and at the commencement of the Renewal Term meet the Minimum Retail Sales Requirement set forth on Schedule B and Licensee is not otherwise in default under this Agreement.

5.     Quality Control

5.1     (a) The Licensed Products and all tags, labels, cartons, containers, wrappings, displays, fixtures and other materials in which or with which Licensed Products are packaged and/or displayed ("Packaging Materials") shall be of such standards and of such style, appearance, distinctiveness and quality as to protect and enhance the prestige of Licensor and of the Trademarks and the goodwill pertaining thereto, which shall not be lesser than the standards and style, appearance, distinctiveness and quality of products similar to the Licensed Products currently being manufactured and sold at equivalent price points in the United States by Gloria Vanderbilt Apparel Corp. ("GVAC"). The Licensed Products will be manufactured, packaged, sold, marketed and advertised in accordance with all applicable national and local laws and regulations. The policy of sale, marketing and advertising by Licensee shall be such that the same shall in no manner reflect adversely upon the good name of Licensor or the Trademarks.

(b)     Licensee acknowledges that the complete control by Licensor over the nature and quality of all Licensed Products and all Packaging Materials subject to the terms and conditions of this Agreement is an essential element of the license herein granted.  Accordingly, all aspects of the use of the Trademarks and the fabrication, material, construction and design (including related artwork) of the Licensed Products and Packaging Materials shall be subject to the prior written approval of Licensor, as set forth herein.  Licensee agrees that the brand positioning of the Licensed Products shall be comprable to the brand positioning of such products in the United States.

5.2     It is acknowledged that Licensor has the right subject to the terms and conditions of this Agreement to approve quality, all designs, concepts, fabrications and colors of Licensed Products, which shall not be unreasonably withheld.  To implement the foregoing, Licensee shall submit concept boards to Licensor before it sells any item proposed to be a Licensed Product.  The concept board shall present concepts of the designs of all items, all material fabrications to be used therein, and all colors in which the items are proposed to be produced.  Once the concept board is approved by Licensor hereunder, Licensee may produce and sell such item as a Licensed Product provided the production items are substantially consistent with the concept board presentation thereof.  Licensor may request the right, at its expense, to inspect production samples from time to time to confirm such consistency.  Any request for approval hereunder, if not rejected in writing within five (5) business days by Licensor, shall be deemed approved. If Licensor shall disapprove, it shall state the reasons therefor and the requirements to make the submission acceptable, and if Licensee modifies the submissions to conform to such requirements, the same may be resubmitted for approval by Licensor which shall respond within two (2) additional business days and shall not unreasonably withhold such approval.  Failure to further disapprove within such time shall be deemed approval.

5.3     Upon learning of any material large-scale complaints from consumers or material large-scale problems concerning the Licensed Products (i.e., a quality problem with a large shipment of merchandise), Licensee shall notify Licensor of same and thereafter Licensee shall conduct or cause to be conducted tests and verification procedures on samples of each Licensed Product so complained of to assure that the quality thereof is at least equal to the quality required hereunder and shall promptly notify Licensor of the procedures and steps taken to resolve such complaints or problems.

5.4     Omitted.

5.5     Licensee shall be permitted to sell damaged or defective Licensed Products, provided that such Licensed Products are clearly marked "Irregular." Prior to the sale of Licensed Products that are substantially damaged or defective, Licensee shall remove or cause to be removed all hang tags, labels, and any other indicia of Trademarks from the Licensed Products, and additionally shall advise or cause to be advised any purchaser of such Licenced Products that they are prohibited from using the Trademarks in connection with such Licenced Products. Licensee shall be permitted to sell such substantially damaged or defective Licensed Products, after compliance with the foregoing conditions, within or outside of the Territory.

5.6     Upon request of Licensor, Licensee shall provide Licensor with the known addresses of all facilities, including third party manufacturers, where the Licensed Products, and components thereof (if known), and Packaging Materials are manufactured or will be located prior to shipment to Licensee's customers. Licensor shall have the right, upon reasonable notice, during regular business hours, to inspect all such facilities controlled by Licensee and Licensee shall use its reasonable efforts to obtain permission for Licensor to inspect all third party facilities. Inspections may include any reasonable actions necessary to assure Licensor that the Licensed Products and Packaging Materials are being manufactured consistent with approved standards.

5.7     Licensee agrees that the Licensed Products and Packaging Materials manufactured and sold shall be substantially consistent with the concept boards submitted to and approved by Licensor. If Licensee is not properly using the Trademarks on Licensed Products or Packaging Materials, or if the standard of quality of any Licensed Product or Packaging Material does not conform to the standards set forth in Section 5.1(a), or if the Licensed Products or Packaging Materials do not conform in any other way to the approval made by Licensor hereunder, Licensor may give Licensee notice to this effect, identifying in such notice the situation to which it objects. Upon receipt of such notice, Licensee shall immediately (a) cease the manufacture and sale of such nonconforming items and (b) correct the defects in any nonconforming Licensed Products so that they comply with all required standards and correct the manufacturing process or destroy same, or dispose of same as set forth in Section 5.5. Notice by Licensor hereunder shall not relieve Licensee from its obligation to pay Sales Royalties (as defined herein) on such Licensed Products for sales made by Licensee to the date of such notice or thereafter. Licensee shall reimburse Licensor for any samples of Licensed Products it purchases in the market that Licensor claims to be non-conforming.

5.8    Licensor may require Licensee to revise approved Packaging Materials, in which event, Licensee shall be permitted to deplete the remaining Packaging Materials within one (1) year of Licensor's notifying Licensee to revise such Packaging Materials.

6.    <u>Use of Trademarks</u>

6.1    Licensee shall not at any time use, promote, advertise, display or otherwise commercialize the Trademarks or any material utilizing or reproducing the Trademarks in a manner that will adversely affect any rights of Licensor therein or in a manner that would derogate or detract from the repute of Licensor or the Trademarks.  Licensee shall not use the Trademarks in any manner whatsoever (including, without limitation, for advertising, promotional and publicity purposes), without obtaining the prior written approval of Licensor, as required herein.  Such approval will be deemed given if such use is in strict conformity with the trademark specifications referred to in Section 6.2 below; provided, however, that such approval shall apply only to the manner in which the Trademarks are used and shall not be construed as approval of any Licensed Product, Packaging Material, advertisement, promotion or publicity campaign, or an opinion that the approved material complies with any applicable laws.  An approval, as required under this Agreement, shall not survive the use period set forth in the written approval and shall not be construed as consent to violate any applicable law.

6.2    Licensor shall furnish or cause to be furnished to Licensee from time to time, trademark specifications containing samples of its approved standard formats and modes of use of the Trademarks then in force, including, without limitation, styles, scripts, colors and size specifications (the "TM Specifications").  Licensor may, in its sole discretion, revise the TM Specifications from time to time during the term of this Agreement and shall furnish Licensee with a copy of any such revision.  Subject to Section 5.8, Licensee shall comply with all such revisions.  Licensor's failure to furnish Licensee the TM Specifications shall not excuse Licensee from obtaining Licensor's prior approval of the manner of use of the Trademarks.  In the event that Licensee wishes to deviate from the TM Specifications in its presentation or use of the Trademarks, Licensee may do so only upon Licensor's written approval (not to be unreasonably withheld) after the submission of a sample of the proposed trademark usage to Licensor.  To the extent that any such new trademark usage is approved by Licensor and thereupon adopted by Licensee,

such new trademark usage shall be owned by Licensor and shall be considered in all respects to be a "Trademark" hereunder.

6.3    Licensee shall affix or apply to all Licensed Products developed and merchandised under this Agreement, tags or labels bearing or using the Trademarks and agrees that such use of the Trademarks shall be strictly in conformity with the TM Specifications or as otherwise set forth in any approval of Licensor then in effect.  No Licensed Products developed and merchandised under this Agreement shall bear or have affixed to it any trademark other than the Trademarks.  Notwithstanding the foregoing, if required by law, all Licensed Products and/or Packaging Materials shall contain Licensee's identifying mark so that the origin of the Licensed Products can be determined.

6.4    Licensee shall cause to appear on or within each Licensed Product, and on all Packaging Materials and in all advertising using the Trademarks, all appropriate or necessary trademark legends, markings and notices as may be required by law or regulation in the Territory, and all in the name of Licensor as set forth in the TM Specifications or as otherwise set forth in any notice received from Licensor.

6.5    (a)    Except as otherwise provided herein and in Section 11.2, Licensor assumes no liability to Licensee or third parties with respect to Licensee's use of the Trademarks or with respect to Licensee's use of any and all marks, letters, words, symbols, characters, designs and the like other than the Trademarks, on or in connection with the Licensed Products and/or Packaging Materials.  Licensee hereby indemnifies and holds Licensor harmless from and against any and all claims, actions, suits, liabilities, losses, damages, costs and expenses (including, without limitation, its reasonable attorneys' fees and disbursements) arising out of Licensee's use, or the use by any Affiliate (as that term is defined in Section 8.2 (b) herein), of the Trademarks or any marks, letters, words, symbols, characters, designs and the like other than the Trademarks on or in connection with the Licensed Products and/or Packaging Materials irrespective of Licensor's approval thereof, except that in the event that a third party claims that Licensee's and/or its Affiliates' use of the Trademarks, as authorized under this Agreement and in a manner approved by Licensor, or Licensee's and/or its Affiliates' use of any marks, letters, words, symbols, characters, designs and the like other than the Trademarks supplied or furnished by Licensor and used in a manner approved by Licensor, infringes upon such third party's rights, Licensor shall indemnify Licensee and its Affiliates against such claim in accordance with Section 11.2 hereof.

or contravenes

(b)    Licensee's use of the Trademarks or any and all legally protectable marks, letters, words, symbols, characters, and the like other than the Trademarks, on or in connection with the Licensed Products and/or Packaging Materials shall inure to the benefit of Licensor, except for the identifying marks of Licensee and its Affiliates (including, without limitation, the Zellers tradename and trademark) to the extent used on or in connection with Licensed Products pursuant to this Agreement, and Licensee shall take any and all steps reasonably required by Licensor and the law to perfect Licensor's rights therein, at Licensor's expense.

7.    Advertising and Promotion

7.1    Omitted.

7.2    With the view towards protecting the prestige of the Trademarks and Licensor, all concepts and strategies with respect to any advertising, promotion or public relations materials or campaigns and trade releases intended to be used by or for Licensee in respect of the Licensed Products must be approved in advance by Licensor in writing.   Licensee shall review such concepts and strategies with Licensor on a quarterly basis and obtain Licensor's input with respect thereto.

8.    Royalties

8.1    In consideration of the license granted by Licensor hereunder, Licensee shall pay to Licensor a guaranteed minimum royalty payment for each Year in the amounts set forth on Schedule B (the "Minimum Royalty"), which, once paid, shall not be returnable. The Minimum Royalty for each Year shall be payable on the dates set forth on Schedule B.

8.2    (a) In consideration of the license granted by Licensor hereunder, Licensor shall be entitled to receive a royalty payment on all Retail Sales (as that term is defined below) of Licensed Products at the rate of one and one-quarter (1 ¼ %) percent of the Retail Sales of Licensed Products (the "Sales Royalty") in accordance with the schedule in Section 8.2(c).   For greater certainty, the Sales Royalty shall be payable to the extent that it exceeds the Minimum Royalty payable hereunder.

(b) For purposes of this Agreement the term "Retail Sales" means the retail invoice price (net of discounts and mark-downs) charged for Licensed Products sold by or for Licensee or any individual or

entity that, directly or indirectly, controls, is controlled by, or under common control with, Licensee (an "Affiliate"). In computing Retail Sales, deductions shall be permitted solely for credits, refunds, returns and taxes.

(c) Sales Royalties shall be accounted for and paid quarterly for each calendar quarter during each Year of the Term and shall be computed on the basis of Retail Sales during such quarter. Sales Royalties will be payable no later than ten (10) days after the end of the quarter in which the Retail Sales were made. The computation of Sales Royalties shall be made in Canadian dollars and then converted to U.S. dollars on the basis that $1.00 (Can.) = $1.00 (U.S.).

8.3     All payments under this Agreement shall be made in the U.S., in U.S. currency or by good check in U.S. dollars to Licensor at P.O. Box 10070, Church Street Station, New York, New York 10259-0070. The foregoing payment instructions shall not be amended or changed without the prior written consent of Marine Midland Bank ("Lender").

8.4     All late royalty payments shall bear interest at two (2%) percent per annum in excess of the prime rate charged by The Chase Manhattan Bank, N.A. to its preferred customers from time to time on the amount unpaid (or, if a lesser amount, the maximum interest rate allowed by law), computed from the date such payment was due to and including the date of payment.

9.     Business Activities

9.1     In furtherance of its duties and obligations hereunder and throughout the term of this Agreement, Licensee shall (a) diligently promote the sale and marketing of the Licensed Products in its retail stores throughout the Territory and (b) cooperate at Licensor's expense with all of the Licensor's domestic and international marketing, merchandising, sales and anti-counterfeiting programs.

9.2     Licensee shall appoint at least one brand manager whose responsibilities will include coordinating, merchandising and managing the sales of the Licensed Products and to liaise with Licensor. Licensor shall also appoint a brand manager to work with Licensee.

9.3     Thirty (30) days prior to the commencement of each Year during the Term of this Agreement, Licensee shall present to Licensor a report containing a projection of Retail Sales for that Year, by season (six (6) months).

9.4     Licensee shall not give away Licensed Products or sell Licensed Products in connection with any tie-in or promotional campaign relating to products other than Licensed Products without the prior consent of Licensor, not to be unreasonably withheld.  Nothing herein shall prohibit Licensee from distributing Licensed Products in connection with "Club Z" or in connection with storewide promotions.

9.5     Omitted.

9.6     Licensor shall have the right to call meetings to be held at either Licensor's offices in New York City and/or New Jersey or Licensee's offices in Brampton, Ontario, Canada, not more frequently than once every three (3) months, at the convenience of the parties, with at least ten (10) days' advance notice to Licensee, to generally review matters relating to the terms and conditions of this Agreement, and to consider policies, planning and performance relating to quality control, production, marketing, sales forecasts, advertising and promotion of the Licensed Products and any other special matter or matters of concern.  All meetings shall be attended by representatives of the parties who are responsible for performance of those matters to be discussed.

9.7     Omitted.

9.8     Without limiting the foregoing, Licensee covenants as follows:  (a) Licensee agrees not to knowingly use child labor in the manufacturing, packaging or distribution of Licensed Products.  The term "child" refers to a person younger than the age for completing compulsory education, but in no case shall any child younger than fourteen (14) years of age be employed in the manufacturing, packaging or distribution of Licensed Products; (b) Licensee agrees to provide employees with a safe and healthy workplace in compliance with all applicable laws.  Licensee agrees to use its reasonable efforts to provide Licensor with all information it may reasonably request about manufacturing, packaging and distribution facilities for the Licensed Products; (c) Licensee agrees only to employ persons whose presence is voluntary.  Licensor agrees not to knowingly use prison labor, or to knowingly use corporal punishment or other forms of mental or physical coercion as a form of discipline of employees; (d) Licensee agrees to comply with all applicable wage and hour laws, including minimum wage, overtime, and maximum hours. Licensee agrees to utilize fair employment practices as defined by applicable laws; (e) Licensee agrees not to knowingly discriminate in hiring and employment practices on grounds of race, religion, national origin, political affiliation, sexual preference, or gender; (f) Licensee agrees to comply with all applicable environmental laws; and (g) Licensee upon reasonable prior written notice of Licensor and at Licensor's expense agrees that Licensor may engage in on-site inspections of manufacturing, packaging and

distribution facilities in order to monitor compliance with applicable laws. Licensee agrees that it will not knowingly use third-party manufacturers and suppliers who are found not to be in substantial compliance with the foregoing standards.

10.    Property of Licensor

10.1    Licensee recognizes the great value of the goodwill associated with the Trademarks and the identification of the Licensed Products with the Trademarks and acknowledges that the Trademarks and all rights therein and goodwill pertaining thereto belong exclusively to Licensor and have acquired a secondary meaning in the minds of the trade and the purchasing public. Sales by Licensee shall be deemed to have been made by and for the benefit of Licensor for the purposes of trademark registration.

10.2    Licensee shall (a) never challenge the validity of Licensor's ownership of the Trademarks or any application for registration or registration thereof and (b) never contest the fact that Licensee's rights under this Agreement are solely those of a manufacturer and seller, and terminate upon expiration or termination of this Agreement. Licensee shall at any time, whether during or after the term of the Agreement, execute any documents reasonably requested by Licensor or, at Licensor's expense, supply Licensor with any samples or other materials to confirm Licensor's ownership rights or to assist Licensor in the registration of any trademark or copyright. All rights in the Trademarks other than those specifically granted herein are reserved by Licensor for its own use and benefit. If, as a result of its exploitation of the Licensed Products Licensee acquires any trade rights, equities, title or other rights in and to the Trademarks, Licensee hereby assigns to Licensor any and all such rights as of the time that they may be deemed to accrue to Licensee, without consideration other than the consideration of this Agreement. Licensee agrees not to register, or attempt to register, the Trademarks in its own name or any other name, anywhere.

10.3    All provisions of this Section 10 shall survive the expiration or termination of this Agreement.

11.    Trademark Protection

11.1    In the event that Licensee learns of any infringement or imitation of the Trademarks or of any use by any person or entity of a trademark similar to the Trademarks, it shall promptly notify Licensor.

Licensor thereupon shall take such action as it deems advisable for the protection of Licensor's rights in and to the Trademarks and, if requested to do so, Licensee shall cooperate with Licensor in all respects, at Licensor's expense. Licensor shall have the sole right to determine if any such action shall be taken and shall have sole control over the form of such action and/or the settlement thereof. If Licensor deems it inadvisable to take any such action, Licensee may then take such action at its own expense provided it first obtains the approval of Licensor, which approval shall not be unreasonably withheld. Any award, or portion of an award, recovered in any such action or proceeding commenced by Licensor or Licensee (as permitted herein) shall first be applied to any out-of-pocket expenses incurred by Licensor or Licensee in connection with the prosecution of such action or proceeding and the balance shall be divided in accordance with the court's determination and allocation of damages, and any damages allocated to Licensee shall be deemed Retail Sales for the account of Licensee subject to a Sales Royalty payment as provided for herein.

11.2    Licensor agrees to defend, indemnify and hold harmless (including, reasonable attorneys' fees and disbursements) Licensee and its Affiliates, their officers, directors, shareholders, employees and authorized representatives, from and against any and all losses, claims, liabilities, demands, law suits, judgments, damages, costs and expenses arising out of Licensee's and/or its Affiliates' use of the Trademarks, as authorized under this Agreement and in a manner approved by Licensor; or Licensee's and/or its Affiliates' use of any marks, letters, words, symbols, characters, designs and the like other than the Trademarks, supplied or furnished to Licensee and/or its Affiliates by Licensor and used in a manner approved by Licensor; or Licensee's and/or its Affiliates' use of any designs, patterns, or specifications supplied or furnished to Licensee and/or its Affiliates by Licensor for use in connection with the manufacture of Licensed Products, provided such designs, patterns, or specifications are used by Licensee strictly in accordance with such designs, patterns, or specifications , without modification or alteration (a "Licensor Covered Claim"). Licensee shall notify Licensor promptly after it receives notice of any Licensor Covered Claim. Licensor shall defend any such action at its cost and expense, and with counsel of its own choice, who shall be reasonably acceptable to Licensee.

11.3    All provisions of this Section 11 shall survive the expiration or termination of this Agreement.

12.    Design Ownership

12.1    All uniquely distinctive designs, concepts, patterns, names and other intellectual property developed by Licensee [other than as set forth in Section 6.5(b)] shall be owned solely by Licensee.  All uniquely distinctive designs, concepts, patterns, names and other intellectual property developed by Licensor shall be owned solely by Licensor.  All Licensed Products manufactured from designs submitted by Licensee and approved by Licensor shall bear the Trademarks.  Notwithstanding the foregoing, Licensor and Licensee agree not to manufacture, or cause to be manufactured, for sale any uniquely distinctive designs created by the other or their respective affiliates, employees, officers, directors, stockholders or independent contractors, for similar products, unless such design has previously been "knocked-off" in the marketplace for at least one (1) selling season following use of such design by Licensor or Licensee, as the case may be.  It is acknowledged by Licensor that the identifying marks of Licensee and its Affiliates (including, but not limited to, the Zellers tradename and trademark) are the sole property of Licensee and/or its Affiliates.


13.    Sales Reports and Recordkeeping; Right to Inspect

13.1    On or before the tenth (10th) day following the end of every calendar quarter during the Term, Licensee shall submit a report relating to the activity of the immediately preceding quarter which shall include the Retail Sales by Licensed Product category, and any other information that may be required under any other provision of this Agreement or as may be reasonably requested by Licensor as back-up, together with a check for Sales Royalties due thereon.  Such statement shall be furnished to Licensor in duplicate whether or not any Licensed Products have been sold during the preceding quarter, and shall be signed by a duly authorized officer of Licensee certified by him or her as being accurate.  Subject to Section 13.2, receipt or acceptance by Licensor of any of the reports furnished or of any sums paid, shall not preclude Licensor from questioning its correctness at any time thereafter.

13.2    Licensee and each of its Affiliates who sell Licensed Products shall prepare and maintain complete and accurate records, in accordance with generally accepted accounting principles consistently applied, covering all transactions relating to the license hereby granted.  Licensor and its duly authorized representatives, on reasonable notice, shall have the right, from time to time, during normal business hours and on a confidential basis, to examine said records and all other accounts, documents, materials and

inventory in the possession or under the control of Licensee and any such Affiliate with respect to the subject matter of this Agreement, and shall have free and full access thereto for said purposes and for the purpose of making copies and extracts therefrom, at Licensor's expense. Licensor agrees to keep such records and documents confidential except as may be necessary for examination by Licensor's representatives and for purposes of litigation. In the event any of said examinations result in a deviation of actual Sales Royalties versus reported Sales Royalties, of five (5%) percent or more, Licensee agrees not only to pay any Sales Royalties due within twenty (20) days, together with interest as provided under Section 8.4, but further agrees to pay the reasonable costs of such examination. All records shall be kept available for at least two (2) years after the expiration or termination of this Agreement.

13.3   No later than sixty (60) days after the end of each Year, Licensee shall deliver to Licensor a statement certified by an officer of Licensee, showing Retail Sales, and Sales Royalties due and paid by Licensee for the preceding Year (an "Annual Report"). If the Annual Report discloses that the amount of Sales Royalties paid to Licensor during the period to which said Annual Report relates is less than the amount required to be paid to Licensor pursuant to the terms of this Agreement, Licensee shall pay said deficiency to Licensor, together with interest as provided under Section 8.4, concurrently with the delivery of such Annual Report.

13.4   At Licensor's request, Licensee shall also deliver to Licensor a copy of its annual audited financial statement, prepared in accordance with generally accepted accounting principles consistently applied, as soon as such statement becomes available. Licensee's fiscal year is set forth on Schedule B.

13.5   Each Licensed Product shall be assigned a style number unique from all other products sold by Licensee, including other Licensed Products. The style number assigned to each Licensed Product shall be identical to the style number utilized to identify that particular Licensed Product in all of Licensee's or any Affiliate's records. All documents evidencing the sale of Licensed Products (other than the sales reports required under this Section 13) shall state the style number of such products.

13.6   All sales of Licensed Products shall be recorded by Licensee to easily trace the source of the reported sales.

14.     Termination

14.1     If in any Year the Retail Sales of Licensed Products do not meet or exceed the Minimum Retail Sales Requirement listed on Schedule B, then Licensor shall have the right to terminate this Agreement within thirty (30) days after its receipt of the Annual Report for the given Year or its discovery of such shortfall, whichever is later, effective upon receipt of notice thereof.  The Retail Sales reported on the Annual Report shall be conclusive for purposes of this Section 14.1; any later discovery that the Retail Sales reported on the Annual Report were more than the actual Retail Sales shall give Licensee no later right to claim that the above Minimum Retail Sales Requirement had been met.

14.2     If Licensee fails to manufacture and sell commercial quantities of any category of merchandise of the Licensed Products by January 31, 2000, or in the event Licensee commences to manufacture and sell commercial quantities of any category of merchandise of the Licensed Products within such period and then discontinues the manufacture and sale of commercial quantities of such category of merchandise of the Licensed Products for a period of one (1) year, unless such discontinuance shall be as a result of force majeure or other similar unavoidable circumstances beyond Licensee's control, then, in either of such circumstances, Licensor and Licensee shall consult with each other and review Licensee's future plans, if any, to manufacture and sell such category of merchandise of the Licensed Products, and in the event Licensor determines, in good faith, and acting reasonably, that it would be in the best interests for the enhancement and promotion of the Trademarks that such category of merchandise of the Licensed Products should no longer be licensed to Licensee hereunder, then Licensor shall have the right to terminate this Agreement with respect to such category of merchandise of the Licensed Products effective upon receipt of notice to Licensee.  "Category of merchandise" as used in this section refers to the classes of items set forth in paragraphs (a) through (u) on Schedule B and not to the individual items making up the various classes.

14.3     If Licensee is in default on any obligation which is secured by a lien on any Licensed Products and such lien is being enforced, or if Licensee breaches Sections 1.2 or 1.3 of this Agreement and such breach involves $100,000 or more (either as to an individual breach or in multiple breaches in the aggregate) worth of Licensed Products (on a retail basis) in any Year, or if Licensor terminates any other agreement it may have with Licensee for reason of Licensee's default thereunder, then Licensor shall have the right to terminate this Agreement effective upon receipt of notice without providing Licensee with an

opportunity to cure its default or breach except to the extent expressly set forth in the aforementioned Sections.

14.4    (a)    Unless the same is dismissed within sixty (60) days, if Licensee or an Affiliate files a petition in bankruptcy or is adjudicated a bankrupt or a petition in bankruptcy is filed against Licensee or an Affiliate or if Licensee or an Affiliate becomes insolvent or makes an assignment for the benefit of creditors or any arrangement pursuant to any bankruptcy law, or if Licensee or an Affiliate discontinues its business or if a receiver is appointed for Licensee or an Affiliate or otherwise, then this Agreement and the license hereby granted shall automatically terminate forthwith without any notice whatsoever being necessary, to the full extent allowed by applicable law. All Sales Royalties on sales made theretofore shall become immediately due and payable. No Minimum Royalty payments paid in advance shall be repayable. In the event this Agreement and the license hereby granted are so terminated, Licensee, its receivers, representatives, trustees, agents, administrators, successors and assigns, shall have no right to sell, exploit or in any way deal with or in any of the Licensed Products theretofore manufactured or in progress, or use any of the Packaging Materials or advertisements pertaining thereto except with and under the special consent and instructions of Licensor.

(b)    Notwithstanding the provisions of this Section 14.4, in the event that pursuant to Canadian bankruptcy law (the "Bankruptcy law"), a trustee in bankruptcy (or the equivalent) of Licensee or an Affiliate or Licensee or an Affiliate, as debtor, is permitted to assign this Agreement to a third party, which assignment satisfies the requirements of the Bankruptcy Law, the trustee or Licensee or such Affiliate, as the case may be, shall notify Licensor of same in writing. Said notice shall set forth the name and address of the proposed assignee, the proposed consideration for the assignment and all other relevant details thereof. The giving of such notice shall be deemed to constitute an offer to Licensor to have this Agreement assigned to it or to its designee for such consideration, or its equivalent in money, and upon such terms as are specified in the notice. The aforesaid offer may be accepted by written notice given to the trustee or Licensee or such Affiliate, as the case may be, by Licensor within thirty (30) days after Licensor's receipt of the notice from such party. If Licensor fails to give its notice to such party within said thirty (30) days, such party may complete the assignment referred to in its notice, but only if such assignment is to the entity named in said notice and for the consideration and upon the terms specified therein. Nothing contained herein shall be deemed to preclude or impair any rights which Licensor may have as a creditor in any bankruptcy proceeding.

14.5   Except as otherwise expressly provided in this Agreement, in the event Licensee or an Affiliate shall default in the performance of any of the terms and conditions on the part of Licensee to be performed hereunder, and if such default involves the payment of money or the failure to submit reports and the same shall not be cured within twenty (20) days after notice to Licensee, or if such default involves performance other than the payment of money or the failure to submit reports and Licensee has not cured the same within thirty (30) days after notice to Licensee, Licensor shall have the right to terminate this Agreement.  The preceding sentence notwithstanding, if any such default which involves the payment of money or the failure to submit reports occurs three (3) times during any Year, regardless of whether such prior defaults were cured, Licensor shall have the right to terminate this Agreement effective upon receipt of notice.  An approval of Licensed Products, Packaging Materials or other uses of the Trademarks prior to the effective date of termination that would extend beyond said date shall not be construed against Licensor's actions to terminate this Agreement.

14.6   This Agreement is personal to Licensee and it may assign its rights or duties hereunder only as provided in Section 3.  Any purported assignment or sublicense in violation of Section 3 shall be null and void and at the option of Licensor shall constitute an incurable default hereunder.

14.7   Omitted.

14.8   If Licensee defaults in the performance of any of its obligations under this Agreement and Licensor terminates this Agreement, Licensor may, at its option, terminate any other license or other agreement between Licensor (or any of its Affiliates or GVAC) and Licensee (or any of its Affiliates) within thirty (30) days after such default, effective upon receipt of notice thereof.

14.9   In the event Licensee shall not have been granted the rights under Section 1.1 of this Agreement with respect to the Licensed Products set forth in Subsection (k) of Schedule B, on or before January 1, 2000, Licensee may, at its option, up until January 31, 2000, terminate this Agreement, effective upon receipt of notice to Licensor.  Licensee shall have the right to sell-off the remaining Licensed Products in inventory or on order, on a non-exclusive basis, for a one (1) year period following such termination.

15.    Consequence of Expiration or
       Termination of This Agreement

15.1    Upon and after the expiration or termination of this Agreement, all rights granted to Licensee hereunder shall forthwith revert to Licensor, who shall be free to license others to use the Trademarks in connection with the manufacture and sale of Licensed Products in the Territory.

15.2    Expect as permitted by Sections 15.3 and 15.4, upon and after the expiration or termination of this Agreement, Licensee and its Affiliates will refrain from further use of the Trademarks or any further reference to them, directly or indirectly, or of anything confusingly similar thereto, in connection with the manufacture or sale of Licensed Products.  Further, except as provided for in Section 15.4, upon and after expiration or termination of this Agreement, Licensee agrees not to make reference in its advertising or its business materials to having been formerly associated with or a licensee of Licensor under the Trademarks.

15.3    In the event of termination of this Agreement by reason of Licensee's default, as herein provided, Licensor shall have the prior right and option to purchase any or all of the Licensed Products and Packaging Materials, at the cost thereof to Licensee, including shipping, handling, import charges, taxes, and other such items separately reflected on purchase invoices and as then carried on its books of account. Upon such termination Licensee shall immediately cause physical inventories to be taken of (a) Licensed Products on hand; (b) Licensed Products in the process of manufacture; and (c) all Packaging Materials, which inventories shall be reduced to writing and a copy thereof shall be delivered to Licensor not later than fifteen (15) days from such termination.  Licensor, at its expense, shall have the right to be present at such physical inventory or to take its own inventory, and to exercise all rights it has pursuant to Section 13.2 with respect to the examination of Licensee's books and records.  If Licensee does not allow Licensor to take such inventory it shall have no right to sell the remaining Licensed Products.

15.4    Licensee recognizes that any sale of the Licensed Products upon termination or expiration, through other than normal and appropriate channels of distribution, would cause irreparable damage to the prestige of Licensor and to the Trademarks, and to the goodwill pertaining thereto.  Accordingly, Licensee covenants and agrees that all of the Licensed Products in inventory or purchased or ordered prior to such termination or expiration (including Licensed Products not purchased by Licensor pursuant to Section 15.3 above) will be offered for sale or sold only in accordance with the following terms and conditions:

        (a)    Licensee may continue to sell or offer for sale, on a non-exclusive basis, for no later than six (6) months after the date of expiration or termination, all of such Licensed Products.  Such sales shall otherwise be strictly in accordance with the terms, covenants and conditions of this Agreement as

— or one (1) year in the case of termination under Section 14.9

19

though the Agreement had not expired or terminated.  Payment of Sales Royalties to Licensor on such sales shall be made in accordance with Section 8.2.  Licensee shall have the right during the sell-off period to advertise and promote the Licensed Products and to utilize all Packaging Materials during this period, all in accordance with this Agreement.  If, at any time during the six (6) month period, Licensee is willing to sell all or substantial all of its then remaining inventory to a single purchaser or group of related purchasers, Licensee will advise Licensor of the identity of the prospective purchaser(s) and the price and terms of the proposed sale and Licensor will have a right of first refusal to buy the remaining inventory at that price and on those terms following notice to Licensor of such proposed sale.

(b)     Except as permitted by Section 15.4(a), upon the termination or expiration of this Agreement, Licensee shall not, directly or indirectly, sell or offer for sale any merchandise bearing the Trademarks or any trademark similar thereto.  Licensee shall remove all uses of the Trademarks, including without limitation, all tags and labels bearing the Trademarks, from such merchandise and destroy all remaining Packaging Materials or, if Licensor so requests, sell said Packaging Materials to Licensor, at Licensee's cost.

15.5   In the event that this Agreement is terminated pursuant to paragraph 14.1 as a result of Licensee's failure to reach the Minimum Retail Sales requirement, the period within which Licensee may sell off its remaining inventory pursuant to this Section 15 shall be deemed to have commenced on the date of receipt of Licensor's notice thereof.

16.     Representations and Warranties
        of Licensee and Licensor

16.1  Licensee is a corporation duly organized, validly existing and in good standing under the laws of Canada.  Licensee has the full power, authority and legal right to execute and deliver, and to perform fully and in accordance with all of the terms of, this Agreement.  The performance by Licensee of all of its obligations and covenants hereunder does not and will not violate any provisions of any law or regulation, agreement or other instrument to which Licensee is a party or by which Licensee may be bound. This Agreement constitutes a legal, valid and binding obligation of Licensee, enforceable against Licensee in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally.

16.2    Licensor is a corporation duly organized, validly existing and in good standing under the laws of The Netherlands.  Licensor has the full power, authority and legal right to execute and deliver, and to perform fully and in accordance with all of the terms of this Agreement.  The performance by Licensor of all of its obligations and covenants hereunder does not and will not violate any provisions of any law or regulation, agreement or other instrument to which a Licensor is a party or by which Licensor may be bound.  This Agreement constitutes a legal, valid and binding obligation of Licensor, enforceable against Licensor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of  creditors' rights generally.

17.    Miscellaneous

17.1    All notices, approvals, consents, statements and other communications hereunder shall be in writing and shall be deemed given when (a) delivered personally or delivery by telecopy (accompanied by a contemporaneous telecopier confirmation) to the parties on a business day during normal business hours at the addresses or telecopier numbers set forth below (or at such other address or telecopier number for a party as shall be specified by like notice) or (b) three (3) days after being mailed by registered or certified mail (return receipt requested) to the parties at the addresses (or at such other address for the party as shall be specified by like notice) set forth in Schedule B.  Approvals need not be sent to the parties to whom copies are to be sent.

17.2    Nothing herein contained shall be construed to place the parties in relationship of partners or joint venturers and Licensee and any of its Affiliates shall have no power to obligate or bind Licensor in any manner whatsoever.

17.3    Licensor assumes no liability to Licensee, its Affiliates or third parties with respect to the performance or characteristics of the Licensed Products, and Licensee and its Affiliates agree to defend, indemnify and hold harmless (including, reasonable attorneys' fees and disbursements) Licensor, its officers, directors, shareholders, employees and authorized representatives, from and against any and all losses, claims, demands, law suits, judgments, damages, costs and expenses incurred through claims of third persons against Licensor involving the manufacture, sale, marketing or advertising of Licensed Products, including, without limitation, product liability claims (a "Licensee Covered Claim"), but

excluding any Licensor Covered Claim.  Licensor shall notify Licensee promptly after it receives any notice of any Licensee Covered Claim.  Without limiting the generality of the foregoing, Licensee shall obtain and maintain throughout the term of this Agreement, at its own expense, comprehensive general liability Insurance (the "Insurance"), including, but not limited to, product liability insurance with an insurance carrier at least in the amount of $5,000,000 (Can.) per occurrence and $25,000,000 (Can.) in the aggregate naming Licensor, as an additional insured, against any loss, claims, suits, damages, costs or expenses arising out of any alleged defects in the Licensed Products, and for coverage against all forms of liability for death or injury to any individual, and for loss or damage to property.  The Insurance shall provide for primary coverage and not contributory coverage, notwithstanding any other insurance which Licensor may obtain or maintain.  As proof of such insurance, a fully paid certificate of insurance, naming Licensor as an additional insured party, will be furnished to Licensor by Licensee before any Licensed Product is sold or shipped.  Any change in certificates of insurance shall be furnished to Licensor, and shall be permitted provided such change complies with this Section.  Licensor shall be entitled to a copy of the then prevailing certificate of insurance, which shall be furnished to Licensor by Licensee.  Compliance by Licensee with the insurance requirements of this Agreement shall not relieve Licensee of its duty to indemnify Licensor hereunder.

17.4    None of the terms of this Agreement shall be deemed to be waived or modified, nor shall this Agreement be renewed, extended, terminated or discharged except by an express agreement in writing signed by a person authorized by the party against whom enforcement of such waiver, modification, etc. is sought.  There are no representations, promises, warranties, covenants or undertakings other than those contained in this Agreement, which represents the entire understanding of the parties.  In the event of a dispute between the parties, neither party shall at any time claim detrimental reliance based on negotiations between the parties with respect to the assumption or alteration of any right or obligation where a final written disposition of the dispute has not been executed by the party against whom enforcement is sought.

17.5    If any of Licensee's covenants contained in this Agreement are breached (or threatened to be breached) by Licensee or any of its Affiliates then, and in any such event, without limiting any other rights and remedies available for such breach, it being agreed that monetary damages cannot fully compensate any such breach, Licensor shall have the right, to seek temporary or permanent injunctive or mandatory relief in a court of competent jurisdiction in order to prohibit the continuation of any existing, or the realization of any threatened, breach of any of such covenants.

17.6    Except as otherwise expressly provided herein, each right, power and remedy herein specifically given to the parties hereto or otherwise existing shall be cumulative and shall be in addition to every other right, power, and remedy herein specifically given or now or hereafter existing at law, in equity or otherwise; and each right, power and remedy, shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy.  Except as otherwise expressly provided herein, no delay or omission by a party hereto in the exercise of any right or power or in the pursuant of any remedy, shall impair any such right, power, or remedy or be construed to be a waiver of any default on the part of a party or to be in acquiescence therein.  No waiver by a party hereto of any breach or default by the other party under this Agreement shall be deemed a waiver of any other previous breach or default or any thereafter occurring.

17.7    The representations, warranties and covenants made herein shall survive the execution and delivery of this Agreement.  The termination or expiration of this Agreement for any reason whatsoever, shall not release any party hereto from any liability which at the time of termination or expiration had already accrued to the other party or which thereafter may accrue in respect to any act or omission prior thereto.

17.8    Each of Licensee or any of its Affiliates and Licensor shall not directly or indirectly, disclose or use at any time (either during or after the termination or expiration of the term of this Agreement), except to or for the benefit of the other as such other party may direct in writing, any confidential information of the other.

17.9    This Agreement is made pursuant to and shall be governed by and construed in accordance with the laws of the State of New York, applicable to agreements made and to be performed in the State of New York.  The parties hereby irrevocably submit to the jurisdiction of the United States District Court for the Southern District of New York or the courts of the State of New York in New York County with respect to any action or proceeding arising with respect to this Agreement.  In any such action or proceeding, the parties consent that service of process may be made in the manner provided for the giving of notices set forth herein.  In addition, each of the parties to this Agreement irrevocably and unconditionally waives any objection that it may now or hereafter have to the venue of any proceedings in any of the courts described above.  This provision shall not limit the right of execution of judgment in any appropriate jurisdiction.

17.10   Any alleged uncertainty or ambiguity in this Agreement shall not be construed for or against a party based on attribution of drafting to said party.  If any provision or any portion of any provision of this agreement is declared invalid or unenforceable, such provision or such portion shall be deemed modified to the extent necessary and possible to render it valid and enforceable.  In any event the invalidity or unenforceability of any provision or any portion of any provision shall not affect any other provision and the remaining portion of any provision of this Agreement, and this Agreement shall continue in full force and effect and be construed and enforced as if such provision had not been included or had been modified as above provided, as the case may be.

17.11   It is expressly understood and agreed that neither this Agreement alone nor in conjunction with the delivery of any deposits or any performance by either of the parties, shall constitute an offer or create any rights in favor of either of the parties or shall in any way obligate or bind either of the parties, unless and until this Agreement is duly executed by both Licensor and Licensee and a fully executed copy thereof is in the possession of Licensor and Licensee.

17.12   Neither party shall issue any press release or otherwise make any public statement or disclosure to any third party with respect to the terms of this Agreement, except as agreed upon by the parties in writing.  Notwithstanding the foregoing, nothing contained in this Section 17.12 shall prevent any party from making any public statement or disclosure as may be required by law or any listing agreement with a national securities exchange.

17.13   This agreement shall inure to the benefit of the parties and their successors and permitted assigns.

17.14   Upon request by Licensor, Licensee shall, within five (5) days of such request, execute a statement confirming to Licensor's lender or any other party that this Agreement is in full force and effect, there are no defaults hereunder, the amount and date through which royalties have been paid, Licensee's agreement to make all payments due Licensor hereunder to such bank account as such lender may direct and such other reasonably requested items.  Failure of Licensee to comply with such request in a timely fashion, shall constitute an event of default under this License.

17.15   Lender has made a certain loan ("Loan") to Licensor and as collateral security for the Loan, Licensor has granted Lender a first priority lien and security interest ("Security Interest") in all of Licensor's assets, including, without limitation, all of the Licensor's right, title and interest in and to all Trademarks, together with all of Licensor's rights under this Agreement, including, without limitation, all

of Licensor's rights to royalty payments and other payments and proceeds arising in connection with this Agreement ("Payments"). As further collateral security for the Loan, and in order to perfect the Security Interest in the jurisdiction of incorporation of Licensor, Licensor has granted to Lender a first priority pledge on the Payments in accordance with the laws of the Kingdom of The Netherlands (the "Dutch Pledge"). Licensee recognizes (i) Lender's rights in connection with the Security Interest and the Loan documents; and (ii) this letter as a notification of the Dutch Pledge in accordance with Section 3:236 of The Netherlands Civil Code. If there is a default in connection with the Loan and Lender exercises any of its rights or remedies in connection with the Loan documents and the interest or ownership of Licensor in the Trademarks and this Agreement is transferred to Lender or another party, the License shall continue in full force and effect, as a direct license between Lender or such third party and Licensee, upon all of the same terms and conditions as contained in this Agreement.

17.16   The parties hereto state their express wish that this Agreement as well as all documentation contemplated hereby, pertaining hereto or to be executed in connection herewith be drawn up in the English language; les parties expriment leur desir exlicite a l'effet que cette entente de meme que tous documents envisages par les presentes, y ayant trait ou qui seront signes relativement aux presentes soient rediges en anglais.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed as of the day and year first written above.

GLORIA VANDERBILT TRADEMARK B.V.

By: _____

Title: _____

Date: August 28th _____

HUDSON'S BAY COMPANY

By: _____

Title: EXEC VICE PRESIDENT

Date: August 21, 1998

SECRETARY
Aug. 21, 1998

SCHEDULE A

Licensed Trademarks

The name "GLORIA VANDERBILT"

AMERICAN ROYAL BY GLORIA VANDERBILT

See attached for additional marks.

## SCHEDULE B

## "LICENSED PRODUCTS"

Women's and girl's apparel and accessory items as follows:

(a)   Casual and jeanswear, consisting of woven tops, knit tops, pants, jeans, basic five pocket jeans, shorts, dresses, jumpers, rompers, vests, blazers and jackets.

(b)   Foundations, underwear, and undergarments (including bras, camisoles, daywear, teddy's, camisets, slips, panties, unitards, leotards and bodysuits) in all sizes and fabrications.

(c)   Robes and sleepwear (including pajamas, shortsets, night shirts, chemises, dusters, sleepwear sets, sleepers, footedsleepers, big shirts, sleepshirts, full-length sweatshirts, robes with belts, robes without belts, kimonos, nightgowns, and peignoirs) in all sizes and fabrications.

(d)   Sweaters, knit tops and knit co-ordinates.

(e)   Activewear and performance wear, consisting of jogging sets, bike shorts, knit bottoms and workout clothing.

(f)   "Career" sportswear marketed as groups of pants, shorts, shirts, sweaters, vests, jackets, blouses, skirts, and dresses, which are co-ordinate as to styles, color schemes and fabrics and are designed to be worn together.

(g)   Dresses.

(h)   Two-piece suits, consisting of a jacket and skirt or a jacket and pants, sold and priced together as sets.

(i)   Outerwear jackets and coats.

(j)   Handbags.

(k)   Hosiery, including pantyhose, knee highs, support hose and socks in all sizes and fabrications.*

---

*Licensee shall not have any rights under this Agreement with respect to such items until the expiration or termination of Licensor's license with Wertex Hosiery, Inc.

(l)   Costume jewelry, including earrings, necklaces, pins, charms, scarf-clips, pendants and bracelets.*

(m)   Belts.

(n)   Scarves.

(o)   Shoes (casual and dress).

(p)   Hair barrettes, hair bows, ponytail holders, headwraps and headbands.

(q)   Small leather goods

(r)   Slippers.

(s)   Wrist watches and timepieces to be worn on the body.

(t)   Hats and gloves.

(u)   Fine jewelry in silver or gold.

---

* Licensee agrees that it may only purchase costume jewelry Licensed Products from Carmen Jewellery Mfg., Inc., Licensor's exclusive licensee for costume jewelry in Canada, and may not manufacture, or cause to be manufactured for its account, such Licensed Products.

## "YEAR"

The period commencing as of the date of this Agreement and ending on December 31, 1999, and each successive twelve (12) month period thereafter during the term of this Agreement, or a shorter period, with respect to the last Year, if this Agreement is terminated prior to its expiration.

## "MINIMUM RETAIL SALES REQUIREMENT"

| Year | Minimum Retail Sales Requirement |
|------|----------------------------------|
| Initial Term: | |
| 1 | $35,000,000  (CDN) |
| 2 | $38,500,000  (CDN) |
| 3 | $42,350,000  (CDN) |

Renewal Term:
4
5           $46,585,000  (CDN)
6           $51,243,500  (CDN)
            $56,367,850  (CDN)

## "MINIMUM ROYALTY PAYMENT"

| Year | Minimum Royalty |
|------|-----------------|
| Initial Term: | |
| 1 | |
| 2 | $437,500 |
| 3 | $481,250 |
| | $529,375 |
| Renewal Term: | |
| 4 | |
| 5 | $582,313 |
| 6 | $640,544 |
| | $704,598 |

The Minimum Royalty for each Year shall be paid to Licensor in equal quarterly installments on the tenth (10th) day following the end of each calendar quarter of each Year, except that, for the first Year the Minimum Royalty shall be paid to Licensor as follows:  $43,750 upon the execution of this Agreement (which amount shall be credited to Minimum Royalties in equal installments during the first Year), and installments of $98,437 on the tenth (10th) day following the end of each calendar quarter during the first Year, commencing with the first calendar quarter of 1999 .

## "LICENSEE'S FISCAL YEAR"

Rolling -- ends on the last Saturday of January.

C:\WPDOCS\GV\HUDSON'SBAY.LIC
Final

"NOTICE ADDRESSES"

1.    If to Licensor, to:

Karspeldreef 2
1101 CJ Amsterdam-Z.O.
The Netherlands
Tel:    011-31-20-6911780
Fax:    011-31-20-6911728
Attn:   Mr. Hendrik J. Keilman

with copies to:

Gloria Vanderbilt Apparel Corporation
50 Hartz Way
Secaucus, New Jersey 07094-2418
Attn:   Mr. Itzhak Weinstock
Tel:    201-865-5588, Ext. 110
Fax:    201-863-2774

Steven M. Gerber, Esq.
1114 Avenue of the Americas
45th Floor
New York, New York 10036-7798
Tel:    212-479-6550
Fax:    212-479-6553

2.    If to Licensee, to:

Hudson's Bay Company
c/o Zellers Inc.
8925 Torbram Road
Brampton, Ontario
Canada L6T 4G1
Attn:   President
Tel:    (905) 792-4400
Fax:    (905) 792-4439

with copies to:

Hudson's Bay Company
401 Bay Street
Toronto, Ontario
Canada M5H 2Y4
Attention:   Vice President, Secretary and
             General Counsel
Tel:    (416) 861-4593
Fax:    (416) 861-4720

C:\WPDOCS\GV\HUDSON'SBAY.LIC
Final

30