FILED VIA ECF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NETHERBY LIMITED,

        Plaintiff,

    -against-          04 CV 07028 (GEL)

JONES APPAREL GROUP, INC. and JONES
INVESTMENT CO., INC.,

        Defendants.

---

# MEMORANDUM IN OPPOSITION TO DEFENDANTS'
# MOTION *IN LIMINE* TO EXCLUDE PLAINTIFF'S EXPERTS

                CHADBOURNE & PARKE LLP
                Attorneys for Plaintiff
                30 Rockefeller Plaza
                New York, New York  10112
                (212) 408-5100

Thomas J. Hall
JaeYoun Kim
  Of Counsel

TABLE OF CONTENTS

Page

Preliminary Statement ..................................................................................................... 1

BACKGROUND ............................................................................................................. 2

ARGUMENT ................................................................................................................... 5

THE TESTIMONY OF PLAINTIFF'S EXPERTS IS FULLY ADMISSIBLE ................... 5

    A.      Parol Evidence Of Industry Custom Is Admissible ................................................... 5

    B.      Each Of Plaintiff's Three Experts Has The Required Expertise ............................... 7

    C.      The Testimony Of Plaintiff's Three Experts Is Relevant ...................................... 11

    D.      Disner's Proposed Testimony Is Reliable ............................................................. 13

    E.      Expert Testimony On The Ultimate Conclusions ................................................. 15

CONCLUSION ............................................................................................................. 18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NETHERBY LIMITED,

                            Plaintiff,

          -against-                        04 CV 07028 (GEL)

JONES APPAREL GROUP, INC. and JONES
INVESTMENT CO., INC.,

                            Defendants.

**MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION *IN LIMINE* TO EXCLUDE PLAINTIFF'S EXPERTS**

**Preliminary Statement**

Plaintiff Netherby Limited ("Netherby") respectfully submits this memorandum of law in opposition to the motion in limine of defendants Jones Apparel Group, Inc. and Jones Investment Co., Inc. (collectively "Jones"), which seeks to exclude from evidence at the trial of this action the testimony of plaintiff's three expert witnesses, Mohan Murjani[1] ("Murjani"), Patti Disner ("Disner") and Andrew Jassin ("Jassin"). As discussed below, Jones's motion is meritless and should be denied in its entity. In this

---

[1] Murjani is also a fact witness who was involved on behalf of Netherby in negotiating the 1995 Modification at issue in this action. It is entirely permissible for a witness to testify in a dual capacity as both an expert and fact witness who was involved in negotiations. See, e.g., In re PCH Assocs., 60 B.R. 870, 874-75 (S.D.N.Y. 1986).

*non-jury trial,* the various points raised by the motion are, at best, properly left for cross-examination.

## BACKGROUND

In the early 1980s, Netherby's predecessor-in-interest created the Gloria Vanderbilt trademarks and launched the Gloria Vanderbilt business in the United States. Pursuant to a 1988 Acquisition Agreement (the "1988 Agreement") (Ex. 3),[2] Netherby conveyed to the "Buyer" under that Agreement the rights to the Gloria Vanderbilt trademarks in five countries, being the United States, Canada, Brazil, Australia and New Zealand (the "Five Countries"), while retaining those rights in the rest of the world. Under the 1988 Agreement, the Buyer (now Jones) is obligated to pay ongoing royalties, called "Contingent Payments," to Netherby based on sales of Gloria Vanderbilt products in the Five Countries.

In December 1995, the parties executed a Modification to the 1988 Agreement (Ex. 4). Paragraph 8 of the 1995 Modification (id. p. 7), which is referred to as new Section 15.11 of the 1988 Agreement, provides:

> "***Buyer shall use its best efforts to provide to Seller, at no cost to Seller, one set of samples of Gloria Vanderbilt designs and products within 30 days after such samples are available to Buyer.*** Additional samples shall be supplied by Buyer, at a cost to Seller of no more than the Buyer's actual cost, if requested by Seller. ***Buyer further agrees to use its best efforts to keep Seller generally informed of the activities of Buyer's licensees***, including providing Seller with copies of such

---

[2] The exhibit references herein are to the trial exhibits in this action, which have been designated in the parties' Pre-Trial Order.

licenses presently in existence and licenses that are executed in the future."[3]

Prior to executing the 1995 Modification, Netherby was contemplating exploiting its worldwide Gloria Vanderbilt rights by seeking licensees interested in producing and selling Gloria Vanderbilt products outside the Five Countries. To attract and secure quality licensees, Netherby needed to be in a position to provide potential licensees with sample designs and products for each season, similar to what licensors of other major brands (such as Jones) provide their licensees. This information and material is provided to licensees to aid them in developing, marketing and selling items bearing the licensed marks in their territories.

At the time of the 1995 Amendment, the Buyer had an active apparel and licensing business in the United States. It produced, itself or through licensees, dozens of lines of Gloria Vanderbilt products, including women's apparel, girls apparel, men's apparel, outerwear, fragrances, shoes, hosiery, handbags and the like. At least quarterly (i.e. seasonal), the Buyer produced designs and product samples for itself and for its licensees. In addition, its licensees produced designs and product samples for the product lines licensed to them which they routinely provided to the Buyer, usually because they were required to do so under their license agreements with the Buyer. For example, Jones's license agreement with Amerex (Ex. 116), the manufacturer and seller of Gloria

---

[3]   Unless otherwise indicated, emphasis is added throughout this brief.

Vanderbilt outerwear, provides that Amerex must provide Jones with a complete collection of all its products one week prior to all of Jones's market shows (id. § 3.7):

> "3.7   Complimentary Product.  During each selling season of each Year during the Term, *Licensee shall provide free of charge to Licensor at Licensor's request, at least one (1) week prior to any and all of Licensor's market shows, one (1) complete collection of all units of Articles, plus such additional units as Licensor shall reasonably request*."

Jones's license agreements with The Echo Design Group and with Premium Apparel Brands contain almost identical provisions (Exs. 123 § 3.5, 126 §3.5).  Similarly, under the Zellers' license (Jones's Canadian licensee), Jones had the right to inspect and approve "quality, all designs, concepts, fabrications and colors of Licensed Products . . . ." (Ex. 68 § 5.2).

Interestingly, this idea of assisting Netherby in its international licensing efforts can be traced to proposals by the Buyer.  For example, the Buyer suggested the following to Netherby in various settlement letters:

- *May 12, 1994*: "*We would agree to work with you and your licensees* in helping with your marketing and advertising material and we would allow you to utilize our showroom in New York *to recruit interested Licensees,* on a reasonable basis" (Ex. 136).

- *September 12, 1994*: "In conclusion in the context of settlement as offered before *we would be willing to help you in your international licensing*"(Ex. 138).

- *November 27, 1995*: "*Gloria Vanderbilt will be willing to share all its products and advertising material* with Murjani" (Ex. 140).

Netherby responded favorably (Ex. 139):  "*Both parties agree to assist each other towards the development of the Gloria Vanderbilt business in their respective Territories*.  You will provide us with one set of designs, samples, etc. of each of your

4

products at no cost . . . we look forward to our new relationship and working towards a common goal."

Jones has repeatedly breached its obligations under Paragraph 8. As such, Netherby brings claims in this action for breach of contract damages and for a decree of specific performance.

## ARGUMENT

### THE TESTIMONY OF PLAINTIFF'S EXPERTS IS FULLY ADMISSIBLE

**A.     Parol Evidence Of Industry Custom Is Admissible**

Jones's defense to the claims based on its breach of Paragraph 8 appears to be that Paragraph 8 is too vague to be enforceable. Netherby submits that this Paragraph is more than definite enough to be enforced and that, to the extent any ambiguity exists, parol evidence is admissible to clarify that ambiguity. Evidence of industry custom and usage is a form of parol evidence admissible to clarify any ambiguities. See Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co., 979 F.2d 268, 274 (2d Cir. 1992) ("[W]hen the terms of the contract . . . are ambiguous, as here, reference to extrinsic evidence provides guidance to the parties' intent. Such extrinsic evidence may in appropriate cases include industry custom and practice."); U.S. Naval Inst. v. Charter Communications, Inc., 875 F.2d 1044, 1048-49 (2d Cir. 1989) (same); ASI Sign Sys., Inc. v. Architectural Sys., Inc., 1999 WL 553825, at *6 (S.D.N.Y. July 29, 1999) (same); Natwest USA Credit Corp. v. ALCO Standard Corp., 858 F. Supp. 401, 413 (S.D.N.Y. 1994) (same); 12 Williston on Contracts § 34:7 (4th ed. 2006).

5

Plaintiff's three expert witnesses will offer at trial expert testimony of various customs and practices in the fashion industry relevant to Netherby's claims under Paragraph 8. Specifically, these experts will opine on industry practices relevant to the interpretation and breach of Paragraph 8 of the 1995 Modification (Ex. 4 p. 7), including the following:

**1.** *Meaning of Provision*: As Jones states it is unable to comprehend the meaning of Paragraph 8, plaintiff's experts will opine on applicable industry custom and usage, particularly in light of the evidence of negotiations over Paragraph 8, reflecting that its purpose was to assist Netherby in developing and maintaining licensing opportunities abroad. Plaintiff's experts will address the types of materials and information that licensors typically provide to actual or prospective licensees, as well as the industry concept of "samples" as used in the context here.

**2.** *The Designs And Products Available to Jones*: As Jones was and is obligated under Paragraph 8 to use its "best efforts" to provide Netherby with designs and products that "are available to" Jones, a threshold question is what types of Gloria Vanderbilt designs and product samples were actually created in each year at issue. Plaintiff's expert Disner, a designer, based on her review of accounting and other records and knowledge of the industry, opines as to the number of Gloria Vanderbilt lines that were created each year and, thus, the types of designs and product samples that were available to Jones had Jones bothered to use its best efforts to secure them.

**3.** *Availability of Designs and Products From Licensees*: Jones suggests that, aside from designs and product samples that it created for its Gloria Vanderbilt lines,

it was only obligated to provide Netherby with designs and product samples from its licensees to the extent that those licensees were contractually obligated to provide them to Jones. But Paragraph 8 is not so limited. Rather, Paragraph 8 requires Jones to use its "best efforts" to provide Netherby designs and product samples "available to" Jones. Thus, to the extent that some of Jones's licensees were not contractually obligated to provide these materials and information to Jones (and putting aside the question of whether Jones breached its best efforts obligation if it failed to negotiate mandatory provisions in all its licenses), at a minimum Jones was required to request that its licensees provide such materials. To rebut this argument, Jones's purported expert has opined that licensees typically would be reluctant to provide this type of material to their licensors (Milgrim Report (Hall Aff.[4] Ex. C pp. 6-7)). Netherby's experts, Murjani and Jassin, counter that defendants' expert is simply wrong, and that this type of information and materials are freely provided by licensees (Mov. Papers Ex. A pp. 7-8, Ex. E p. 6).

B. **Each Of Plaintiff's Three Experts Has The Required Expertise**

As its initial argument, Jones seeks to exclude the testimony of plaintiff's three experts by asserting that none of them has the required expertise to testify in this matter. Jones attacks Murjani's expertise on the grounds that "his report does not give any specific examples of the experiences that led him to" his conclusions (Mov. Br. pp. 4-5).

---

[4]  "Hall Aff." is a reference to the Affidavit of Thomas J. Hall, sworn to June 15, 2006, submitted herewith in opposition to the in limine motion.

Jones attacks Disner's expertise on the grounds that her qualifications "are limited to the field of design" (Mov. Br. p. 6).  Lastly, Jones challenges Jassin because "his report is completely silent as to any specific examples of experiences that led him to his conclusion in this case" and that he has no "experience with a situation such as this one where two different entities own the trademark rights in different portions of the world" (Mov. Br. p. 9).  As addressed below, each of the three experts has more than sufficient expertise to give at trial their opinions on this matter.  If anything, Jones's complaints go to the weight of, not the admissibility of, the experts' testimony.  See Wechsler v. Hunt Health Sys., Ltd., 381 F. Supp. 2d 135, 141 (S.D.N.Y. 2003) (quoting McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1043 (2d Cir. 1995) ("[Defendant's] quibble with [plaintiff's expert's] academic training . . . and his other alleged shortcomings . . . were properly explored on cross-examination and went to his testimony's weight and credibility -- not its admissibility.")); Baxter Diagnostics Inc. v. Novatek Med. Inc., 1998 WL 665138, at *10 (S.D.N.Y. Sept. 25, 1998).

      *Murjani*:  As set forth in his Report (Mov. Papers Ex. A), Murjani opines as to the exchange of information, designs and samples that usually occur between licensors and licensees in the fashion industry, as well as how licensors use such designs and samples to attract new licensees and to maintain existing licensees (id. pp. 6-8).  Notably, Murjani's report is a rebuttal to the reports of defendants' experts, one of whom, Milgrim,

8

opines that licensees "would be highly resistant" to share designs with licensors[5] (Hall Aff. Ex. C p. 6). Curiously, while Jones attacks Murjani's expertise, Jones's expert Milgrim, an intellectual property attorney, discloses no experience at all in the fashion industry. In contrast, Murjani has over 40 years experience in the apparel industry with "first hand experience in apparel marketing, promotion, licensing, brand management, sales and product development, both in the United States and in international markets" (Mov. Papers Ex. A p. 1). His Report states that he has been personally involved "in over 100 licensing negotiations and transactions, both as licensor and licensee" (id. pp. 1-2). He was personally involved in launching the Gloria Vanderbilt trademarks, and was actively involved in licensing that brand (id. p. 3). In addition, he was personally involved in launching the Tommy Hilfiger trademark, the Coca Cola Clothes trademark, the Jeep trademark and others (id.). Annexed as Exhibit 1 to his Report is his curriculum vitae. In addition, Murjani was questioned extensively at his deposition (e.g., Hall Aff. Ex. D pp. 131-142) concerning his experience.

  *Disner*: Jones asserts that Disner does not have the expertise to express an opinion "about the meaning of Section 15.11" (Mov. Br. p. 6). But the crux of Ms.

---

[5] Courts often allow expert testimony for the purpose of critiquing or presenting a differing opinion on a subject on which an opposing party's expert has testified. See Stroheim & Romann, Inc. v. Allianz Ins. Co., 2003 WL 21980389, at *3 (S.D.N.Y. Aug. 14, 2003); Domblackly v. Celebrity Cruises, Inc., 1998 WL 734366, at *3 (S.D.N.Y. Oct. 21, 1998) ("Either both meteorologists can testify in these regards, or neither . . . . [a]t this point . . . both may give the proffered testimony.").

Disner's testimony is as follows:  "The interpretation of this contractual provision *may be aided by an understanding of the way in which the apparel industry operates*" (Mov. Papers. Ex. C p. 7).  She goes on to describe that brands such as Gloria Vanderbilt generally produced a number of "lines" in each year and that there may be 25 to 50 different "pieces" within each line (id.).  She also describes what is needed to create the pieces for each line (id.).  Disner's years of experience as a designer plainly qualifies her to give this expert testimony.

  *Jassin*:  As set forth in his Report (Mov. Papers Ex. E p. 1), Jassin is the Managing Director of a brand management and licensing consulting firm specializing in the fashion industry.  Since 1989, Jassin has specialized in branding and marketing with a particular emphasis on licensing and product placement (id.).  He has been extensively involved in the development and negotiation of licensing agreements, having represented both licensors and licensees (id.).  He has published his research in the area of brand licensing and has conducted seminars on the subject (id. pp. 1-2).  He is recognized as a brand/licensing specialist by the financial community, including J.P. Morgan Chase, New York Life Insurance Company, Standard & Poors, Dun & Bradstreet, UCC Capital Corporation and GMAC (id. p. 2).  A more comprehensive discussion of Mr. Jassin's expertise is set forth at pages 1-4 of his Report and Appendix A, thereto which is curriculum vitae.  As set forth in his curriculum vitae, Jassin has served as an expert witness in at least a dozen prior litigations (id. p. 16).

  While Jones suggests that Jassim does not have "specialized knowledge," his resume demonstrates otherwise.  Jones also argues that Jassim lacks expertise because he

has "no experience with a situation such as this one where two different entities own the trademarks rights in different portions of the world" (Mov. Br. p. 9).  While the reader is left to speculate as to the significance of this point, Jones's experts do not purport to have any such experience either (Hall Aff. Exs. B, C).

### C.    The Testimony Of Plaintiff's Three Experts Is Relevant

Next, Jones challenges the relevancy of plaintiff's experts' opinions.  Jones asserts that Murjani's expert testimony "is not relevant or helpful" (Mov. Br. p. 5), that Disner's testimony "is not helpful to the trier of fact" (id. p. 8), and, likewise, that Jassin's testimony offers "absolutely no help to the trier of fact" (id. p. 10).  Evidence is relevant if it "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401; see Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002).

*Murjani*:  Jones challenges the relevancy of Murjani's testimony on the ground that he "does not tie any alleged industry practice of approvals over, or use of, licensee product to the language or intent of § 15.11" (Mov. Br. p. 5).  But to the contrary, his testimony clearly goes to (a) how licensors use designs and product samples with actual and prospective licensees, and (b) the availability to Jones of designs and design samples from its licensees had Jones exercised its best efforts to obtain such.  In fact, defendants' expert Sarabia opines in similar fashion:

- "Licensees typically require licensees to provide samples of the licensed product before production and sometimes after production as well" (Hall Aff. Ex. B p. 7).

11

- "Licensors may provide theme and color trend information to the licensee" (id. pp. 7-8).

- "These items [prototype samples, pictures, material samples, swatches, color, sketches or computer generated drawings] may be delivered to licensor or an employee of licensor may visit the licensee" (id. p. 8).

- "A licensor may keep samples, may take pictures of them or may just review them and make comments and suggestions without taking samples" (id. p. 8).

- "In most consumer licensing, a licensor is always shown prototype samples" (id. p. 9).

***Disner***: Jones's basis for challenging the relevancy of Disner's testimony is that Disner "opinion is nothing more than a conclusion" (Mov. Br. p. 8). In fact, Disner speaks at length of the practice in the industry of creating designs, creating samples and the like (Hall Aff. Ex. A). These are not mere "conclusions," but specific evidence of industry practice based on her years of experience and expertise.

***Jassin***: Jones attacks the relevancy of Jassin's proposed testimony because it addresses the industry practice of how licensors and licensees generally interact, instead of "the issue of what [Jones] in this case is contractually obligated to do" (Mov. Br. p. 9). But the issue of how licensors and licensees generally interact is important to at least two issues. First, as Paragraph 8 was negotiated in the context of Jones offering to help Netherby in its relationships with actual and prospective licensees, expert testimony of the types of materials and information that licensors usually provide to actual and prospective licensees is probative of the parties' intention when they drafted Paragraph 8. Second, this testimony is probative on the issue of what designs and samples were "available to" Jones during the ordinary course of its business and interactions with its

12

licensees. If Jones never asked it licensees to provide designs and product samples for it to give to Netherby, and it is standard industry practice for licensees to comply with such requests, we submit that Jones did not satisfy its "best efforts" obligation to make such designs and samples available to Netherby. Thus, the industry practice in this regard, as opined upon by Jassin as well as Jones's purported experts, is directly relevant.

### D. Disner's Proposed Testimony Is Reliable

Jones further challenges the proposed testimony of expert Disner on the ground that it is not reliable. As an initial matter, District Judges "have broad discretionary authority 'to determine [the] reliability [of an expert's] testimony in light of the particular facts and circumstances of the particular case.'" Wechsler, 381 F. Supp. 2d at 143 (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 158 (1999)); accord McCullock, 61 F.3d at 1042. In determining reliability, the district court must ensure that an expert, "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho, 526 U.S. at 152; see Amorgianos, 303 F.3d at 265-66; Wechsler, 381 F. Supp. 2d at 144.

An expert witness's testimony can be established as reliable based on his or her personal and or professional experience. McCullock, 61 F.3d at 1043 (admitting testimony of an expert based, in part, on background industrial experience with ventilation and practical experience with fumes); Wechsler, 381 F. Supp. 2d at 141, 143 (allowing witness to testify as an expert based on experience as an accountant even though witness had little or experience in health care industry accounting practices, little

13

or no experience testifying as an expert, did not hold himself out as an expert, and had not taught or published in the accounting field and holding that his credentials "satisf[ed] Rule 702's flexible standard"); S.E.C. v. U.S. Envtl., Inc., 2002 WL 31323832, at *3 (S.D.N.Y. Oct. 16, 2002) (allowing expert to base conclusions on his past experience in the securities industry); NAACP v. A.A. Arms Inc., 2003 WL 2003788, at *1 (E.D.N.Y. 2003) (expert "may testify in the form of an opinion because . . . . it is appropriate and adequate for an expert witness to base testimony on his or her deductions form observation and experience, just as a physician makes a diagnosis based on observations of a patient.  Expert testimony is not limited to the results of experiments conducted in scientific labatories."); see also In re World Com, Inc. Sec. Litig., 2005 WL 375313, at *3 (S.D.N.Y. Feb. 17, 2005).  "[L]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications."  Henry v. Champlain Enters., Inc., 288 F. Supp. 2d 202, 220 (N.D.N.Y. 2003).

    Jones contends that Disner's opinions on the number of Gloria Vanderbilt lines and pieces produced are "completely unreliable" because she did not go shopping to see "what [types of Gloria Vanderbilt] products are actually sold at retail" (Mov. Br. p. 7).  However, as set forth in her Report (Mov. Papers Ex. C pp. 9-10), Disner was able to create a comprehensive list of the different product lines being sold under the Gloria Vanderbilt trademarks by reviewing detailed accounting records from Jones's Gloria Vanderbilt licensees reflecting the products those licensees have sold.  Indeed, these

detailed accounting records would appear to be far more reliable than shopping for random samples at retail.

Jones further challenges Disner's reliability by asserting she "misquotes" Jones's license with Zellers (Mov. Br. p. 7 fn. 4). In fact, her quote from that license is entirely accurate. In her Report, Disner quotes the Zellers's license agreement as providing that "fabrication, material, construction and design" are "subject to the prior written approval of the licensor" (Mov. Papers Ex. C p. 7). The Zellers's license agreement uses these precise words:

> "Licensee acknowledges that the complete control by licensor over the nature and quality of all licensed products and all packaging material subject to the terms and conditions of this agreement is an essential element of the license herein granted. Accordingly, all aspects of the use of the trademarks and the ***fabrication, material, construction and design*** (including related artwork) of the licensed products and packaging material shall be ***subject to the prior written approval of licensor***, as set forth herein" (Ex. 68 § 5.1(b)).

### E.   **Expert Testimony On The Ultimate Conclusions**

Finally, Jones challenges plaintiffs' experts on the grounds that they purportedly opine on ultimate issues in the case. Again, as this will be a non-jury trial, to the extent any of the opinions step into this arena, the Court is certainly capable of reaching its decision on the ultimate merits independently of any expert's testimony thereon. See, e.g., Purdue Pharma L.P. v. ENDO Pharm. Inc., 2004 WL 26523, at *16 (S.D.N.Y. Jan. 5, 2004); Gulino v. Bd. of Educ. of the City Sch. Dist. of of the City of N.Y., 2003 WL 41997, at *2 (S.D.N.Y. Jan. 6, 2003) ("Although the court is mindful of . . . [the expert testimony] objections and deems them not without merit, since this is a bench trial, the court has decided to exercise its discretion in favor of admission.");

15

Henry, 288 F. Supp. 2d at 221 (in considering a motion in limine, the court states, "[i]t is also important to note that, with respect to these issues, [expert] will be presenting his testimony in the context of a bench trial, and this judge is quite confident in his ability to separate the wheat from the chaff").

In any event, while it is true that an expert's testimony may not make legal conclusions that "encroach upon the court's duty to instruct on the law[,]" an expert's testimony may properly "make factual conclusions that embrace an ultimate issue[.]" U.S. Envtl., Inc., 2002 WL 31323832, at *4 (allowing expert make conclusions such as "[the] investors were misled" and that the "trading activity was prearranged"); see Wechsler, 381 F. Supp. 2d at 146 (allowing expert to give testimony concluding that certain acts had "a material adverse condition on the financial well being of the company" because it was an opinion on the ultimate issue of fact). Even language such as "there is no evidence to support [the party's] claims" is not considered a legal conclusion. Llerando-Phipps v. The City of N.Y., 390 F. Supp. 2d 372, 379 (S.D.N.Y. 2005) (denying motion in limine to exclude expert testimony because expert is allowed to make conclusions based on the evidence).

*Murjani*: Jones suggests that Murjani's testimouny is improper because it could "impermissibly direct[] the trier of fact to reach a particular conclusion" (Mov. Br. p. 6). Jones cites to no law that precludes expert testimony that might lead a trier of fact towards a particular conclusion. Indeed, one would expect most expert testimony to do just that.

*Disner*.  While Disner states the obvious, that Paragraph 8 requires Jones to provide designs and products whether created by Jones or by its licensees (Mov. Papers Ex. C p. 8), surely Jones does not challenge this interpretation.  The paragraph plainly states that Jones will provide designs and products "within 30 days *after such samples are available* to Buyer" (Ex. 4 p. 7).  As such, under the plain reading of this paragraph, the sources of those designs and products (whether from Jones itself, its licensees or somewhere else) simply does not matter.

*Jassin*:  Jones suggests that Jassin's testimony should be excluded because Jassin opines that "there has been a breach" (Mov. Br. p. 11).  But Jassin's report contains no such conclusion.  Instead, Jassin's report contains a simple statement of fact that "defendants have purposely avoided addressing Netherby's request for the information it needs, (and is entitled to)" (Mov. Papers Ex. E p. 10).  To be sure, whether there has been an unlawful breach of contract is an issue that the Court will need to decide.  However, the statement of what should be undisputed fact has no bearing on the issue of the admissibility of Jassin's testimony.

## **CONCLUSION**

For the foregoing reasons, plaintiff Netherby respectfully requests that Jones's motion in limine be denied in its entirety.

Dated: June 15, 2006

CHADBOURNE & PARKE LLP

By   /s/ *Thomas J. Hall*
        Thomas J. Hall (TH 3398)
            A Member of the Firm
    Attorneys for Plaintiff
    30 Rockefeller Plaza
    New York, New York  10112
    (212) 408-5100

Thomas J. Hall
JaeYoun Kim
    Of Counsel