Exhibit B

# Expert Report of  Antonio R. Sarabia II

## Netherby Limited v.  Jones Apparel Group, Inc. et. al.

## I.  QUALIFICATIONS

For twenty years I have worked in consumer product licensing and with apparel trademarks as a business person and attorney.  I have participated in thousands of licensing negotiations, culminating in dozens of licenses.  This participation included negotiation of all of the business points of the licenses.   On behalf of licensors, I have chosen licensees from among many candidates. I selected the countries and products into which the licensing of a brand should be expanded.  I was vice-president of the licensing department of a major apparel company the licensing revenues of which were in the millions of dollars. I worked with and negotiated numerous international  distribution and licensing agreements for a range of consumer products. I  have decided what information and materials to provide to licensees and prospective licensees and have participated in many such decisions.  I have learned what information major apparel brand licensors provided to licensees and prospective licensees.

I have traveled to and inspected licensee operations abroad.  I have reviewed licensee and distributor performance.  I regularly advise clients about licensing as a means to expand and develop a brand.

1

I was retained as a licensing expert by the Vatican Library.

For twenty years I have focused on the evaluation and development of trademark and service mark portfolios for companies. I create worldwide trademark and service mark plans for apparel companies.  I have  managed apparel trademark and service mark portfolios which include thousands of marks.

For nine years I was employed full time by a leading sportswear company, Guess?, Inc.  During my employment at Guess, I constantly participated in and made management decisions about  brand establishment and protection. Since leaving Guess  through the present I have continuously worked with apparel brand, service mark and trademark matters, both domestic and international.

My  intellectual  property  work  has  encompassed  large  companies  (Guess, Gymboree, Dooney & Bourke and Microsoft)  and young companies in their early growth stages.

Exhibit A is my resume. Exhibit B lists my publications in the last ten years, my compensation and other cases in which I have given expert testimony in the last four years. Exhibit C is a list of sources used.

2

## II.  ASSIGNMENT

I am providing opinions on:

1.    In the context of trademark use in the apparel business, does the mark "Glo" suggest the mark "Gloria Vanderbilt?"

2.    What is the meaning of the requirements in §15.11 of the 1988 Acquisition Agreement (added by ¶8 in the 1995 Modification) that Defendants use their best efforts to: (a) provide samples of Gloria Vanderbilt designs and products and (b) generally inform Plaintiff of the activities of Defendants' licensees?

3.    Is it important for a licensor of a major apparel brand to have a package of styles, colors, specifications and sketches to attract prospective licensees in new territories?

## III.  INFORMATION  AND DOCUMENTS RELIED UPON

In forming my opinions I considered the  documents and sources of information listed on Exhibit C. In addition, I relied on my knowledge of licensing and the apparel business obtained during my twenty years of work in these fields. I may supplement my

3

opinions or analysis if additional information is provided to me.[*]

## IV. SUMMARY OF OPINIONS

1.    In the context of trademark use in the apparel business, the mark "Glo" does not suggest the mark "Gloria Vanderbilt."

2.    The requirements of §15.11 that Defendants use their best efforts to provide Plaintiff with samples of Gloria Vanderbilt designs and products and general information about the activities of Defendants' licensees are narrow requirements. Defendants are only obligated to forward samples and designs, if available, and to advise Plaintiff about major changes with regard to Defendants' licensees.

3.    It is not important for a licensor of a major apparel brand to have a package of styles, colors, specifications and sketches to attract prospective licensees in new territories.

//

//

_____

[*]If this case goes to trial, I may use any of the Exhibits attached in a larger or different format (such as projection), as well as excerpts of any parts of this report in a larger or different format suitable to a court room.

# V.  ANALYSIS

**1.      The mark "Glo" does not suggest "Gloria Vanderbilt."**

There are a number of reasons why the mark "Glo" does not suggest the trademark "Gloria Vanderbilt."  First, "Glo" has a number of possible meanings inlcuding: warmth, light, a feeling, a facial appearance, a nick name and a truncation of "Gloria."  As an example of a feeling or facial appearance, often women who are pregnant may be described as having a "glow."

The meanings "Glo" may have are affected by whether the mark is used in speaking or writing.  When it is spoken, the listener does not have the spelling and has less information about the possible meaning then if one sees it in writing.  For example, a listener would not know if it is spelled with or without a "w" of it is capitalized.

Even when the mark is written, "Glo" could be interpreted as simply shorthand for "glow." All of the potential meanings of "glow" are swept in, plus other meanings not likely to be attached to "glow." For example, one is unlikely to think of "Glow" as a nickname.

Just because "Glo" is a nick name does not indicate that the real name of the person is "Gloria.  Nick names often originate based upon an incident or personal characteristic.  For example, someone who smiles often might be nicknamed "Glo."

5

The wealth of meanings which "Glo" may have are reflected in the large number of federal trademark registrations for clothing which incorporate "glo." Attached as Exhibit D is a list of these marks.

It is clear that "Glo" has wide use as part of apparel trademarks. When an element has wide use, is far less likely that the element will be associated with another particular mark. In other words, the many apparel trademark uses of "Glo" mean that people in the apparel industry or people buying clothes are unlikely to relate "Glo" to one other particular mark such as "Gloria Vanderbilt."

Even if one were to assume that "Glo" would automatically be interpreted as a truncation of "Gloria," that would not link "Glo" to "Gloria Vanderbilt." In the apparel industry it is common for first name trademarks to be owned by different companies than full name trademarks which include the same first name. This rule applies even among prominent and well-known marks. See Exhibit E.

Apparel marks which consist of a first name commonly coexist with well known full name marks with the same first name, even though the owners are different, because apparel industry professionals and people buying clothes do not automatically associate the first name as belonging to the same owner as the full name. This rule in the apparel business follows on the heels of everyday experience. We all know that not every "Anne" is "Anne Klein." Similarly, in the apparel business it is common for different owners to use

6

the same first name followed by a different surname or different word.  Ownership of "Maximilian" will not automatically be linked to ownership of "Max Studio" or even "Max." This is because trademark use of a particular mark establishes the rights to it - but not to everything that incorporates it or even marks that may be derivative.

Based on consideration of trademark use in the apparel industry, the mark "Glo" does not suggest "Gloria Vanderbilt."

My conclusion about whether the apparel trademark "Glo" suggests "Gloria Vanderbilt" is based upon the generally accepted standards of the usage of trademarks in the apparel business.  I know these standards and that these standards are generally accepted in the apparel business as a result of my extensive work with the trademarks of apparel companies and my participation in tens of thousands of communications with trademark and apparel professionals about trademarks in the apparel business over the last 20 years.

**2.**    **The Requirements of Samples and General Information in §15.11 of the 1988 Acquisition Agreement Are Narrow Requirements**

Apparel agreements and licenses may require a wide array of different materials to be exchanged.  Licenses typically require licensees to provide samples of the licensed products before production and sometimes after production as well.  Licensors may provide

7

theme and color trend information to licensees.  A watch licensee may be permitted to see a licensor's new line of clothing so that it can coordinate its new line of watches.  The amount and type of this communication may be the product of a written agreement or custom between the parties.  It may evolve as the parties work together over a period of time.  In some cases it may expand as mutual trust increases and in some cases it may contract as a result of a weakening rapport.

There are a number of different ways in which licensors and licensees communicate about products.  Generally a licensee must submit its products for designs.  This is typically done at the prototype stage with either one or some combination of prototype samples, pictures, material samples, swatches, colors, sketches or computer generated drawings.  These items may be delivered to the licensor or an employee of licensor may visit the licensee.  For example, a person in the licensing department of licensor may go to the showroom of the licensee to inspect the latest prototype samples.

A licensor will indicate approval, disapproval or suggest changes.   A licensor may keep samples, may take pictures of them or may just review them and make comments and suggestions without taking samples.  There may or may not be a written record of the approvals, comments or rejections.  Whether a licensor gets samples to keep depends on what arrangement is made between the licensor and the licensee and varies with the type of products.  For example, typically in the apparel industry a licensor would not keep samples because the licensee needs them for its sales department to show potential

8

buyers.

Section 15.11 requires Defendants to use their "best efforts" to provide "one set of samples" of "designs and products within 30 days after such samples are available" and to keep Plaintiff "generally informed of the activities" of Defendants' licensees (which use the specified trademarks). These terms are as significant for what they do not say as for what they say.

In the consumer licensing business there are usually two types of samples, prototype samples and production samples. Prototype samples are custom-made samples. Only very few prototype samples are made. Prototype samples are generally used by the manufacturer to create a line of products which it will show to prospective buyers. Once orders are placed for a product, the manufacturer begins large scale manufacturing. A "production sample" is one of these mass-produced products. In most consumer licensing, a licensor is always shown prototype samples. A licensor may or may not receive production samples.

There is no requirement that Defendants "must" provide samples. Instead, Defendants are only required to use their "best efforts." The difference is significant because if it were mandatory to provide samples, that might have imposed a specific and burdensome requirement on Defendants. Defendants would have had to reflect that requirement in their negotiations and licenses with third parties. For example, they would

have had to tell prospective licenses that samples would not be returned.  In the apparel business this would have discouraged some prospective licensees.  Apparel companies, including prospective licensees, need prototype samples returned.  Prototype samples are given to sales people to use in showing prospective buyers.  Prospective buyers, such as department stores,  only place orders after seeing prototype samples.  A requirement that the licensor keep prototype samples would have communicated to prospective licensees that this was a licensor with which it would be particularly expensive and difficult to work.

Since the requirement was  "best efforts," that left Defendants free to use license terms and practices which were most likely to attract the best and most profitable licensees.  Defendants were not strapped with a requirement of retaining prototype samples at a cost of discouraging prospective licensees.  This allowed Defendants to find the best licensees which would generate more revenue for both Defendants and Plaintiff.

Even the reference to "samples" of "designs and products" is narrow.  For example, §15.11 might have required Defendants to provide certain information for each season. In the apparel business there are generally four "seasons" a year which usually correspond to the seasons of the year. At each season, an apparel company may create a new set of matching clothes such as coordinated tops and bottoms. Each season may have certain fabrics, colors and prints.  Information such as sample fabrics, the colors, the garment silhouettes, even specifications, may be gathered together in a presentation (referred to in this report as a "style master," but many other terms may be used to describe it).  A

10

licensor may or may not give licensees a style master with the direction that they follow the master.  Licensors with many apparel licensees in different countries may or may not use style masters to ensure a uniform world wide appearance and consistency of products. Section 15.11 did not require submission of these detailed materials by Defendants to Plaintiff.

The requirement of §15.11 that Defendants keep Plaintiff "generally informed of the activities" of Defendants' licensees is a big picture requirement.  It does not specify any particular information such as sales revenues or lists of products or current licensee addresses. When a license requires specific information, the information sought is typically listed in the agreement or described specifically in a form attached as an exhibit.  In this case neither was done.  The requirement was modified by "generally."  In the licensing business the requirement would be interpreted to mean that Defendants advise Plaintiff of major events, such as when a license is signed, terminated or perhaps if a licensee entered bankruptcy.

My conclusions about the meaning of §15.11 are based upon the generally accepted standards of the usage of terms in the consumer licensing business.  I know these terms and that these terms are  generally accepted in the consumer licensing business as a result of my extensive work with and for licensors and licensees and my participation in thousands of negotiations with licensors, licensees, professional licensing agents and attorneys over the last 20 years.

11

3.    It is not important for a licensor of a major apparel brand to have a package of styles, colors, specifications and sketches to attract prospective licensees in new territories.


The threshhold element for most prospective licensees of an apparel trademark is whether that trademark has sufficient clout in the marketplace to do two things: gain the licensee a foothold in a retail store level which allows it to sell at a good profit margin and enable the licensee to increase the number of units it sells.  Once a prospective licensee has determined, by its own investigation, that the trademark has clout, it then considers some other critical elements.   These elements are whether the prospective licensee can obtain the product range, financial terms, territory and length of time it wants from the licensor.  The final critical element is whether there is a personal rapport between the senior management at the licensor and  licensee.


Once the critical elements are met, there are many other details to be resolved in the course of negotiations.  The critical elements are the deal breakers.  Other issues are significantly less important.  Among the issues which are considerably less important is whether the licensor will supply a package of styles, colors, specifications and sketches each season.  There is no doubt that this is a plus, but it is a minor plus.  To analogize to buying a house, once one finds a house in the right neighborhood, with the right size, at the right price and in the right condition, the color of the carpet in a particular room is minor. If you can get the color changed by the seller, that is nice.  But if you cannot, it will not affect whether you buy the house.   The provision of a package of styles, colors,

12

specifications and sketches each season plays the same role in most licensing negotiations over major apparel brands, it is not important to attract licensees.

My conclusions about the importance of a package of style, color, specifications and sketches to attract prospective licensees are based upon the generally accepted standards in the consumer licensing business.  I know these standards and that these standards are generally accepted in the consumer licensing business as a result of my extensive work with and for licensors and licensees and my participation in thousands of negotiations with licensors, licensees, professional licensing agents and attorneys over the last 20 years.

_____

Antonio R. Sarabia II

October /2, 2005

13

**EXHIBIT A**

**ANTONIO R. SARABIA II**
3463 TANGLEWOOD LANE
ROLLING HILLS ESTATES, CA 90274
FAX: (310) 377 5039
PHONE: (310) 377 5171
asarabia@cox.net

R E S U M E

EXPERIENCE

1994 - Present    **Private Practice**

Emphasis on: apparel industry transactions and operations, licensing, international intellectual property, including trademarks, copyrights and infringements; domestic and international contracts. Preparation of sales, manufacturing, distribution and import agreements.

1992 - 1993    **Licensing and Trademark Counsel**

1988 - 1992    **General Counsel**

1986 - 1987    **Vice President of Licensing**

1984 - 1986    **General Counsel**

Attorney and part of the Senior management of Guess?, Inc., a major international fashion company, with annual revenue of over $450 million. Establish company policies in numerous areas including trade secret protection, personnel, business contracts, licensing, trademarks, copyrights, and litigation. Supervise, negotiate and resolve hundreds of disputes such as similarities between competing garment designs, logos, copyrights and trademarks. Confer with and advise the Board of Directors on a wide range of matters.

Work closely with senior managers in all departments including design, marketing, promotions, sales, production, import, export, trim, and piece goods. Negotiate, prepare and review contracts for all phases of the apparel business, including operation of retail stores, foreign and domestic manufacturing, purchasing agents, sewing and cutting, fabric purchase, product display, advertising, distribution agreements, buy/sell agreements and employment agreements. Review problems of performance in apparel contracts.

Counsel management in legal and administrative compliance in United States and overseas, including laws applicable to the garment industry, retail store operations, labor laws, U.S. customs requirements and antitrust. Recommend, plan and supervise business litigation; determine appropriate remedies and review of all pleadings, correspondence and settlement agreements.

Plan licensing and distribution for the Company by targeting products and countries in which to recruit licensees and distributors to increase revenue. Qualify potential licenses and distributors (analysis of current operations and management).

Nine years of experience in negotiating and writing domestic and international trademark licenses and distribution agreements (for apparel and other products) with a variety of countries worldwide such as Argentina, Australia, Brazil, Canada, Chile, Canada, Hong Kong, Japan, Korea and Mexico.

Supervise licensing department in monitoring licensee compliance, enforcement of licenses, interpretation of licensee and licensor obligations and termination of licenses. Participate in mediation and arbitration of licensing disputes.

Creation of an international program to control counterfeiting, diversion and unauthorized sales of garments.

1980 - 1984  **Associate**
    Ball, Hunt, Hart, Brown and Baerwitz

Responsibilities included working with clients and addressing their various legal problems. Diversified experience in civil and business litigation, including trials by judge, discovery, writs, appearances before regulatory agencies; commercial and real estate transactions.

1979 - 1980  **Associate**
    Jack Heller and Associates, Realtors
    A commercial real estate company.

1978 - 1979  **Associate**
    Forster, Gemmill & Farmer
    A law firm.

EDUCATION
University of Chicago Law School, J.D. June 1978
Occidental College, Los Angeles, A.B. 1974 (magna cum laude),
    Philosophy; Phi Beta Kappa

BAR MEMBERSHIPS
Supreme Court of California
United States Court of Appeals for the Ninth Circuit
United States Federal District Court for the Central, Eastern,
    Northern and Southern Districts of California
United States Tax Court

Expert Report of Antonio R. Sarabia II
Netherby Limited v. Jones Apparel Group, Inc. et. al.
EXHIBIT A

15

## OTHER ACTIVITIES

Testimony in civil and criminal, state and federal cases on issues related to the apparel industry, licensing and intellectual property.

Expert Report of Antonio R.  Sarabia II
Netherby Limited  v. Jones Apparel Group, Inc.  et. al.
EXHIBIT A

16

**EXHIBIT B**

**Exhibit B**

1.      Publications in the last 10 years:

A Marked Recovery," in <u>Los Angeles Lawyer</u>, April 2005.

Chapter 48, "Victim Restitution," in <u>California Criminal Law Procedure and Practice</u> (Eighth Edition, 2005).

"Google Blithely Ignores Legal Rights of Trademark Holders," in <u>Los Angeles Daily Journal</u>, November 25, 2004.

Chapter 58, "Victim Restitution," in <u>California Criminal Law Procedure and Practice</u> (Seventh Edition, 2004).

"Shared Weight," in <u>Los Angeles Daily Journal</u>, September 25, 2003.

"Do Not Confuse Criminal and Civil Subpoenas Duces Tecum," in <u>Los Angeles Daily Journal</u>, October 16, 2002 (coauthor with William Kopesky).

Chapter 58, "Victim Restitution," in <u>California Criminal Law Procedure and Practice</u> (Sixth Edition, 2002).

"Restitution Bind - The Harvest Court Performed Legal Gymnastics and Ignored Precedent," in <u>Los Angeles Daily Journal</u>, September 5, 2001.

"Forgotten Citizens - Too Often Victims of Criminal Acts are Kept in the Dark about Their Legal Rights," in <u>Los Angeles Daily Journal</u>, April 28, 2000.

Chapter 58, "Victim Restitution," in <u>California Criminal Law Procedure and Practice</u> (Fifth Edition 2000).

Chapter 58, "Victim Restitution," in <u>California Criminal Law Procedure and Practice</u> (Fourth Edition, 1998).

"Forgotten Citizens," in <u>Los Angeles Daily Journal</u>, April 28, 2000.

"Civil Litigators Should Consider Action for Criminal Restitution," in <u>Los Angeles Lawyer</u>, March 1999.

"Pay Back, California's Restitution Statute," in <u>Los Angeles Daily Journal</u>, August 26, 1996.

2.      Compensation: $525 per hour.

3.      Other cases in which expert testimony has been given in the last four years:

<u>Rush v.  Pechenick</u>, No.  BC295709, Los Angeles County Superior Court.

**EXHIBIT C**

**Information and Resources Used by Antonio R. Sarabia II
in Preparation of His Report**

Discussions and written communications with K. Frieman and R. Halligan

Internet

Saegis

Lexis

Amended Complaint

Jones' 0001202, 001295 - 7, 000796, 000194 - 5, 000200 - 1,

Netherby's  001268, 001475 - 6, 001293 - 4,  000797

Plaintiff's Motion for Summary Judgment

A draft Opposition to Plaintiff's Motion for Summary Judgment

<u>McCarthy on Trademarks</u>

<u>Gilson on Trademark Protection and Practice</u>

Thomson and Thomson Full Availability Report on "Glo"

<u>Weinstein on Evidence</u>

Excerpts from the licenses between Defendants and: Echo, Amerex, Group E, Zellers, Carmen,  Kids International/Premium Brands and Nettlewoods

Export Report of Antonio R.  Sarabia II
<u>Netherby Limited v. Jones Apparel Group, Inc. et. al.</u>
EXHIBIT C

19

**EXHIBIT D**

Apparel Trademark Registrations with "Glo" or "Glow"

| MARK | OWNER |
|------|-------|
| Sun-Glo | Hoy Shoe Company, Inc. |
| Midnite Glow | Wolfie Furs, Inc. |
| Powerglow | Brown Shoe Company, Inc. |
| Underglows | Vanity Fair, Inc. |
| Inner Glow | Vanity Fair, Inc. |
| Glo-Toes | The Wormser Company |
| Glo-Jama | The Wormser Company |
| Glogo! | Atomic Products, LLC |
| Glowtronix | Atomic Products, LLC |
| Go with the Glow | Atomic Products, LLC |
| Glow Dog | Reflec USA Corp. |
| Glow Cat and design | Reflec USA Corp. |
| Dayglo | Day-Glo Color Corporation |
| Glo Bra and design | Gloria Johnson |
| Glokids - (stylized) | Karen Castagno |
| L.A. Glo - (stylized) | L.A. Glo, Inc. |
| Heat-N-Glo and design | Hearth Technologies, Inc. |
| The Glow-Togethers | Maidenform, Inc. |

| | |
|---|---|
| The Original Glo-Glov | Lynette Warneke |
| Glow in the Dark Sleepwear | Creative Apparel Concepts, Inc. |
| Glowosaurs | Gregory Frei |
| Fireglo by Renosky and design | Joseph Renosky |
| Glomonkey and design | Anton Christian Corbin |
| Glo | Jones Investment Co., Inc. |

# EXHIBIT E

| First Name - Registered Apparel Trademarks | Well Known or Prestigious Registered Apparel Marks with the First Name - Owned by Different Companies | Approximate Number of Other Apparel Trademark Registrations with the First Name |
|---|---|---|
| | | |
| Annie | Anne Cole | 40 |
| | Anne Fontaine | |
| | Ana Sui | |
| | Ann Taylor | |
| | Anne Klein | |
| | | |
| Jon | John Henry | 93 |
| Johne | John Galliano | |
| | John Varvatos | |
| | John Weitz | |
| | St. John's Bay | |
| | St. John | |
| | Sean John | |
| | | |
| Giorgio | Giorgio Sant'Angelo | 50 |
| George | Giorgio Armani | |
| | Georges Marciano | |
| | | |
| Christy | Christian Lacroix | 58 |
| Chris' | Christian Dior | |
| Kriss | Christyne Forti | |
| Christian | | |

Expert Report of Antonio R. Sarabia II
Netherby Limited v. Jones Apparel Group, Inc. et. al.
Exhibit E

22

| First Name - Registered Apparel Trademarks | Well Known or Prestigious Registered Apparel Marks with the First Name - Owned by Different Companies | Approximate Number of Other Apparel Trademark Registrations with the First Name |
|---|---|---|
| | | |
| Maximilian | T.J. Maxx | 98 |
| | Maximilian Meerstein | (including "Max") |
| | Max Mara | |
| | Max Studio | |
| | Max Silver | |
| | BC BG Max Azria | |
| | Maxima | |
| | | |
| Tony | Tony Lama | 30 |
| | | |
| Su | Susan Dell | 28 |
| Suzanne | Susan Lawrence | |
| | Sue Wong | |
| | Susana Monaco | |
| | | |
| Tommy | Tommy Bahama | 52 |
| (Owned by Tommy Hilfiger) | Thomas Burberry | |
| | Tommy Hilfiger | |

Expert Report of Antonio R. Sarabia II
Netherby Limited v. Jones Apparel Group, Inc. et. al.
Exhibit E

23