UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                              :
NETHERBY LIMITED,                             :
                                              :
             Plaintiff,                       :
                                              :               04 Civ. 7028 (GEL)
        -v-                                   :
                                              :           **OPINION AND ORDER**
JONES APPAREL GROUP, INC., and                :
JONES INVESTMENT GROUP, INC.,                 :
                                              :
             Defendants.                      :
                                              :
-------------------------------------------------------------x

Thomas J. Hall, Melissa J. LaRocca and
JaeYoun Kim, Chadbourne & Parke LLP,
New York, NY, for plaintiff.

Karen S. Frieman and Francine N. Nisim,
Duane Morris LLP, New York, NY,
for defendants.

GERARD E. LYNCH, District Judge:

        Plaintiff Netherby Limited brought suit against Jones Apparel Group, Inc. and Jones

Investment Co., Inc., alleging breach of contract.  The case was tried before the Court without a

jury from June 26 to June 29, 2006.  This Opinion sets forth the Court's Findings of Fact and

Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).  To the extent any

Finding of Fact reflects a legal conclusion, it shall be to that extent deemed a Conclusion of Law,

and vice versa.

## BACKGROUND

### Findings of Fact

**I.      The Parties**

1.      Plaintiff Netherby ("plaintiff" or "Netherby") is a corporation organized under the laws of Jersey, Channel Islands, with its principal place of business in Jersey, Channel Islands.

2.      Defendant Jones Apparel Group, Inc. ("JAG") is a Pennsylvania corporation with its principal place of business in Bristol, Pennsylvania.

3.      Defendant Jones Investment Co., Inc. ("JICO"; collectively with JAG, "defendants") is a Delaware corporation with its principal place of business in Wilmington, Delaware.  JICO is wholly owned by JAG.

4.      This dispute involves the "Gloria Vanderbilt" trademark, which has been used on designer jeans and other apparel since 1975.  In 1980, Gloria Vanderbilt Cooper transferred the rights to her trademark to Netherby.  (Mohan Murjani Decl. ¶ 3; P. Ex. 1.)  Pursuant to a contract signed in 1988 (the "1988 contract"), plaintiff, through Murjani Worldwide B.V., sold to G.V. Gitano, JICO's predecessor-in-interest, the rights to the Gloria Vanderbilt trademarks in five countries, namely, the United States, Canada, Brazil, New Zealand and Australia (the "Five Countries").

5.      Since 1988, the rights and duties of the contract have been assigned to various parties.  For purposes of the present case, it is undisputed that Netherby holds the rights and obligations belonging to Murjani Worldwide B.V. under the 1988 contract.  The Court therefore will refer collectively in this Opinion to Netherby and any of its subsidiaries and/or predecessors-in-interest under the contract as "Netherby" or "plaintiff."

6.      Despite over a year of discovery and several days of trial, there remains uncertainty with respect to whether JICO or JAG has assumed the rights and obligations originally belonging to G.V. Gitano under the 1988 contract.  (See, e.g., P. Post-Trial Mem. 40; see also P. Proposed Findings of Fact and Conclusions of Law ("P. Proposed Findings") ¶ 4 ("Either [JICO] or [JAG] is currently the owner of the rights to the Gloria Vanderbilt Marks in the Five Countries.").)  Defendants insist that only JICO assumed the contract, an assertion which plaintiff has questioned at various points during the case.  The Court need not dwell on this issue, however, because plaintiff has now effectively accepted defendants' position; plaintiff's post-trial brief states that plaintiff "would take no issue with a conclusion that [JICO] is the proper party against whom the judgment should be entered."  (Id.)  Thus, for purposes of the instant dispute, the Court will treat JICO, not JAG, as the successor-in-interest to G.V. Gitano under the 1988 contract.  However, because (1) JAG owns JICO, (2) both JAG and JICO have been involved in the events relevant to this litigation, and (3) both JAG and JICO have been named as defendants, the Court will, for the sake of simplicity, refer collectively in this Opinion to JAG and JICO, as well as any of JICO's predecessors-in-interest under the contract, as "defendants."  This should not be taken as a finding that any entity other than JICO (and Netherby) is bound by the contract or the amendments thereto; nor should it be taken as an indication that the Court's Opinion renders judgment against any party other than JICO.

7.      Though the Court uses the term "defendants" to refer to JAG, JICO and their predecessors under the contract, it is worth noting that defendants and their witnesses frequently referred collectively to these entities, certain divisions thereof, and their predecessors as the "Gloria Vanderbilt Company," despite the fact that no company with that name actually exists or

has ever existed during the time period relevant to this litigation.  So far as the Court is aware, the closest any company has come to that name is the "Gloria Vanderbilt Apparel Corporation," which manufactured and marketed the Gloria Vanderbilt brand from the mid-1990s through 2002.  (See Dabah Decl. ¶ 2.)  Jack Gross testified that "Gloria Vanderbilt . . . is a division, a company. . . .  It's basically a company within the group."  (Tr. 453.)

   8. The confusion is exacerbated by defendants' inconsistent explanations of the relationship between the Gloria Vanderbilt company and/or divisions, on the one hand, and the Glo division and/or brand, on the other.  Defendants' Proposed Findings of Fact and Conclusions of Law ("D. Proposed Findings") state that the Gloria Vanderbilt division, which is "a division of an indirect subsidiary of [JAG]," manufactures and markets clothing bearing the Gloria Vanderbilt, Glo, and Glo Jeans trademarks.  (D. Proposed Findings ¶¶ 73-74.)  At trial, however, Jack Gross testified that the Gloria Vanderbilt division manufactured the Gloria Vanderbilt brand and Glo Girl brand, but not the Glo brand or Glo Jeans brand.  (Tr. 471.)  In his sworn declaration, he testified that Glo and Gloria Vanderbilt are each their own "division[]" of the "company."  (Gross Decl. ¶ 20.)  Another defense witness employed by defendants agreed that there is a "GLO Division" of the company, but indicated that this division forms part of the "Gloria Vanderbilt Division."  (Brown Decl. ¶ 2.)  A third defense witness suggested that, at least at one time, there was a "Gloria Vanderbilt division of GLO."  (Dabah Decl. ¶ 2.)  The witness identifying himself as the "President of the Gloria Vanderbilt Division," meanwhile, testified that he does not now have and has never had "any involvement with the GLO business." (Brisman Decl. ¶ 2.)

9.     A determination of the exact structure of defendants' Gloria-Vanderbilt-related business entities is unnecessary for disposition of the case, though defendants' use of the phrase "Gloria Vanderbilt company" and their failure to provide clarity on the issue will be relevant to part of the Court's legal analysis below.

**II.     The 1988 Contract**

10.     Under the 1988 contract, defendants agreed to pay to plaintiff, for a limited time, a percentage of revenues that defendants or their "affiliates"[1] earned from the exploitation – through sales and licensing royalties – of the contractually defined Gloria Vanderbilt "Marks." (P. Ex. 3 ¶ 3.)

11.     The contract prohibits defendants from selling products bearing the "Marks" to any entity that defendants know or should know will resell or distribute the product outside of the Five Countries.  (Id. ¶ 12.2.)  In other words, plaintiff retains the right to the Marks outside those countries.

12.     The 1988 contract defined the trademarks (or "Marks") at issue as follows:

> "Marks" -- (a) the name "Gloria Vanderbilt" both in stylized signature form and all other manner of representation, (b) the initials "GV" both in stylized signature form and all other manner of representation, (c) all registrations of Seller or its Affiliates [for] representations of swan designs, and all representations of swan designs used at any time by Seller or its Affiliates or their respective licensees, (d) the stylized signature of Gloria Vanderbilt in a rectangular box, (e) any and all variations of any of the foregoing, including, without limitation, "Vanderbilt," "Gloria" and any other manner of representation to the extent that Seller or its Affiliates or their respective licensees have or subsequently obtain a right thereto, (f) *any other mark associated with Gloria*

---

[1] The contract defines "affiliate" as "any other Person that, directly or indirectly, controls or is controlled by that Person, or is under common control with that Person."  (P. Ex. 3 ¶ 1.)

> *Vanderbilt*, (g) all logos and distinctive configurations used in
> connection with any of the foregoing, (h) any copyright (common
> law or statutory) bearing any of the Marks, and (i) all registrations
> for and applications for registration of any of the foregoing . . .

(Id. ¶ 1 (emphasis added).)

13.     Netherby's right to receive Contingent Payments in each of the Five Countries
lasts only for a limited period of time, the length of which is determined by certain conditions
enumerated in the contract.  The relevant period with respect to the United States expired in
1997 or 1998, and will expire with respect to Canada in 2009.  The period for Contingent
Payments has not begun to run in Australia, Brazil or New Zealand, as defendants have not yet
sold in those countries any products covered by the contract.

**III.     The 1995 Modification**

14.     In a 1995 amendment (the "1995 Modification"), the parties added § 15.11 to the
1988 contract.  The new section provides:

> Buyer shall use its best efforts to provide to Seller, at no cost to
> Seller, one set of samples of Gloria Vanderbilt designs and
> products within 30 days after such samples are available to Buyer.
> Additional samples shall be supplied by Buyer, at a cost to Seller
> of no more than the Buyer's actual cost, if requested by Seller.
> Buyer further agrees to use its best efforts to keep Seller generally
> informed of the activities of Buyer's licensees, including providing
> Seller with copies of such licenses presently in existence and
> licenses that are executed in the future.

(P. Ex. 4 ¶ 8.)

15.     Plaintiff claims that it negotiated for this clause so that it would be able to pursue
international licensing opportunities for the Gloria Vanderbilt trademark:

> To attract and secure quality licenses with advantageous
> licensing agreements, Netherby needed to provide potential

6

licensees with a Licensing Package for each season . . . . This
Licensing Package [includes] samples of other licensees' activities
as they relate to the brand (e.g. information on brand management,
colors, fit, logos, signage, photos, line plans, trends, etc.) and
designs and sample products of the different lines.  This Licensing
Package is provided to licensees to aid them in developing,
marketing and selling items bearing the licensed marks.  . . .

. . . Because Netherby did not have the substantial, surplus funds
necessary to develop the Licensing Package on its own, and
because Netherby felt that [defendants] could comfortably provide
the same, it negotiated for the receipt of the Licensing Package . . .
as part of the 1995 [Modification].

(P. Proposed Findings ¶¶ 61-64; see also Tr. 116.)

## IV.    The Current Litigation

16.    Plaintiff filed suit against defendants in this Court on September 1, 2004, alleging

breach of the 1998 contract, as amended by the 1995 Modification.  The dispute between the

parties concerns two distinct subject matters.  First, plaintiff contends that under the terms of the

1988 contract, defendants owe, and have failed to make, Contingent Payments on sales of

clothing bearing the trademark "Glo," which plaintiff contends is a "mark associated with Gloria

Vanderbilt" within the meaning of the contract's definition of "mark."  (P. Ex. 3 ¶ 1.)  Second,

plaintiff contends that defendants failed to comply with its obligations under § 15.11 of the 1995

Modification to provide samples and to keep plaintiff generally informed of the activities of its

licensees.

17.    More specifically, the Amended Complaint asserted nine causes of action, two of

which have since been resolved in full or in part by the parties.  The remaining causes of action

consist of (1) contract claims – seeking damages and specific performance – based on

defendants' alleged breach of the "samples" clause and the "generally informed" clause of §

7

15.11; (2) a request for a declaratory judgment that the Glo trademarks are encompassed in the contract's definition of "Marks," that defendants have breached the contract by registering Glo marks outside of the Five Countries, and that defendants' sales of Glo products outside the Five Countries would constitute a breach of contract; (3) a contract claim seeking damages for defendants' failure to pay royalties on the Glo sales; (4) a request for a permanent injunction enjoining Jones from registering or using Glo marks outside the Five Countries; and (5) attorneys' fees.

18.     Defendants assert two counterclaims.  The first requests various declaratory judgments regarding defendants' right to use and register the Glo trademark.  The second counterclaim seeks attorneys' fees.

19.     The Court referred the parties to mediation in 2004, which was unsuccessful.  In 2005, the parties were referred to a magistrate judge for settlement talks, which were also unsuccessful.  In January 2006, the Court denied motions for partial summary judgment submitted by both sides.  A bench trial was held from June 26 to June 29, 2006.

20.     Because the two distinct disputes between the parties involve distinct factual predicates, each will be addressed separately, with distinct Findings of Fact and Conclusions of Law relating to each.

## THE GLO TRADEMARK

### Findings of Fact

1.      In the mid-1990s, defendants developed the "Glo by Gloria Vanderbilt" brand for a children's line of clothing.[2]  The "Glo by Gloria Vanderbilt" trademark was registered with the United States Patent and Trademark Office ("USPTO") on January 22, 1996.  (P. Ex. 14.)

2.      Belk Stores, a retail chain, agreed to carry defendants' Glo by Gloria Vanderbilt children's line in 1996.  Belk sold Glo by Gloria Vanderbilt products to consumers for approximately nine to ten months, but the products were unsuccessful and the line discontinued.  (D. Post-Trial Mem. 13 n.10; P. Post-Trial Mem. 4-5; Gross Decl. ¶¶ 14-15; Gross Dep. at 30:5-7.)  JICO made Contingent Payments to Netherby based on Glo by Gloria Vanderbilt sales.  (Tr. 466.)

3.      In 1998, defendants licensed several trademarks to Hudson's Bay Company, the owner of "Zellers" retail stores, for use in the manufacturing, sale, and marketing of women's apparel in Canada.  The licensed marks included "GLORIA VANDERBILT," "AMERICAN ROYAL BY GLORIA VANDERBILT," and "GLO GLORIA VANDERBILT."  (P. Ex. 68; see

---

[2] Because the word "brand" is not a legal term of art, see J. Thomas McCarthy, 1 McCarthy on Trademarks and Unfair Competition § 4:18 (4th ed. 2000), the Court uses the term in its ordinary sense to refer to "a product, line of products, or service" that bears a widely recognized "word name, symbol, etc., esp[ecially] one legally registered as a trademark. . . . used by a manufacturer or merchant to identify its products distinctively."  Webster's New Universal Unabridged Dictionary 254 (2003).  "Brand" as used in ordinary English may also serve as a synonym of "trademark," id., and in some cases may serve as a "corporate identifier."  1 McCarthy on Trademarks and Unfair Competition § 4:18.  In this case, however, the parties and their witnesses did not use the term "brand" as a synonym for "company"; rather, they used the word "brand" to mean "trademark" or "line of products bearing a particular trademark."  Defendants, for example, emphasized the difference between the concept of a "brand" and the concept of a "company" by insisting that their 2001 press releases associated Glo only with the *company* Gloria Vanderbilt, and not with the *brand* Gloria Vanderbilt.

also P. Ex. 70.)

4.      Glo has not been used in a trademark in combination with Gloria Vanderbilt on any consumer products since at least 2000.  (Gross Decl. ¶ 18.)

5.      In January 2001, defendants launched a "Glo" brand without the words "Gloria Vanderbilt" in the trademark's name.  Like the Gloria Vanderbilt line of clothing, the Glo brand consists primarily of denim apparel.  (P. Exs. 205-14.)  Defendants filed a trademark application for Glo with the USPTO in April of that year; they had filed an application for Glo Jeans the year before.  (See P. Exs. 15-16; see also P. Ex. 17.)

6.      Defendants' marketing and publicity of the new Glo brand has linked Glo to the Gloria Vanderbilt mark, brand and person in numerous ways.  In January 2001, for example, defendants organized a party to which they invited all of their Gloria Vanderbilt brand customers.  (Tr. 7-8, 581-83.)  Isaac Dabah, formerly the CEO of defendants' predecessor under the 1988 contract, explained at trial that one of the company's goals in holding the party was to make its Gloria Vanderbilt customers "aware" that the company was "going to be launching a new brand called Glo to serve the younger customer."  (Tr. 583.)  Photos from the Glo advertising campaign were unveiled at the party (Gross Dep. 105), and guests were shown a videotape of "vintage advertising" of the Gloria Vanderbilt brand.  (Tr. 584.)

7.      Glo and Gloria Vanderbilt were also linked in press releases touting the new Glo brand.  "This spring," a 2001 press release began, "*Gloria Vanderbilt* adds a spark to the hot junior market with the launch of its new line, GLO."  The press release's concluding paragraph stated that "*Gloria Vanderbilt* has made its mark as one of America's first mega brands in designer jeans.  In 2001, GLO will add a youthful, sassy and carefree look for a young audience

. . . . 'It's what you'd expect from Gloria Vanderbilt.'" (P. Ex. 45 (emphasis in original); <u>see</u> <u>also</u> P. Exs. 44, 46-47.) Jack Gross, JAG's then-CEO who was involved in Glo's 2001 launch, conceded that he attempted through the press releases to "key back into the good will" that the Gloria Vanderbilt brand had enjoyed since the 1970s. (Tr. 460.)

8.    A JAG press release regarding its acquisition of two of its predecessor companies, Gloria Vanderbilt Apparel Corp. and Gloria Vanderbilt Trademark B.V., noted that the acquired companies' "brands" included "Gloria Vanderbilt and junior product marketed under the GLO brand name." (P. Ex. 38.)

9.    In 2000, an investment group prepared a presentation on behalf of defendants' predecessor that was aimed at attracting potential buyers of the company. The presentation noted that "Gloria Vanderbilt is currently in the process of developing brand extensions such as GLO by Gloria Vanderbilt for juniors . . . . GLO will be launched in August 2000 . . . ." (P. Ex. 135 at 8.)

10.    A webpage created by defendants placed the words "Glo jeans" side-by-side with "Gloria Vanderbilt jeans," all under the heading "GLORIA VANDERBILT." (P. Ex. 36.) This website existed for approximately five years, ending in 2005. (Tr. 461.) Though defendants suggested at trial that the webpage was intended for members of the trade, as opposed to consumers, this assertion is belied by the fact that the webpage included prominent links directed to consumers such as "Where to Buy" and "Customer Service." (P. Ex. 36.)

11.    Regardless of defendants' intent in creating all these connections, the links they drew between Glo and the Gloria Vanderbilt name and brand were parroted by various trade publications, as well as mainstream publications. A 2002 Womens Wear Daily article, for

example, referred to Glo as the "junior line" of "denim brand Gloria Vanderbilt."  (P. Ex. 48.)

Other publications referred to "Glo by Gloria Vanderbilt" and "Glo jeans by Gloria Vanderbilt."

(See, e.g., P. Exs. 53, 56.)

12.     Despite many connections between Glo and Gloria Vanderbilt, these trademarks –

and the lines of apparel on which they are used – are by no means interchangeable.  Glo clothing

is targeted to women 17 to 21 years old, while Gloria Vanderbilt clothing is targeted to women

over 27.  Concerned that their targeted young consumers associate the name "Gloria Vanderbilt"

with clothing of an older and less "hip" generation, defendants have, at least in recent years, sold

and marketed Glo clothing separately from Gloria Vanderbilt clothing.  Defendants' witnesses

explained that they have established a separate division of their company to conduct the design,

sale and marketing activities for the Glo brand.  (Dabah Decl. ¶ 3; Gross Decl. ¶ 6.)  Defendants

also emphasized that Glo can carry independent meanings to consumers, such as "light" or

"coolness."  (Tr. 581.)

13.     Defendants contend that they have *always* sought to prevent young women from

associating Glo and Gloria Vanderbilt, because "it would be detrimental to sales of the junior

brand to tie it in any way to the GLORIA VANDERBILT brand."  (Dabah Decl. ¶ 4; see also id.

¶ 13 ("I never considered GLO to be related in any way to the GLORIA VANDERBILT

brand.").)  The sale of "GLO by GLORIA VANDERBILT" clothing in Belk Stores in the mid-

1990s, defendants argue, did not implicate this concern because the mark was used on clothing

for younger children who did not make their own purchasing decisions.  (Dabah Decl. ¶ 9.)

However, the evidence before the Court – including the press releases and Gloria Vanderbilt

webpage – requires the rejection of defendants' contention, particularly when viewed in light of the fact that Glo consists of the first three letters of "Gloria Vanderbilt."

14.     Defendants' witnesses, moreover, testified inconsistently on this point.  While Dabah asserted that tying Gloria Vanderbilt to Glo "in any way" would be detrimental (Dabah Decl. ¶ 4), Gross testified that there was no harm in linking the brands in the eyes of retailers, and conceded at trial that connections drawn between the marks had been deliberate.  (Tr. 455-57, 460.)

### Conclusions of Law

15.      In this diversity action for breach of contract, the parties' agreement contains a choice of law provision providing that New York law will govern any dispute under the contract. (P. Ex. 3 ¶ 15.10.)  The provision is enforceable, see Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000), and New York law will therefore govern this case.

16.     To prevail on a contract claim under New York law, a plaintiff must prove "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."  Id. at 245-46 (citation and internal quotation marks omitted).

17.     Courts must interpret contracts so as to give effect to the parties' intention "as expressed in the unequivocal language they have employed."  Id. at 245.  The court cannot rewrite a contract "under the guise of interpretation" when the terms are clear and unambiguous; nor may the Court rewrite the contract in accordance with "its instinct for the dispensation of equity upon the facts of a given case."  Id.; see also Trio Asbestos Removal Corp. v. Marinelli, 829 N.Y.S.2d 594, 595 (2d Dep't 2007).

18.     The 1988 contract defines "Marks" to include, inter alia, "any . . . mark associated with Gloria Vanderbilt."  "Associated" is typically understood to mean "connect[ed]," "[brought] into relation," "unite[d]" and/or "combine[d]."  Webster's New Universal Unabridged Dictionary 126 (2003).

19.     Though trademarks are typically governed by federal law, Netherby's cause of action arises out of a contract governed by New York state law.  (See, e.g., P. Ex. 3. ¶ 15.10.) Cf. J. Thomas McCarthy, 1 McCarthy on Trademarks and Unfair Competition, § 18:43 (4th ed. 2000) ("Trademark license contract disputes are governed by the general rules of contract interpretation.")  Nevertheless, federal law may govern the construction of the contract to the extent the "contracting parties use[d] terms and concepts that are firmly rooted in federal law." Hugo Boss Fashions, Inc. v. Federal Ins. Co., 252 F.3d 608, 618 (2d Cir. 2001).

20.     At the close of trial, the Court invited the parties to address in their post-trial briefing whether the word "associated" has an established meaning in federal trademark law. Neither party has brought to the Court's attention any legal source indicating that the word has special meaning in the trademark context; nor has the Court's research uncovered any such special meaning.

21.     Defendants' post-trial brief states that "under traditional notions of trademark law, the term 'associated with' is understood in the context of a likelihood of confusion analysis."  (D. Post-Trial Mem. 6.)  Defendants do not, however, provide a citation to any legal source that supports this assertion.  They cite instead to the testimony of Jeffrey M. Samuels, one of their expert witnesses, whose testimony on this question undermines rather than supports defendants' position.  Samuels stated: "[I]n trademark law the term associated is usually used in

14

the context of an analysis of whether or not there is a likelihood of confusion . . . . That is how, at least I think, most trademark lawyers would interpret the term associated." (Tr. 336.) Samuels added: "Whether that is how the parties intended the term associated to be interpreted in this contract, I can't speak to. It's at best ambiguous." (Id.) When asked whether "the Glo mark [is] associated with the Gloria Vanderbilt trademark," he responded, "Yes." (Id. 337.)

22.    Though defendants do not cite any law suggesting that "associated" carries a special meaning in the trademark context, the argument in their post-trial brief is premised on the assumption that the Court can deem a mark to be "associated" with another mark for purposes of the 1988 contract only if the marks are "confusingly similar" for purposes of federal trademark law. Defendants argue, for example, that because plaintiff "failed to sustain its burden at trial to demonstrate . . . a likelihood of confusion between the GLO and GLORIA VANDERBILT Trademarks by an appreciable number of reasonable consumers," plaintiff has "failed to demonstrate that GLO is encompassed by the 1988 Agreement." (D. Post-Trial Mem. 7; see also id. at 16 (arguing that "[i]n the absence of sufficient evidence of confusion between the GLO Trademarks and the GLORIA VANDERBILT Trademarks, it simply cannot be found that the right to create GLO was conveyed by the 1988 Agreement").) There is nothing in trademark law or in the terms of the parties' contract, however, that justifies defendants' narrow interpretation of "associat[ed]." The question of confusing similarity is certainly crucial in resolving issues of trademark infringement under the federal Lanham Act, but it requires several leaps of logic to conclude on this basis alone that the confusing-similarity inquiry must also be crucial in defining the word "associated" for purposes of a contract pertaining to trademark rights. The mere fact that a contract pertains to a subject matter generally governed under federal law does not justify

15

setting aside the specific language chosen by the contracting parties and replacing it with federal

court interpretations of terms that do not actually appear in the parties' contract.

23.     This conclusion is bolstered by the fact that the Lanham Act includes a definition

of "trademark" that is much narrower in scope than the parties' definition of "Marks" in the

contract:

> The term "trademark" includes any word, name, symbol, or device,
> or any combination thereof--
>> (1) used by a person, or
>> (2) which a person has a bona fide intention to use in
>> commerce and applies to register on the principal register
>> established by this chapter,
> to identify and distinguish his or her goods, including a unique
> product, from those manufactured or sold by others and to indicate
> the source of the goods, even if that source is unknown.

15 U.S.C. § 1127; see also id. (defining "service mark," "collective mark" and "certification

mark," and including all of these terms, together with "trademark," in the definition of "mark").

24.     This is not to say that trademark principles should be ignored in interpreting the

contract's terms.  The subject matter and context of a contract are always relevant to its

interpretation.  See, e.g., Terwilliger, 206 F.3d at 245; Madison Ave. Leasehold, LLC v.

Madison Bentley Assocs. LLC, 811 N.Y.S.2d 47, 53 (1st Dep't 2006).  An appreciation of the

contract's context, however, does not justify a disregard of the ordinary meaning of "associated."

Madison Ave. Leasehold, LLC, 811 N.Y.S.2d at 53 (explaining that courts interpreting contracts

should consider both the "common meaning of the language employed" and the "factual context"

in which the contract was made).

25.     The various subclauses accompanying subparagraph (f) of the "Marks" definition

provide additional confirmation that the parties intended their agreement to govern the use of

marks that would not be protected under trademark infringement law alone.  The contract defines "Marks," for example, to include "any and all variations" of "Gloria Vanderbilt," "all manner of representation" of "Gloria Vanderbilt," and "any and all variations" on any "manner of representation" of "Gloria Vanderbilt."  (P. Ex. 3.)  This language plainly sweeps more broadly than the Lanham Act's trademark infringement provisions, which restrict the use of marks that are "likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114(a).  Regardless of whether Glo itself falls under any of the terms cited in this paragraph, the terms evidence a general intent to create a definition of "Marks" that is not confined by trademark rules of confusing similarity.

26.     Defendants' Glo mark, including such variations as Glo Jeans and Glo Girl, is "associated with" Gloria Vanderbilt for purposes of the 1988 contract.  The Court rests this conclusion on a combination of various factors, including (i) the fact that Glo consists of the first three letters of Gloria Vanderbilt; (ii) defendants' registration and use of the mark "Glo by Gloria Vanderbilt"; (iii) the press releases announcing the launch of the Glo line in 2001, in which defendants unambiguously linked Glo to the Gloria Vanderbilt trademark, brand and person; (iv) the close pairing of Glo jeans and Gloria Vanderbilt jeans on the Gloria Vanderbilt website for several years; (v) the connections drawn between Glo and the Gloria Vanderbilt brand in both trade and mainstream publications; and (vi) concessions by Jack Gross at trial that his company sought to capitalize on the recognition of the Gloria Vanderbilt brand name in launching the Glo line in 2001.

27.     Defendants' deliberate linking of Glo to Gloria Vanderbilt undermines their claim that they have *always* sought to keep the marks separate in the eyes of the young consumer.

17

Even if defendants had consistently endeavored to maintain a clear distinction between the marks at the consumer level, moreover, they conceded at trial that they have done precisely the opposite at the trade and retailer level, particularly during the initial launch of the mark. This alone weighs heavily in favor of finding "association," as nothing in the contract suggests that the parties intended subparagraph (f)'s broad language to refer only to association *by consumers*. This conclusion is consistent with principles of trademark infringement, under which courts take into account the impressions of retailers as well as the impressions of purchasers at the consumer level. See Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 397 (2d Cir. 1995); Abraham Zion Corp. v. Lebow, 761 F.2d 93, 105 (2d Cir. 1985); Mattel, Inc. v. Azrak-Hamway Int'l, Inc., 724 F.2d 357, 361 (2d Cir. 1983); see also Syndicate Sales, Inc. v. Hampshire Paper Corp., 192 F.3d 633, 636 (7th Cir. 1999).

28.     At various points during trial and in the briefs, defendants have insisted that any public associations of the Glo mark with Gloria Vanderbilt have been associations with Gloria Vanderbilt the company and not Gloria Vanderbilt the trademark or brand. (See, e.g., Tr. 445.) This distinction is crucial, according to defendants, because the 1988 agreement cannot fairly be read to govern associations with the company. If the agreement were read so broadly, they argue, then any brand marketed by the company would necessarily be encompassed within the definition of "Marks" – a result clearly not intended by the contracting parties.

29.     Defendants' position is unpersuasive. As an initial matter, despite their frequent references to the "Gloria Vanderbilt Company," defendants have not established that a company by that name – or simply by the name "Gloria Vanderbilt" – even exists. More importantly, some of the Glo-related press releases refer explicitly to Gloria Vanderbilt's success as a person

18

and as a "brand," as Jack Gross acknowledged at trial.  (See, e.g., P. Exs. 44-46; Tr. 457-58.)

Gross conceded that the connection to the brand was deliberate.  It is implausible, therefore, that

defendants' references to "Gloria Vanderbilt" in public communications such as their website

and the 2001 Glo press releases were merely intended to identify the name of a company.

30.     Even if one ignores defendants' references to the brand and assumes that they

intended only to create an association with the Gloria Vanderbilt Company (whatever that is),

this intention would not save them from a finding that the Glo mark is "associated" with the

Gloria Vanderbilt trademark and brand.  It is simply an unavoidable fact that by including the

words "Gloria Vanderbilt" in the name of a company or division that markets a product with a

name reminiscent of "Gloria," and publicizing the Glo brand in ways that further cement the

association with the Gloria Vanderbilt line, defendants have helped create an association

between certain of their products, including Glo jeans, and the Gloria Vanderbilt trademark and

brand.

31.     Defendants argue that this reasoning leads to absurd and unintended results, by

bringing all of their products within the scope of the contract, and by punishing them for the

legitimate use of Gloria Vanderbilt in their company's name.  These objections are misguided.

First of all, the Court does not hold that *any* product produced by a company or division named

"Gloria Vanderbilt" will necessarily fall within the 1988 contract's definition of Marks.  The

name of the company or division is merely one contributing factor in the creation of an

association.  As clearly set forth above, it is a combination of many factors – including the fact

that Glo consists of the first three letters of Gloria Vanderbilt, and the cited aspects of

defendants' Glo marketing – that creates the association for purposes of subparagraph (f) in this case.

32.     Second, while defendants may find it unfair or unreasonable that the legitimate inclusion of the words "Gloria Vanderbilt" in their company (or division) name has in effect limited their choice of trademark names, they themselves created this limitation by agreeing to the broad definition of "Marks."  The potential disadvantages of the limitation were entirely foreseeable – in fact, they were conspicuous – at the time of the contract's formation.  The predecessor of defendants that signed the contract, after all, was named "G.V. Gitano," but nevertheless agreed to explicit restrictions on its use of the initials "GV" and "any and all variations" thereof.  It may have been costly, or even unwise, to consent to such terms, but that does not permit the Court to re-write the party's agreement.  See RM 14 FK Corp. v. Bank One Trust Co., --- N.Y.S.2d ---, 2007 WL 473704, at *2 (1st Dep't Feb. 15, 2007).

33.     Finally, defendants argue that because the name Gloria Vanderbilt does not appear in quotation marks in subparagraph (f), it must refer to the *person* Gloria Vanderbilt and not to the trademark or brand.  This is flatly inconsistent with defendants' interpretation of the term Gloria Vanderbilt (also appearing without quotation marks) in § 15.11, a section which now forms part of the same contract.  (See, e.g., D. Post-Trial Mem. 24-26.)  Even if defendants were correct, however, that the use of the name Gloria Vanderbilt in subparagraph (f) of the Marks refers only to the person Gloria Vanderbilt, defendants have still created an association.  As plaintiff points out, defendants' press releases expressly associated Glo not only with Gloria Vanderbilt the company, but with Gloria Vanderbilt the person.  (See, e.g., P. Ex. 44.)  Moreover, even if the press releases had referred to a corporate entity, the fact that the corporate

entity is called "Gloria Vanderbilt" inevitably contributes heavily to an association with Gloria Vanderbilt the person.

34.     In addition to relying on the word "associated," plaintiff claims that Glo is a "variation" or "manner of representation" of "Gloria Vanderbilt" for purposes of the 1988 contract.  (P. Ex. 3. ¶ 1.)  As the Court finds that Glo is "associated" with Gloria Vanderbilt, it need not consider plaintiff's alternative theory.

35.     As there is no dispute that defendants have not made Contingent Payments on the sale of Glo products, there is no question that they have breached the 1988 contract.  The Court need not address the issue of damages, because the parties have agreed to the amount due on Glo sales in the event the Court finds it plaintiff's favor.  Judgment will be entered in plaintiff's favor in the agreed amount.

36.     Plaintiff seeks a declaratory judgment (1) that the Glo marks are encompassed in the 1988 contract's definition of "Marks" and (2) that defendants' sale of Glo products outside the Five Countries would breach the 1988 agreement.  The first of these issues has already been explicitly resolved by the above analysis of the breach-of-contract claim, and a declaratory judgment will be granted.  While the second issue has implicitly been resolved, since its resolution depends entirely on the decision of the first issue, the Court declines to issue a declaratory judgment as to the legal status of hypothetical future actions of the parties.  The request for a permanent injunction with respect to the Glo products will be denied, because there has been no showing of the inadequacy of money damages to remedy any sale of Glo products outside the Five Countries, and because there is no reason to anticipate that defendants will engage in future conduct violative of the contract, now that its contours have been adjudicated.

37.     Plaintiff also seeks a declaratory judgment that defendants' registration of the Glo marks outside the Five Countries is a breach of the 1988 contract.  Plaintiff is unable, however, to point to any language in the contract that prohibits registrations.  Accordingly, the request for declaratory relief on this issue will be denied.

38.     Defendants seek declaratory relief on the same issues for which plaintiff seeks such relief.  For reasons made clear in the preceding discussion, a declaratory judgment in favor of defendants on these issues would be superfluous, unnecessary, or unsupported by law, and the request will therefore be denied.

## SECTION 15.11

**I.     Providing Samples**

### Findings of Fact

1.     Plaintiff alleges that defendants failed to provide samples of products and designs as required by § 15.11 of the contract.  The validity of § 15.11 is not in dispute; nor do defendants argue that plaintiff has failed to perform its duties in any way.  The issues are only (1) the scope of the obligations created by the provision, (2) defendants' alleged breach, and (3) damages and other remedies, if any.

2.     Because resolution of the dispute is contingent on the Court's interpretation of § 15.11, to the extent the Court has considered extrinsic evidence necessary to resolve ambiguities in the contract, it is making findings of fact, but to the extent any of its interpretations are more akin to conclusions of law based on the plain meaning of the contract's terms, they should be treated as conclusions of law.

3.        There are several disputed issues regarding the scope of § 15.11's "samples" provision, including: (i) whether the "best efforts" language requires defendants actively to pursue samples from licensees; (ii) the significance of the word "available"; (iii) whether § 15.11 requires defendants to provide a full "Licensing Package"; (iv) whether § 15.11 includes an obligation to provide product and design samples from defendants' licensees, in addition to samples manufactured by defendants themselves; (v) what kinds of product and design samples must be provided; (vi) whether "samples of . . . designs" refers to something separate and distinct from "samples of . . . products"; and (vii) whether the obligation to provide samples of "Gloria Vanderbilt designs and products" includes samples of all products that bear trademarks falling into the contract's definition of "Marks."

4.        With respect to the issue of "best efforts" and the significance of the word "available," the Court finds that § 15.11 only requires defendants to exercise "best efforts" to supply plaintiff with samples (not to acquire them or create them) and that this obligation arises only after the samples become available.  The duty to "acquire," "procure," "solicit," "obtain," or "create" simply does not appear in the sentence at issue, making it unlikely that "best efforts" was intended, as plaintiff suggests, to create an obligation to engage in such activity.[3]

---

[3] With respect to the word "provide," the Court rejects defendants' suggestion that merely making samples available for viewing is equivalent to "provid[ing]" them to plaintiff.

With respect to the term "best efforts," the Court need not dwell on its precise meaning. The only disagreement between the parties on that term's meaning relates to whether it referred to the acquisition of samples in addition to the provision of those samples.  The Court having resolved that issue in favor of defendants, there is no other "best efforts" issue to consider.  The Court notes, however, that the term has been defined to mean, inter alia, "pursue all reasonable methods," Town of Roxbury v. Rodrigues, 277 A.D.2d 866, 867 (3d Dep't 2000) (citation and internal quotation marks omitted), and "active exploitation in good faith," Western Geophysical Co. of America, v. Bolt Assocs., Inc., 584 F.2d 1164, 1171 (2d Cir. 1978) (internal quotation marks omitted).

5.      "Available" samples are those that are "readily obtainable" or accessible by

defendants, see Webster's New Universal Unabridged Dictionary 142 (2003), including those

readily accessible from licensees.  A sample is not readily accessible, however, merely because it

*should* be readily accessible under defendants' agreements with their licensees.[4]

6.      These interpretations of § 15.11's terms conform best to the terms' ordinary

meaning, and are bolstered by extrinsic evidence.  Plaintiff, for instance, introduced numerous

licensing contracts which, according to one of plaintiff's expert witnesses, reflect general

"industry practice" with respect to the exchange of samples between companies.  (Murjani

Expert Rep. at 8.)  Though plaintiff introduced this evidence to support its own reading of §

15.11, the evidence in fact weighs heavily in favor of defendants, because it demonstrates that a

company seeking to protect its right to obtain samples will do so through unconditional and

unambiguous contractual language.  In one contract on which plaintiff relies, for instance, the

licensee agrees to "provide free of charge to Licensor, at least one (1) week prior to any and all

of Licensor's market shows, one (1) complete collection of all units of articles."  (P. Ex. 116 ¶

3.7; Murjani Expert Rep. 8.)  In another contract cited by plaintiff, the licensee agrees to "submit

to Licensor . . . samples, including prototypes, final pre-productions samples, and upon

Licensor's request, random production samples, of all Articles or Packaging Materials, and any

all items or components used . . . in the design [and] manufacture . . . of Articles and Packaging

materials."  (P. Ex. 123 ¶ 3.6(a).)  A third contract on which plaintiff relies contains a nearly

---

[4] Section 15.11 also provides: "Additional samples shall be supplied by Buyer, at a cost
to Seller of no more than Buyer's actual cost, if requested by Seller."  Plaintiff's claim under §
15.11 pays scant attention to this additional clause, presumably because plaintiff seeks samples
free of cost.

identical provision.  (P. Ex. 126 ¶ 3.6(a); see Murjani Expert Rep. at 8.)  If, as plaintiff's expert

contends, these expansive clauses reflect industry practice, § 15.11's much more modest

language is best understood to create much more limited obligations.

7.      Plaintiff's contracts with its own licensees similarly support a narrow reading of §

15.11's requirements.  A 1998 form "License Agreement" written by plaintiff, for example,

provides:

> Prior to manufacture and/or marketing and/or sale of any Licensed
> Products pursuant hereto, Licensee shall submit to Licensor
> [Netherby] . . . the concept, rough art, final artwork, and one (1)
> prototype of each of the Licensed Products to be sold, and of the
> labels, tags and package design . . . .  Licensee shall also submit
> production samples, 1 of each color and print, of first run . . . .
> Licensee shall also submit to Licensor . . .  copies of all proposed
> advertising and promotional materials for the Licensed Products.

(D. Ex. ZZZZZ ¶ 5(b).)  In 2004, plaintiff included identical language in a licensing agreement

with Pura Moda, S.A.  (D. Ex. HHHHHH ¶ 9(b).)  Plaintiff did not insist on such expansive

language in § 15.11, despite the fact that plaintiff had on at least some prior occasions considered

such language to be standard.  This omission strongly suggests that plaintiff did not originally

expect what it is now demanding under § 15.11.[5]

8.      For similar reasons, the Court rejects plaintiff's suggestion that § 15.11 requires

the provision of a full "Licensing Package," including "designs, product samples, advertising

images, promotional material, seasonal direction of the brand, labels and packaging material."

---

[5] The contracts in evidence containing requirements for the provision of samples to a
licensor are different from the parties' contract, in that they are licensing agreements that require
the licensee to get approval of its designs.  They nevertheless provide powerful evidence for the
general proposition that an apparel company seeking to protect its unconditional right to receive
samples will do so through language more expansive and explicit than the language in § 15.11.

(Murjani Expert Rep. at 10.)  The plain language of § 15.11 simply does not create such a requirement, and the evidence of plaintiff's prior practice and of general industry practice demonstrates that companies that contract for full "Licensing Packages" do so in detailed, unambiguous language.

9.      Because the word "mark" does not appear in § 15.11, the Court does not interpret the provision to incorporate the broad definition of Marks in the contract.  Rather, § 15.11 is best interpreted to require the provision of design and product samples only with respect to defendants' Gloria Vanderbilt line of clothing.  This includes any products defendants or their licensees publicly identify as Gloria Vanderbilt clothing, and any clothing bearing the actual trademark "Gloria Vanderbilt," but it does not include products – such as Glo jeans – that are merely "associated with" the Gloria Vanderbilt trademark, name and company.  If the contracting parties intended to incorporate the contract's broad definition of marks in § 15.11, they could have easily done so.

10.     The Court interprets § 15.11 to include samples from *licensees*, in addition to defendants' own samples, for two principal reasons.  The first reason is simply that this conforms to the most natural reading of the clause, which contains no language limiting defendants' obligations to clothing they produce themselves.  Licensees create "Gloria Vanderbilt designs and products" just as defendants do; if they did not, they would not need a license.

11.     The second reason for including licensees is § 15.11's requirement that the samples be provided within 30 days of becoming "available" to defendants.  The word "available," which means "accessible" or "readily obtainable," see Webster's New Universal

Unabridged Dictionary 142 (2003), suggests that defendants will be accessing or obtaining at least some of the samples from other parties.

12.     The record indicates evidence regarding various types of product samples utilized in the industry, including "prototype" samples, which are made early in the production process from preliminary designs; "salesman samples," which are the final samples shown to retailers who may be interested in carrying the products; and "production samples," which are samples of what actually ends up in stores.  (See, e.g., Tr. 252-55, 379-80, 539; Sarabia Decl. ¶¶ 16-17.) Though the parties appeared to disagree at trial with respect to the kind of product samples required by § 15.11, the post-trial briefing eliminates that disagreement.  Plaintiff's brief emphasizes the importance of obtaining salesman samples, but does not present any argument as to why "samples . . . of products" should be interpreted to include prototype samples.  (P. Post-Trial Mem. 19-20.)  Defendants argue that prototype samples are not required, and that § 15.11 "should be understood to refer only to the final product being sold by Jones to its accounts (salesman samples) or examples [of] actual product[s] being sold at retail."  (D. Post-Trial Mem. 27-28.)  Because plaintiff only demands a kind of sample that defendants now acknowledge the contract requires them to provide, there is no dispute on this issue for the Court to resolve.[6]

13.     Section 15.11 not only calls for the provision of product samples, but also for "samples of . . . designs."  Defendants urge the Court to disregard this provision, arguing that it is "merely a reiteration of the idea of 'samples of products.'"  (Id. at 28.)  Under New York law,

---

[6] The Court finds that parties seeking to require the provision of prototype samples would likely include more specific language than that present here, in view of the fact that such samples may be expensive to provide and may not represent what actually appears in stores for sale to consumers.

however, courts must not construe any contract term to be "superfluous or meaningless" if another reasonable interpretation of the term is available.  Galli v. Metz, 973 F.2d 145, 150 (2d Cir. 1992); see Conzo v. City of New York, 438 F. Supp. 2d 432, 435 (S.D.N.Y. 2006); Solutia Inc. v. FMC, Corp., 385 F. Supp. 2d 324, 337 (S.D.N.Y. 2005).  Here, the term "samples of . . . designs" in § 15.11 can be reasonably interpreted to refer to "line books" or "line plans" (see, e.g., P. Ex. 206), which contain a full set of pictures and descriptions for a given line of clothing. (See Tr. 28-29; Disner Dep. 148; P. Ex. 206.)  Indeed, defendants note that if the word "designs" must be given any meaning at all, the "most plausible interpretation" is that it refers to line books.  (D. Post-Trial Mem. 28.)

14.     Putting all of this together, the Court concludes that § 15.11 of the contract requires defendants to use their best efforts to provide to plaintiff one set of salesman samples and line books for any products forming part of the Gloria Vanderbilt line of clothing and/or products bearing the trademark "Gloria Vanderbilt" (including products manufactured or sold by defendants' licensees), to the extent such samples and line books are actually readily accessible by defendants.

15.     Turning to the question of breach, the record clearly establishes that Gloria Vanderbilt samples were often available to defendants, and that defendants provided samples to plaintiff on only two occasions.  (See, e.g. Tr. 443, 576.)  Defendants make no effort in their post-trial brief to argue that they ever provided samples of its licensees' products to plaintiff. Defendants also concede that they did not send samples to Netherby every season since the 1995 Modification.  (D. Post-Trial Mem. 34-35.)

16.    At trial, when the Court expressed skepticism that defendants had complied with § 15.11, defense counsel conceded the point: "Obviously I am not going to stand here and say, yessiree, we packed up every season our line and we shipped it right over to Netherby."  (Tr. 107.)

17.    There is no question, therefore, that defendants breached their obligations under § 15.11.  It is unnecessary to determine the precise extent of the breach, however, because plaintiff has not established actual damages, as explained below.

18.    Plaintiff alleges that defendants' failure to provide samples in accordance with § 15.11 made it impossible for plaintiff to "effectively . . . pursue quality licensees with advantageous licensing opportunities in the countries in which it owns the Gloria Marks." (Amended Complaint ¶ 33.)  However, while the record contains evidence of the general importance of samples in soliciting licensees, plaintiff has provided no meaningful evidence that defendants' breach of § 15.11 directly and proximately caused plaintiff to lose any potential business with any prospective licensees.  Plaintiff's post-trial brief cites to Murjani's testimony to support the damages claim, but the cited testimony consists merely of Murjani's unsupported and conclusory statement that the lack of designs and samples was "very much" a cause of plaintiff's failure to successfully solicit licensees.  (Tr. 29-30.)

19.    Plaintiff cites limited documentary evidence that it lost at least one prospective licensee due to its inability to provide a "licensing package."  (P. Ex. 244.)  Murjani testified, moreover, that prospective licensees would not be interested in signing a contract if plaintiff could not provide "advertising material, samples, the designs and everything else."  (Tr. 35.)  As discussed above, however, defendants were never under any obligation to provide a "licensing

package" (as defined by plaintiff's witnesses), advertising materials, or the undefined "everything else."  There is no evidence that any prospective licensee would have signed a contract with plaintiff had defendants complied with their limited obligations under § 15.11 to provide "available" salesman samples and line books.

20.    Plaintiff alternatively argues that defendants' breach of § 15.11 forced plaintiff to take on the business of developing samples itself.  "As a result of not receiving the sample products and designs from Jones," plaintiff explains, "Netherby attempted to launch the Vanderbilt line" in Europe in 1999 and 2000.  (P. Post-Trial Mem. 39.)  The business venture was unsuccessful, allegedly costing plaintiff $2,358,947.  (Id.)

21.    This theory of damages fails for numerous reasons.  Most importantly, plaintiff's theory rests on the assumption that § 15.11 required much more of defendants than the provision actually requires, and there is no evidence to support the notion that defendants' compliance with § 15.11's actual (limited) requirements would have reduced costs or eliminated the need to attempt the Vanderbilt venture.

22.    Furthermore, Murjani's testimony, taken as a whole, does not support plaintiff's claim that it created the Vanderbilt line as a result of defendants' breach.  When asked at his deposition whether the effort to launch a European Vanderbilt brand was a result of defendants' failure to provide a licensing package, Murjani responded: "There were other aspects."  (Murjani Dep. 108-09.)  He confirmed the accuracy of this deposition testimony at trial.  (Tr. 122.)

23.    Arguing that it is entitled to recover "what it would have cost to procure substitute performance" of defendants' obligations, plaintiff presents an elaborate calculation of what it would cost to hire "an independent design company to provide samples of . . . designs

30

and products for each Gloria Vanderbilt product line, on an annual basis." (Disner Rep. ¶ 8.)
According to one of plaintiff's expert witnesses, Patti Disner, this would cost $2.1 million
dollars per year. (Disner Rep. 9.)

24.    Disner's proposed estimate is flawed for numerous reasons, many of which are set
forth in defendants' post-trial brief. (See D. Post-Trial Mem. 38-46.) Disner testified at trial that
she had never undertaken a project as large as that envisioned by her estimate, that the costs
described in her estimate could be lowered – perhaps substantially – by working with companies
in the Far East, and that Murjani had previously declined to work with her because of her high
prices. (Tr. 290-91; see also P. Post-Trial Mem. 37-38.) She also conceded that in preparing her
expert opinion she did not do any market research about the Gloria Vanderbilt brand, did not
review any Gloria Vanderbilt line books or advertisements, and made no efforts to see what
categories of Gloria Vanderbilt product were sold at retail. (Tr. 277-78.)

25.    Perhaps the most significant defect in the proposed estimate, however, is that it
does not reflect the value of defendants' Gloria Vanderbilt sample products and designs, but
rather the purported value of sample products and designs created *independently*. Plaintiff
contracted specifically for the former, not the latter; that is, plaintiff contracted for the provision
of samples of the products and designs actually manufactured by defendants and their licensees.
(P. Ex. 4 ¶ 8 ("Buyer shall use its best efforts to provide to Seller . . . samples of Gloria
Vanderbilt designs and products.").) Plaintiff sought the samples so that its licensees could
"duplicate" the Gloria Vanderbilt clothing actually to be sold in the United States and Canada.
(P. Post-Trial Mem. 17 (citation and internal quotation marks omitted).) According to plaintiff,
it was also essential that the samples received be of Gloria Vanderbilt clothing that had not yet

31

appeared – but that would soon appear – in stores.

26.     Murjani's testimony on these points was unambiguous and emphatic.  He stated, for example:

- "[I]t's exceptionally important that whatever is produced under your brand is exactly the same no matter which part of the world you go [to]. . . .  [T]he whole concept is [that] everything that is produced anywhere in the world is exactly the same . . . . "  (Tr. 20.)

- "[W]hat I wanted to do was to ensure . . . that everything that happened around the world was similar to what was going on in the United States as well, even though we are two different owners but it was still one brand."  (Id. 22.)

- "They actually gave us samples that were already at retail or goods that had already shipped.  So they were really of little or no use to us. . . . [I]t's particularly important that the garments or the samples that we receive are fashion forward, in other words, in time."  (Id. 32-33.)

- "[Y]ou couldn't really build a business on using or always having last year's merchandise . . . .  No one wants last year's merchandise."  (Id. 34-35.)

- "[G]oods they had already shipped to the stores three months ago . . . have no relevance . . . ."  (Id. 39.)

- "[T]he whole object of the exercise" was to allow licensees to "reproduce the same kind of garments produced here."  (Id. 105)

27.     In view of all of this, it is clear that hiring an independent design company to produce, from scratch, samples never used and never to be used by defendants or their licensees would not, under plaintiff's theory of the case, provide plaintiff with a remotely suitable replacement of goods specified in the contract.  If actual Gloria Vanderbilt samples from defendants are not suitable if they arrive a few months late, then independently created samples based only in part on old Gloria Vanderbilt samples, which could hardly be created in a timely manner in view of the complexity of the project contemplated by the Disner testimony, cannot be

32

suitable either.  The Disner calculation is thus premised on an exercise that is extremely

expensive and, in plaintiff's own view, worthless.  It does not represent an appropriate measure

of any damage to plaintiff.

28.     The only other damages plaintiff might plausibly claim would be based on an

argument that the missing samples themselves were of value, regardless of whether they were

necessary to solicit licensees.  Under plaintiff's theory of the case, however, the samples

standing alone were worthless; their only value was in their potential to assist in attracting

licensees.  In any event, plaintiff has not offered evidence of the samples' market value, but has

provided instead a measure of what it might cost to create comparable samples from scratch.

This is not an appropriate measure of what a willing buyer would pay a willing seller for Gloria

Vanderbilt samples.[7]  See United States v. Boccagna, 450 F.3d 107, 115 (2d Cir. 2006).

## Conclusions of Law

29.     Defendants have breached the contract by failing to comply with their obligation

under § 15.11 to "use [their] best efforts to provide to [plaintiff], at no cost to [plaintiff], one set

of samples of Gloria Vanderbilt designs and products within 30 days after such samples become

available to [them]."

30.     "Under New York law, '[n]ominal damages are always available in breach of

contract actions.'"  Semi-Tech Litig., LLC v. Bankers Trust Co., 353 F. Supp. 2d 460, 488

(S.D.N.Y. 2005), quoting Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 95 (1993).  To be entitled

to compensatory damages, however, a plaintiff "must prove that [the] defendant's breach *directly*

---

[7] The Court cannot assume that the samples would be worth the amount that a consumer
would pay in a store, because it is industry practice to deliver product samples in slightly
damaged condition.  (See, e.g., Tr. 412.)

*and proximately caused* [the] damages." <u>Nat'l Market Share, Inc. v. Sterling Nat'l Bank</u>, 392

F.3d 520, 525 (2d Cir. 2004) (emphasis in original).  There must be at least a "reasonable

evidentiary foundation" for an estimate of these damages, though the plaintiff does not need to

prove damages with "mathematical precision."  <u>Exodus Partners, LLC v. Cooke</u>, No. 04 Civ.

10239, 2007 WL 120053, at *14 (Jan. 17, 2007); <u>see</u> <u>Boyce v. Soundview Tech. Group, Inc.</u>, 464

F.3d 376, 391-92 (2d Cir. 2006); <u>see also</u> <u>ESPN, Inc. v. Office of Comm'r of Baseball</u>, 76 F.

Supp. 2d 416, 418 (S.D.N.Y. 1999) ("It is well-settled under New York law that [a] plaintiff

seeking compensatory damages has the burden of proof and should present to the court a proper

basis for ascertaining the damages [it] seeks to recover." (citation and internal quotation marks

omitted)); <u>Borne Chemical Co. v. Dictrow</u>, 85 A.D.2d 646, 651 (2d Dep't 1981) ("A person

violating his contract should not be permitted entirely to escape liability because the amount of

damages which he has caused is uncertain.  In that event, the trier of the facts . . . [may] award

such damages as may be *reasonably calculated* to be the result of the defendant's breach."

(emphasis added) (citations omitted)).

     31.    Because plaintiff has not provided any method of estimating damages, and

because the Court does not find any manner of doing so independently on the present record,

plaintiff is entitled to only $1.00 in nominal damages.

**II.**    **Keeping Plaintiff Generally Informed**

<u>**Findings of Fact**</u>

     32.    Defendants agreed under the 1995 modification to keep plaintiff "generally

informed of the activities of [defendants'] licensees, including providing Seller with copies of

such licenses presently in existence and licenses that are executed in the future."  Plaintiff claims

that this requires defendants to inform plaintiff of "contracts, amendments, payments, brand management, colors, fit, logos, signage, photos, binders, line plans, trends, etc." of defendants' licensees.  (P. Proposed Findings ¶ 68.)  Defendants respond that the provision only requires them to provide, at most, information about major events, such as the execution or termination of licenses, as well as financial information regarding royalties and sales, new licenses and changes in royalty rates.  (D. Post-Trial Mem. 33.)

33.    As the Court already indicated at the close of trial, plaintiff's interpretation of defendants' obligations reads more into the contract than its words can bear.  (Tr. 612-13.) "[G]enerally" only means "with respect to the larger part," "for the most part," and "without reference to . . . particular persons, things, situations, etc., that may be an exception."  Webster's New Universal Unabridged Dictionary 795 (2003).  Plaintiff has not provided any sufficient basis to believe that the word should carry a different meaning here.  Accordingly, the Court agrees with defendants that the "generally informed" language requires only basic information about finances, royalties, and major events.  A failure to provide information on a particular occasion or with respect to a particular transaction, moreover, would not necessarily give rise to a breach, so long as defendants "for the most part" inform plaintiff of the licensees' activities. Plaintiff has not proven any acts or omissions by defendants that would amount to a breach under this standard.

34.    The clause specifically requiring copies of licenses, of course, imposes a more concrete obligation on defendants; that language, moreover, is not qualified by a word like "generally."  (This clause also demonstrates that the parties knew how to draft a clause requiring the provision of specific information when that was their intention.)

35

**Conclusion of Law**

35.     Plaintiffs have not established a breach of the provision of § 15.11 requiring

defendants' to keep plaintiff "generally informed."  Plaintiff has demonstrated that defendants

breached the clause regarding copies of licenses by failing to provide the copies in a reasonably

timely manner.  (See, e.g., P. Exs. 142-52.)  However, because plaintiff does not "suggest[] it

suffered any demonstrable damages caused by [defendants'] failure to provide licenses" (P. Post-

Trial Mem. 28), the Court will award only nominal damages of $1.00 for the breach.

## SPECIFIC PERFORMANCE

**Conclusions of Law**

1.     In addition to seeking actual nominal damages for defendants' breach of § 15.11,

plaintiff asks the Court to order specific performance.  Such an order may be appropriate, at the

trial court's discretion, where (1) there is a valid contract; (2) the plaintiff has substantially

performed its part of the contract; and (3) the parties are each able to continue performing their

parts of the agreement.  See Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp., 992 F.2d 430,

433 (2d Cir. 1993); La Mirada Prods. Co., Inc. v. Wassall PLC, 823 F. Supp. 138, 140-41

(S.D.N.Y. 1993).  A plaintiff seeking specific performance must demonstrate the lack of an

adequate remedy at law.  Nemer Jeep-Eagle, Inc., 992 F.2d at 433.  Legal remedies may be

found inadequate where any calculation of damages would be speculative, id.; Payroll Express

Corp. v. Aetna Casualty and Sur. Co., 659 F.2d 285, 292 (2d Cir.1981); La Mirada Prods. Co.,

823 F. Supp. at 141, or where the contract involves goods that are "unique in kind, quality or

personal association," Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co., No. 04 Civ. 10014,

2006 WL 1493132, at *8 (S.D.N.Y. May 31, 2006) (citation and internal quotation marks

omitted).  "Doubts concerning the adequacy of money damages should be resolved in favor of granting specific performance."  Nemer Jeep-Eagle, Inc., 992 F.2d at 436.

      2.      Specific performance is not appropriate where the terms of the contract to be enforced are not "certain enough to permit the [C]ourt to frame an order of specific performance . . . and to determine whether resulting performance is in accord with what has been ordered."  Restatement (Second) of Contracts § 362 cmt. a; see Corti v. Cont'l Copper & Steel Export Corp., 223 F. Supp. 503, 510 (S.D.N.Y. 1963); see also Brookhaven Housing Coalition v. Solomon, 583 F.2d 584, 593-94 (2d Cir. 1978).  A contract may be too indefinite to justify an order of specific performance even though it is definite enough to sustain an action for damages.  See Corti, 223 F. Supp. at 510, citing Gulbenkian v. Gulbenkian, 147 F.2d 173 (2d Cir. 1945).  Specific performance is also inappropriate where the burdens on the court to enforce the order would outweigh any benefits to be gained.  Restatement (Second) of Contracts § 366; see Litho Prestige, Div. of Unimedia Group, Inc. v. News Am. Pub., Inc., 652 F. Supp. 804, 809-10 (S.D.N.Y. 1986).

      3.      The requirements for an order requiring specific performance are satisfied here.  The record sufficiently establishes the inadequacy of legal remedies for defendants' breach of § 15.11.  Any calculation of damages for a breach would likely be speculative, and the contract involves samples that are unique in kind and personal association.  In addition, the parties' contract includes a provision stipulating that "no adequate remedy of law would be available for breach of this Agreement."  (P. Ex. 3 ¶ 15.5.)  While not dispositive, this provision weighs in favor of plaintiff.  See Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999); Alpha Capital Aktiengesellschaft v. Advanced Viral Res. Corp., No. 02 Civ. 10237, 2003 WL 328302,

at *5 (S.D.N.Y. Feb. 11, 2003).  Moreover, to the extent here relevant, the provisions of the

contract are sufficiently definite to permit enforcement.

     4.     The Court will therefore grant the request for an order for specific performance.

However, as explained below, certain requirements of § 15.11 are too indefinite – and their

enforcement too difficult – to warrant an order of specific performance.

     5.     The requirement that defendants provide "copies of such licenses presently in

existence and licenses that are executed in the future" does not present difficulties of application

or enforcement that would preclude an order of specific performance, and plaintiff's request for

an order in that respect will be granted.  It may be argued that the term "available" is too

unspecific to permit an order enforcing the provision of § 15.11 with respect to the provision of

samples.  With respect to samples created by defendants themselves, however, "available" is

clearly sufficiently definite to allow for specific performance, and enforcement would not

impose undue burdens on the Court.  If defendants create salesman samples or line books for

Gloria Vanderbilt products, those books and product samples are unquestionably "available"

upon their creation and must be provided to plaintiff.

     6.     With respect to the requirement that defendants provide plaintiff with licensees'

samples, the question is closer.  It might well be unduly burdensome on the Court to become

embroiled in disputes over whether particular salesman samples and linebooks are actually

readily accessible from licensees, particularly because the availability of such samples is likely

to vary significantly depending on defendants' relationship with a particular licensee.  However,

to the extent that the term "available" is construed, as the Court believes it should be, to mean

samples that are actually provided to defendants, there is no obstacle to specific enforcement.

The word "available" is used in § 15.11 with respect to all samples, both those produced by defendants and those provided by licensees.  While it would be theoretically possible to consider samples "available" whenever defendants have a contractual right to obtain them, because "available" merely means "readily obtainable," that would make little sense with respect to defendants' own samples, which defendants always have a right to create, but which are only "available" once manufactured and in defendants' possession or control.  The same must be true, therefore, of licensees' samples: the samples are "available" once created and accessible to defendants.  Samples that do not exist or are never provided to defendants are not available to them.

7.     The Court declines to order specific performance of defendant's obligation to keep plaintiff "generally informed" of licensees' activities, except to the extent it specifically requires defendants to provide copies of licenses.  "Generally informed" provides no meaningful guidance to the Court in framing an order or ensuring compliance.  In any event, as plaintiff has not established a breach of this provision, there is no basis for injunctive relief.

8.     There is some dispute regarding the duration of § 15.11's requirements. Defendants contend that the obligations terminate in October 2009, with a possibility of extensions if certain conditions are met.  Plaintiff's post-trial brief does not address the issue, though according to defendants, plaintiff has previously insisted that § 15.11's obligations extend until the last payment period for the last of the Five Countries has started and terminated. For present purposes, it is sufficient to hold that the requirements last at least through October 2009.  A determination of the parties' rights after that date is premature, particularly in view of the limited briefing on the issue and the possibility that the issue will be resolved without the

assistance of the Court sometime before November 2009.  Resolution will hopefully be

facilitated by the Court's resolution of the dispute surrounding § 15.11's scope.

## ATTORNEYS' FEES

### Conclusion of Law

1.      Both parties seek attorneys' fees.  At the close of trial, the Court indicated that the

issue of attorneys' fees would be addressed at a later date in order to "economize" the post-trial

briefing on the merits.  (Tr. 598.)  Defendants' post-trial brief barely touches on the issue, and

plaintiff has indicated that it intends to submit more papers.  (P. Post-Trial Mem. 48.)

Accordingly, the Court will defer ruling on the attorneys' fees issue pending additional briefing.

The parties are encouraged to confer regarding this matter with a view to reaching agreement.

## CONCLUSION

For the foregoing reasons, the Court (1) finds that defendants' use of the Glo marks

without making Contingent Payments breached the 1988 contract; (2) awards damages in the

amount agreed to by the parties in consequence of that breach; (3) grants in part and denies in

part plaintiff's demand for declaratory or permanent injunctive relief with respect to the Glo

marks; (4) finds that defendants breached their obligations with respect to both that portion of

the "generally informed" clause requiring provision of copies of licenses and the "samples"

clause of § 15.11 of the Agreement; (5) awards plaintiff nominal damages in the total amount of

$2.00 for the breaches of § 15.11; and (6) orders defendants to specifically perform its

obligations under § 15.11 through October 2009 with respect to the provision of product and

design samples and with respect to the obligation to provide copies of licenses.

Plaintiff is directed to submit an appropriate form of judgment no later than April 16,

2007.  Plaintiff shall submit any supplemental briefing with respect to its motion for attorneys'

fees no later than April 30, 2007.  Defendants shall file any response thereto no later than May

25, 2007.


SO ORDERED.

Dated: New York, New York
     April 5, 2007

                                     GERARD E. LYNCH
                                  United States District Judge

41