FILED VIA ECF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NETHERBY LIMITED,

                        Plaintiff,

              -against-

JONES APPAREL GROUP, INC. and JONES INVESTMENT CO., INC.,

                        Defendants.

04 CV 07028 (GEL)

**DECLARATION IN SUPPORT OF ATTORNEYS' FEE CLAIM**

       THOMAS J. HALL, declares under the penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

       1.     I am a member of the firm of Chadbourne & Parke LLP ("Chadbourne"), attorneys for plaintiff Netherby Limited ("Netherby").  As such, I am fully familiar with the facts set forth herein.  I had primary responsibility for representing Netherby in this litigation and supervised the other Chadbourne professionals who assisted me in this litigation.  I submit this Declaration in accordance with this Court's April 5, 2007 Opinion and Order (the "April 5, 2007 Decision") in support of Netherby's claim for an award of attorneys' fees pursuant to Section 17 of the parties' December 8, 1995 Settlement Agreement (Tr. Ex.[1] 5).

       2.     I graduated from Fordham Law School in 1980, where I was Managing Editor of the *Law Review*.  I was admitted to the New Jersey bar in 1980 and to the New York bar

---

[1]   References herein to "Tr. Ex." are to the exhibits admitted into evidence at the trial of this action.  References herein to "Ex." are to the exhibits annexed hereto.

in 1981. I have spent my career practicing commercial litigation, most of which has been before the New York courts, state and federal. I have tried well over 20 cases to verdict, and I am co-head of Chadbourne's Commercial Litigation Practice Group. I have published extensively on litigation topics.

## BACKGROUND

3.  Netherby commenced this action on September 1, 2004, after sending several demand letters to Jones. The case focused on two principal claims (April 5, 2007 Decision p. 7 ¶ 16), that the "GLO" trademarks were within the definition of "Marks" in the parties' 1988 Contract (Tr. Ex. 3 p. 4), and that Jones had breached its obligations under Section 15.11 thereof (Tr. Ex. 4 p. 7) to provide samples of Gloria Vanderbilt designs and products and licensee information to Netherby. The GLO issue was raised both by plaintiff's claims and defendants' counterclaim.

4.  Considerable documentary discovery was conducted. The plaintiff's production of documents exceeded 2500 pages, and defendants' production exceeded 5500 pages. Non-party documentary discovery was also conducted, some of which served as important evidence at trial, for example documents from The Bromley Group (Tr. Exs. 42-47), from Zellers (Tr. Exs. 76, 78, 81, 83), and from Financo, Inc. (Tr. Ex. 135). Interrogatories and requests for admissions were served and answered.

5.  A total of nine depositions were conducted. On behalf of the plaintiff, we conducted five depositions (Jack Gross, Isaac Dabah, Brian Davies, Jeffrey Brisman, Robin Mandell). The defendants conducted four depositions (Mohan Murjani, Lalit Khanna, Patti Disner and Andrew Jassin). Seven of these depositions were used as affirmative evidence at trial (Jeffrey Brisman, Jack Gross, Brian Davies, Patti Disner, Andrew Jassin, Lalit Khanna and

Mohan Murjani), and some were used for purposes of cross-examination. In consultation with our client, we undertook a cost-benefit analysis in deciding which depositions to conduct. For example, while the defense identified three expert witnesses, all of whom testified at trial, we decided to forego deposing any of them.

6. Several pre-trial motions were filed. In March 2005, we filed a motion for letters rogatory directed to Jones' Canadian licensee, Hudsons Bay Company and its subsidiary Zellers [Docket No. 26]. Jones opposed that motion unsuccessfully. In October 2005, both parties moved for summary judgment on the GLO issue. In addition, defendants filed two motions *in limine*, both of which were denied [Docket No. 96].

7. At the Court's direction, the parties engaged in efforts to settle this action [Docket Nos. 20, 83]. The parties engaged in settlement mediation before Magistrate Judge Debra Freeman. Attorneys' fees were incurred in connection with those efforts.

8. Following the close of discovery, extensive trial preparation work was required. This included preparation of a 131-page pre-trial order listing 289 plaintiff exhibits and 142 defense exhibits, witness declarations in lieu of direct testimony (6 by plaintiff and 9 by defendant), and pre-trial briefing. The trial lasted four days (June 26-29, 2006) during which 13 witnesses testified, and was followed by the submission of post-trial briefing (49 pages by plaintiff and 57 pages by defendants) and extensive proposed findings of fact and conclusions of law.

9. Netherby prevailed in this action by establishing that the "GLO" trademarks are within the definition of "Marks" in the 1988 Contract (April 5, 2007 Decision p. 21 ¶ 36). In

addition to a declaratory judgment to this effect, plaintiff established that Jones has breached its obligation to pay Netherby Contingent Payments of GLO sales in the past,[2] and that Jones is obligated to pay Contingent Payments on GLO sales in the future (in Canada until October 2009 and for ten years in each of Brazil, Australia or New Zealand once Jones begins to make GLO sales there).

10.     The Court further found "implicit" in the above ruling that Jones is prohibited from selling GLO goods outside the five countries[3] covered by the 1988 contract (April 7, 2007 Decision p. 21 ¶ 36). This determination is quite significant, as demonstrated by the fact that Jones has registered, or attempted to register, the GLO trademark in at least the following jurisdictions outside the five countries:  European Union (Tr. Ex. 31), China (Tr. Ex. 32), Peru (Tr. Ex. 27, 29), and Colombia (Tr. Ex. 28, 30). In light of the GLO ruling in this action, Jones is now prohibited from selling GLO in those countries.

11.     In addition, Netherby prevailed on its claim that, for years, Jones has breached its obligation under Section 15.11 of the 1988 Contract to provide Netherby with samples of Gloria Vanderbilt products and designs (April 5, 2007 Decision p. 33 ¶ 29). The Court has ordered Jones to specifically perform this obligation in the future (id. p. 38 ¶ 5). As established at trial, this will require Jones to provide salesmen samples and line books for its own Gloria

---

[2]     The proposed judgment submitted to the Court contains the amount due for Contingent Payments only through the first quarter of 2006, the last full quarter before the trial.

[3]     United States, Canada, Brazil, Australia and New Zealand.

Vanderbilt lines, which are prepared quarterly, and to provide such materials as are available from Jones' licensees (id. p. 38 ¶¶ 5-6).

12.     Netherby also prevailed on its claim that Jones has breached its obligation to provide Netherby with licenses it has entered into for the Gloria Vanderbilt trademarks (April 5, 2007 Decision p. 36 ¶ 35). The Court has ordered Jones to specifically perform this obligation in the future (id. p. 38 ¶ 5).

13.     Notably, Section 15.11 of the 1988 Contract, obligating Jones to provide to Netherby samples of Gloria Vanderbilt products and designs and licensee information, was adopted in December 1995 as part of the settlement of an earlier lawsuit brought by Netherby against Jones' predecessor for breach of the 1988 Contract. As this Court has found, Jones' predecessor began breaching its obligation to provide samples soon after the ink was dry on the 1995 Agreement. While the parties disagreed in this action over exactly what Section 15.11 required Jones to provide, there is little doubt that, had Jones' predecessor honored its obligations under Section 15.11 from the start, with the memory of the settlement discussions fresh in their minds, the parties would have resolved any disagreement over the scope of Section 15.11. One thing that Netherby surely did not bargain for in 1995 is that the 1995 settlement would force Netherby to bring yet another lawsuit for the breach of its terms.

14.     It is also noteworthy that Jones' obligation to pay attorneys' fees was another term of the 1995 settlement, and is set forth in the 1995 Settlement Agreement itself (Tr. Ex. 5 ¶ 17). As should be apparent, that provision was adopted to disincentivize Jones from future breaches of the 1988 Contract. While it has not had the intended effect, a full award of attorneys' fees to Netherby in this action will, hopefully, provide Jones and its counsel with more reason to comply with Jones' contractual obligations in the future. Although it was not until 2002 that

Jones acquired the company that was Netherby's counter-party to the 1988 Contract, senior executives of the company and its counsel have remained constant.

## **NETHERBY'S REASONABLE AND ACTUAL ATTORNEYS' FEES**

15. The total amount of fees and disbursements reasonably and actually incurred in connection with our firm's representation of Netherby in this action to date is **$912,895.62**, consisting of fees of **$780,466.50** and disbursements of **$132,429.12**. This amount is calculated according to the traditional lodestar approach based on our customary hourly rates and customary disbursement charges. Annexed hereto as Exhibit A is a computer run, created and maintained in the ordinary course of our business, reflecting all our time entries for this matter. The last page of Exhibit A gives a summary by professional of hours and rates. In making these materials available for the purposes of Netherby's attorneys' fee claim, Netherby does not waive any attorney-client, work product or other privilege that may exist under applicable law.

16. Four Chadbourne professionals formed the core of Netherby's legal team. Their names, positions and level of experience, billing rates, number of hours billed, and total amount of fees attributable to each of them are set forth in the following chart:

| NAME | POSITION AND LEVEL OF EXPERIENCE | AVERAGE BILLING RATE (2004-2007) | TOTAL HOURS | TOTAL AMOUNT OF FEES |
|---|---|---|---|---|
| Thomas J. Hall | Partner<br>Admitted 1980 | $689.37 | 334.10 | $ 230,320.00 |
| Melissa J. LaRocca | Associate<br>Admitted 2001 | $421.76 | 811.0 | 342,047.00 |
| Jae Youn Kim | Associate<br>Admitted 2005 | $345.74 | 256.30 | $88,613.50 |
| Lissette Mendoza | Paralegal<br>11 Years of Experience | $171.95 | 154.6 | $26,584.00 |
| | | | TOTAL | $ 687,564.50 |

Detailed entries of the services that each of these professionals provided are set forth in Exhibit A hereto. I have reviewed these entries and find them to be reasonable.

17. In addition, other professionals had minor involvement. Counsel Michael Graif, an intellectual property specialist admitted in 1992, recorded 24.6 hours at an average rate of $478.60 for a total of $11,773.50. As set forth in Exhibit A, Mr. Graif advised our litigation team on trademark issues related to the GLO dispute. Eight other junior associates performed isolated legal research and other tasks as required as follows:

| ASSOCIATES | HOURS | BILLING RATE | TOTAL |
|---|---|---|---|
| E. Abrahams | 2.3 | $295 | $ 678.50 |
| C. Charles | 72.4 | $295 | 21,358.00 |
| B. Galiano | 23.0 | $220 | 5,060.00 |
| W. Hennessey | 45.1 | $345 | 15,559.50 |
| J. Park | 16.9 | $220 | 3,718.00 |
| T. Stevenson | 75.8 | $286 | 21,685.00 |
| P. Tanck | 7.2 | $295 | 2,124.00 |
| J. Porter (summer associate) | 19.2 | $230 | 4,416.00 |
| | | | $ 74,599.00 |

Detailed entries of the services each of these professionals provided are set forth in Exhibit A hereto. I have reviewed these entries and find them to be reasonable.

18. In addition to our main paralegal in the case, Lissette Mendoza, other paralegals assisted in minor matters as needed as follows:

| PARALEGAL | HOURS | AVERAGE BILLING RATE | TOTAL |
|---|---|---|---|
| B. Barrera | 8.7 | $166.61 | $ 1,449.50 |
| M. Iacopelli | 21.0 | $178.52 | 3,749.00 |
| T. Ikiz | 3.3 | $175.00 | 577.50 |

| | | | | |
|---|---|---|---|---|
| S. Santos | 1.7 | $155.00 | | 263.50 |
| E. Weissman | 0.5 | $100.00 | | 50.00 |
| C. Rozier | 2.2 | $200.00 | | 440.00 |
| | | | $ | 6,529.50 |

Detailed daily entries of the services each of these paralegals provided are set forth in Exhibit A hereto. I have reviewed these entries and find them to be reasonable.

19. In setting our hourly rates for attorneys, we take into account that paralegal charges will be separately billed to and paid by our clients. Thus, we do not expect our hourly rates for attorneys to cover the cost of providing paralegal services. Rather, the salaries and other related costs associated with providing paralegal services are billed separately to our clients which is customary in the New York legal community. Instead of building this cost into our attorney hourly rates, billing separately for paralegal hours results in a fairer allocation of such costs to the clients that use more paralegal services. Moreover, by shifting certain tasks from attorneys to paralegals at lower hourly rates, we create efficiencies for our clients.

20. During the years 2001-2005, I was a member of our firm's five-partner Management Committee. In that capacity, I became very familiar with the customary rate and billing practices in the New York legal community, and have continued to keep abreast of the subject since. I sat through many presentations on this subject from knowledgeable law firm consultants who studied these issues. I frequently reviewed reports and studies on such practices and rates. We also collected and reviewed publicly available information, including from court filings, on rates and billing practices of other major New York law firms, including as to disbursement charges. I was also personally involved in our firm's annual task of adjusting our billing rates and disbursement charges. Our firm sets billing rates for each attorney and paralegal based on level of experience and to be consistent with the range of rates charged by other major

New York law firms for attorneys and paralegals of similar experience. We do the same for disbursements. The types of disbursements that we bill to clients, and the charges therefor, are consistent with the industry norm in New York City.

21.     Based on my 27 years of experience litigating in New York, the number of hours and the billing rates listed above, and in Exhibit A hereto, are reasonable and are consistent with charges for this type of work in the New York City legal community.

22.     I have personally represented Netherby since 1992 in connection with various claims and litigations under the same 1988 Contract that was at issue in this action. I have successfully represented Netherby in at least eight lawsuits and/or arbitrations against Jones or its predecessors for breach of the 1988 Contract. E.g., Netherby Ltd. v. G.V. Licensing, Inc., 92 Civ. 4239 (MBM) (SDNY); Netherby Limited v. G.V. Gitano Inc., No. 103710/94 (N.Y.Co.); Netherby Limited v. G.V. Trademark Investments, Ltd., No. 606237/96 (N.Y.Co.); Netherby Limited v. G.V. Trademark Investments, Ltd., No. 601205/97 (N.Y.Co.); Netherby Limited v. G.V. Trademark Investments, Ltd., No. 605382/97 (N.Y.Co.).

23.     The primary associate who assisted me on this case, Melissa LaRocca, also had considerable experience on the subject matter of this dispute. In 2002, Ms. La Rocca and I successfully tried a case together in New York state court against Jones' predecessor for breach of the 1988 Contract. Gloria Vanderbilt Trademark B.V. v. Netherby Ltd., No. 113339/01 (N.Y.Co.). In 2003, we successfully conducted an arbitration for Netherby against Jones' predecessor also involving claims under the 1988 Contract. Netherby Ltd. v. G.V. Trademark Investments, Ltd., No. 1420012555 (JAMS Arbitration). Our vast experience in dealing with the 1988 Contract, its history, the parties and issues relating thereto made it highly efficient for

us to handle this current matter for Netherby.  Indeed, the discovery we conducted in some of those earlier cases was useful in this action.

## DISBURSEMENTS

24.	As part of our attorneys' fees, we customarily charge clients for disbursements and other charges which include out-of-pocket expenses (e.g., filing fees, local counsel fees, process-serving fees, court reporter fees, expert witness fees, charges from copying services, charges for litigation support vendors, fees for obtaining documents and fees for other outside services, etc.), as well as internal or external charges for matters such as reproduction (photocopying), word processing, electronic (computer-assisted) research, proofreading, long-distance telephone, fax communications, postage, Federal Express, courier and messenger services, travel and transportation expenses, business meals, charges for staff overtime services, and overtime meals and local transportation after hours.  Our practice in this regard is consistent with most other New York City law firms.

25.	In setting our hourly rates for professionals, we take into account that disbursement charges will be separately billed to and paid by our clients.  Thus, we do not expect our hourly rates to cover the cost of disbursements.  Instead of building these costs into our hourly rates, billing separately for disbursements results in a fairer allocation of such costs to the clients on whose behalf disbursements are incurred.

26.	For this action, $132,429.12 in disbursement charges were incurred and billed to Netherby, an amount that is fair, reasonable and customary.  Annexed hereto as Exhibits B and C are computer runs, created and maintained in the ordinary course of our business, reflecting all disbursements for this matter, Exhibit B being a summary sheet and Exhibit C

containing a more detailed breakdown. As reflected on Exhibit B, these disbursements break down as follows (for certain third-party charges, I also attach copies of invoices as indicated below):

| | |
|---|---:|
| Court Reporters (Ex. D) | $ 3,338.50 |
| Computerized Legal Research | 46,141.21 |
| Federal Express and Courier Charges | 1,395.75 |
| Local Transportation | 2,620.82 |
| Meals | 390.12 |
| Managing Clerk Services | 1,755.59 |
| Miscellaneous (cost of photos of inspection and binders for trial exhibits) | 138.16 |
| Staff Overtime | 1,367.27 |
| Postage | 71.85 |
| Outside Professional Services - Service of Process Fees and Trademark Searches (Ex. E) | 3,323.00 |
| Proofreading | 487.00 |
| Photocopying | |
|    - Internal | 22,169.35 |
|    - Outside Service (Ex. F) | 1,058.04 |
| Telephone and Telecopier Charges | 1,769.24 |
| Long Distance Travel (Canada) | 1,182.55 |
| Word Processing | 45,220.17 |
| Total Disbursements | $132,429.12 |

27.     While the above categories of disbursements are largely self-explanatory, I elaborate on a few as follows:

> **Local Transportation:** This represents reimbursements to our attorneys and paralegals for the actual costs incurred (generally subway or taxi fares) for local transportation. These costs are incurred for attending court appearances or meetings outside of our office. We also reimburse our professionals for transportation costs for weekend work, and for taxi rides home after late evening work, which might be necessary where, for example, a brief is due the following day.
>
> **Meals:** The cost of meals generally falls into two categories. First, the cost of coffee, etc., and occasionally lunch, in connection with internal meetings at

our offices, for example in connection with depositions. The second is reimbursement of meal costs of our professionals for working on weekends or late evenings.

**Managing Clerk Office:** This internal office handles service of papers, court filings, deliveries of courtesy copies to Chambers, and the like. Included in these costs are charges for electronic docket sheet searches and filings.

**Internal Photocopying:** We charge 20¢ per page for copies made in our photocopying center which is designed to offset the cost to our firm for this service. Large copying projects may be sent to outside services where turn-around time is not as important or where bulk discounts can be obtained.

**Word Processing:** We charge our clients by the amount of time on our word processing system for their projects. This charge is designed to offset the cost to our firm for this service, and to spread it fairly amongst our clients.

28.     Our fees and disbursements set forth above are the actual fees and disbursements incurred by and billed to Netherby for this litigation. Attached hereto as Exhibit G are copies of our monthly bills sent to Netherby during the course of our representation in this action (without the monthly computer runs attached as they are part of Exhibit A and C hereto). There are no unshown write-offs or discounts to any of these bills.

### CANADIAN COUNSEL'S FEES

29.     In addition, Netherby incurred attorneys' fees of Canadian counsel retained to pursue discovery of Zellers, Jones' Canadian licensee. As set forth in more detail in the Declaration of Tracy Wynne submitted herewith, to obtain that discovery Canadian counsel engaged in litigation before the Canadian court as well as lengthy negotiations with Zellers' Canadian counsel.

30.     As demonstrated by the Letters Rogatory issued by this Court for the Zellers discovery [Docket No. 51], that discovery focused on two things, Zellers' sale of GLO goods and a broader review of Zellers' sales of Gloria Vanderbilt goods to assure that Jones was paying

Netherby the full Contingent Payment due on Zellers' Gloria Vanderbilt sales. This broader review was needed because Jones and its predecessors failed for three years prior to the commencement of this litigation to provide complete information in response to repeated inquiries concerning Zellers' activities (Tr. Ex. 147-77; Tr.[4] 131-69). In fact, in the case that we tried in state court in 2002, Justice Gammerman ruled that Jones' predecessor was diverting royalties from Zellers so as to artificially reduce Contingent Payments to Netherby, concluding it was a "scheme, cleverly thought of . . . to deny to [Netherby] a royalty or a portion of the royalty to which it is entitled." In the present case, the additional amounts Jones owed for Contingent Payments other than for GLO sales turned out to be relatively small, and that claim was settled before the trial of this action (April 5, 2007 Decision p. 7 ¶ 17).

31.     The charges of Canadian counsel totaled 47,553.25 Canadian Dollars, broken down as follows: hourly fee charges of 42,195, disbursements of 2,247.27 and GT tax of 3,110.98 (Wynne Dec. ¶ 10). Using a conversion rate of 0.898037 (the published market conversion rate as of April 27, 2007), Canadian counsel costs convert to U.S. **$42,688.68**. As stated in Ms. Wynne's Declaration, Netherby has paid this amount in full.

## OTHER LITIGATION COSTS PAID BY NETHERBY

32.     In addition, Netherby has paid directly **$30,121.07** for two categories of litigation expenses that are typically billed as part of attorneys' fees. Netherby has incurred and paid $24,411.82 for the costs of two experts, Patti Disner and Andrew Jassin, both of whom

---

[4]   References herein to Tr. are to the trial transcript in this action.

testified at trial. Ms. Disner's fees totaled $2,355 and Mr. Jassin's fees totaled $22,056.82. The bills from each of them, which have been paid in full, are annexed as Exhibits H and I, respectively. I believe the amounts charged by these experts are reasonable based on my experience.

33. In addition, Netherby paid directly the invoices for six court reporters' bills (Ex. J hereto) totaling $5,709.25 for the following depositions: Murjani (Day 1) ($1,057.10), Murjani (Day 2) ($1,033.50), Mandell ($435.20), Brisman ($372.25), Gross ($1,341.20) and Davies ($1,470.00). These amounts are reasonable and customary.

34. In sum, Netherby respectfully requests an award of attorneys' fees consisting of the following:

| | |
|---|---|
| Chadbourne Attorneys' Fees: | $912,895.62 |
| Canadian Attorneys' Fees: | $ 42,688.68 |
| Direct Payments by Netherby: | $ 30,121.07 |
| Total | $985,705.37 |

35. I declare under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated: New York, New York
       April 30, 2007

*/s/ Thomas J. Hall*
Thomas J. Hall