UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

NETHERBY LIMITED,                                      :        04 CV 07028(GEL)

              Plaintiff,                          :

                                  :        DECLARATION OF
           - against -                       :        KAREN S. FRIEMAN

JONES APPAREL GROUP, INC. and JONES                   :
INVESTMENT CO. INC.,

                     :

               Defendants.                       :

------------------------------------------------------------------------x

           KAREN S. FRIEMAN, declares under the penalty of perjury pursuant to 28

U.S.C. §1746 as follows:

        1.      I am Special Counsel to the firm of Duane Morris LLP, attorneys for defendants

Jones Apparel Group, Inc. ("JAG") and Jones Investment Co. Inc. ("JICO").   I submit this

declaration in opposition to plaintiff's application for an award of its attorneys' fees and

disbursements pursuant to ¶17 of the 1995 Settlement Agreement between plaintiff and JICO's

predecessor which states, in pertinent part, "[i]n any action to enforce this Agreement and/or the

1988 Acquisition Agreement, the prevailing party shall be entitled to recover its reasonable and

actual attorneys' fees from the non-prevailing party." This declaration is also submitted in

support of defendants' application for an award of its attorneys' fees and disbursements under

that same provision.[1]  Defined terms used herein are the same as defined by the parties during the

litigation of this matter or are defined in the accompanying memorandum of law.

---

[1]      Defendants do not believe that an award of disbursements is appropriate under the plain language of the
contract provision at issue.  However, should the Court decide that such disbursements are encompassed
within the provision, defendants would seek to be reimbursed for their expenses.

2.      I am a member in good standing of the Bar of the State of New York and have

been since my admission in 1985. I was admitted to practice before the United States District

Courts for the Southern and Eastern Districts of New York in 1985. I am also admitted to

practice in the United States Courts of Appeal for the Second and Third Circuits. I am a 1984

graduate of the Columbia University School of Law where I was a Harlan Fiske Stone Scholar. I

have been a practicing law for over 20 years, specializing primarily in commercial litigation in

the State and Federal Courts in New York.

3.      I was the attorney in charge of, and primarily responsible for, the representation

of the defendants in this action. As a result, I am fully familiar with the facts set forth herein.

4.      This Court must determine which party, if either, was the prevailing party in this

litigation. In order to make that determination it is necessary to analyze what plaintiff sought in

this action and compare that to what plaintiff achieved. In an effort to establish that it was the

prevailing party, plaintiff's papers make no reference to its complaint or amended complaint or

to most of the nine causes of action asserted therein. Rather, plaintiff merely identifies the issues

on which it had some success in this litigation, describes them only in terms of what the Court

granted as contrasted with the relief plaintiff sought, and conveniently ignores the issues and

claims which plaintiff lost or abandoned.

5.      Plaintiff's submission also fails to mention that the fees and disbursements it

seeks are nearly <u>ten times greater</u> than the recovery it obtained on its GLO Claims and <u>500,000

times greater</u> than the damages it was awarded on its ¶15.11 Claims. Moreover, plaintiff's

recovery on its ¶15.11 Claims is approximately <u>.000013%</u> of the amount it sought and a fraction

of what it could have obtained in settlement. In this light and as set forth in the accompanying

memorandum of law, it is clear that plaintiff should not be considered the prevailing party and/or

that its request for almost $1,000,000 in fees and disbursements is not reasonable and should be

denied.

6.      I turn to a discussion of plaintiff's claims.[2]

### Plaintiff Did Not Prevail on its First or Second Causes of Action (the "Royalty Claims")

7.      Plaintiff's First Cause of Action alleged that defendants diverted and hid royalty

income so as to avoid paying Contingent Payments. The Second Cause of Action alleged that

defendants therefore failed to provide accurate reports of royalty income. These causes of action

were entirely separate and apart from the cause of action alleging an entitlement to Contingent

Payments with respect to GLO product. Rather, they were based on:

a. The re-negotiation of the royalty rate being paid by JICO's master licensee in

Canada, Zellers, the paper work relating to which had been provided to Netherby by JICO or its

predecessor (Tr. Ex. 71A and B; Tr. Transcript, pp 160-161, 168); and

b. Zeller's refusal to pay royalties to JICO in respect of product purchased by it

from JICO or its affiliates, of which refusal Netherby became aware through the production to it

of documents from JICO or its predecessor. (Tr. Ex. 71B; Tr. Transcript, p. 166, 168.)[3]

8.      Plaintiff did not allege that either the renegotiation or the cessation of payments

were breaches of the 1988 Agreement. Rather, plaintiff felt these facts were "suspicious", and so

---

[2]      The analysis contained herein is organized on a "cause of action" by "cause of action" basis. In the accompanying memorandum of law, the analysis of plaintiff's claims is organized on an issue by issue basis. In either event, it is clear that plaintiff achieved little in this action as compared with its original scope.

[3]      In the original complaint, plaintiff also relied on Zeller's failure to pay royalties on certain categories of products such as sunglasses, notwithstanding that plaintiff never owned the rights to sunglasses, could never have transferred those rights pursuant to the 1988 Agreement and, therefore, could in no way be entitled to a Contingent Payment. Although the Amended Complaint eliminated any reference to sunglasses (after defendants reminded plaintiff it had no rights to use the trademarks on that product), plaintiff persisted in taking discovery on this issue.

filed a claim alleging some royalties due had not been paid. There was no evidence to support these claims from the time they were first asserted and they were abandoned by plaintiff before trial. Nonetheless, significant time and expense was spent in taking discovery on these issues, including significant time spent in taking discovery from Zellers in Canada. The result of this effort was only Netherby finding out what it already knew from documents previously provided to it by defendants. (Tr. Transcript, pp. 169-170; see also, id., p. 136.)

9.    Plaintiff claims that it received "important evidence" from Zellers which it used at trial. It identifies that evidence as Tr. Exs. 76, 78, 81 and 83. (Declaration of Thomas J. Hall, dated April 30, 2007 (the "Hall Decl."), ¶4.) However, Exhibit 83 is not in evidence, Exhibit 81 refers only to "housekeeping issues", Exhibit 78 is an unexecuted draft agreement, and Exhibit 76 is a letter which merely notified Zellers of JICO's purchase of the GLORIA VANDERBILT Trademarks. The fact that these documents symbolize the value of the Zellers' discovery in plaintiff's own mind, demonstrates more than any argument defendants can make that the discovery was worthless. Plaintiff should not recover the costs of that discovery from defendants.[4]

10.    Further, plaintiff's inquiry into the fact that Zellers refused to pay a royalty on goods purchased from defendants, demonstrated a fundamental misunderstanding of the licensing business, surprising given Netherby's experience in the field. Zeller's license agreement granted Zellers the right to manufacture and sell goods bearing the trademarks. (Tr.

---

[4]    Plaintiff also seems to indicate (Hall Decl., ¶ 30), that it discovered a small amount of additional Contingent Payments due to it through its discovery of Zellers. It is true that a small amount of "past due" payments (approximately $8,000) were discovered during the course of this action and were paid. None of these amounts were discovered through Zellers. Two small amounts were discovered after other third party licensees provided documents to Netherby which included information they had not previously provided to JICO. The third, larger amount, was discovered by JICO on its own review of its documentation. JICO then advised Netherby of this error and the payment was made with interest.

Ex. 68.) In exchange, it was required to pay a royalty on the sale of goods it so manufactured and sold. Zellers (like any retailer) needed no license to sell trademarked goods it purchased from JICO or from other manufacturers any more than a grocery store needs a license or pays a royalty to the manufacturer of Tide detergent. (See, Exhibit A, excerpt from defendants' deposition designation of Zellers by Brian Davies, 47:10- 47:21; 49:10-25.) Plaintiff's failure to "get this", resulted in wasteful time-consuming and expensive discovery in Canada.

11.    This misapprehension also resulted in plaintiff seeking to take unnecessary discovery from third party retailers such as Macy's East, Kohls, J.C. Penney, Sears and Beall's Department Stores, about royalties they might have paid on sales of GLORIA VANDERBILT product and about other issues that could pertain only to the relationship between JICO and licensees. (See, e.g., Exhibit B, Macy's subpoena, document request Nos., 1, 2, 4, 7.) None of those retailers, however, were licensees. None owed or paid royalties. None of this discovery supported or could have supported any claim asserted by plaintiff.[5]

12.    Moreover, ¶17 of the Settlement Agreement is limited to fees incurred "in an action." The discovery plaintiff took on these issues from third parties, including Zellers, and from defendants, is more accurately characterized as in the nature of an investigation of possible claims. Plaintiff's counsel concedes that the purpose of the discovery plaintiff took of Zellers was to obtain "a broader review of Zellers's sales of Gloria Vanderbilt goods to assure that Jones was paying Netherby the full Contingent Payment due on Zellers' Gloria Vanderbilt sales." (Hall Decl., ¶30.) In other words, the discovery was a fishing expedition for which defendants should not be required to pay and which netted plaintiff virtually nothing.

---

[5]    All the subpoenas contained identical document requests. In addition to the above, request Nos. 5 and 7 in the subpoena, related to plaintiff's unsuccessful position that a "Licensing Package" was due.

13.    This investigation, should have been conducted <u>before</u> the litigation was commenced and at plaintiff's own expense and not after the litigation was commenced so that plaintiff could attempt to impose the cost of this investigation on defendants. Indeed, the 1988 Agreement provides plaintiff with the right to conduct an audit of JICO which it did not do. (Tr. Ex. 3, ¶3.9.) Allowing plaintiff to recover its fees in connection with this investigation would subvert the purposes of the 1988 Agreement and the 1995 Settlement.[6]

14.    In short, there was simply no basis for the assertion of the First and Second Causes of Action and plaintiff did not prevail on them. It should not be awarded its fees in respect of these claims. In the alternative, the inclusion of fees and disbursements incurred with respect to these claims makes plaintiff's application unreasonable. Those fees and disbursements must be deducted from any fees awarded.

<u>Plaintiff Did Not Prevail, In Large Part, On Its Third Cause of Action</u>

15.    In its Third Cause of Action, plaintiff claimed that defendants breached ¶15.11 of the 1988 Agreement, as modified, by:

        a. failing to keep Netherby generally informed of licensee activity; and

        b. failing to provide copies of license agreements.[7]

16.    The Court held that defendants had not breached their obligation under ¶15.11 to keep plaintiff generally informed of the activities of its licensees. (Order, p. 35, ¶33.) The Court

---

[6]    Plaintiff alleges that its efforts to investigate before litigation were stymied. However, as set forth below, the Court rejected plaintiff's claims, asserted in its Third Cause of Action, that defendants failed to provide information to it about Zellers' royalties and failed to keep it generally informed of licensee activity. (Opinion and Order, dated April 5, 2007 (the "Order") p. 35, ¶33.)

[7]    See <u>also</u>, fn. 6.

6

also rejected plaintiff's expansive interpretation of that provision of the 1988 Agreement.

(Order, pp. 34-35, ¶¶ 32-33.)  Plaintiff did not prevail on this part of its Third Cause of Action.

17.     However, plaintiff spent significant time and incurred significant expense on

these issues as part of its claim, discussed below, that there was an obligation to provide a

"Licensing Package".  These fees and expenses should be disallowed.

18.     The Court found that JICO had breached ¶15.11 by failing to provide Netherby

with copies of license agreements in a reasonably timely fashion.  The Court also found that

plaintiff did not "suggest it suffered any demonstrable damages" as a result.  (Order, p. 36, ¶35.)

Therefore, the Court awarded only nominal damages of $1.00.  It is submitted that plaintiff,

having failed on two of the three bases for its Third Cause of Action, did not prevail on its Third

Cause of Action so as to support an award of attorneys' fees.  Moreover, it would be

unreasonable to award plaintiff the nearly $1,000,000 it seeks in attorneys' fees on the strength

of its $1.00 recovery on this claim.

### Plaintiff's Did Not Prevail On Its Fourth Cause of Action for a Licensing Package

19.     In its Fourth Cause of Action, plaintiff alleged that defendants breached ¶15.11

of the 1988 Agreement by failing to provide plaintiff with a "Licensing Package", including

samples, with the result that Netherby was "unable to secure quality licenses outside the Five

Countries and negotiate favorable licensing terms."  (Amended Complaint, ¶79.)

20.     From the inception of this action, plaintiff sought damages of "in excess of $1

million per year" for the alleged failure of defendants to provide plaintiff with a so-called

"Licensing Package."  (Amended Complaint, ¶80.)  Paragraph 15.11 of the 1988 Agreement

calls for the use of best efforts to provide plaintiff with "one set of samples of Gloria Vanderbilt

designs and products."  From this plain language, plaintiff asserted a multi-million dollar claim

for a "Licensing Package" which it claimed would include, but not be limited to, samples, "information on brand management, colors, fit, logos, signage, photos, line plans, trends, etc." for JICO's own product as well as the product of its licensees. (Complaint, ¶21; Amended Complaint, ¶28.)

21.   Significant time and expense was spent in connection with this claim. Indeed, it was one of only two issues on which plaintiff proceeded to trial. Defendants had to examine the reports of plaintiff's two experts purporting to support the claim for a Licensing Package. Defendants deposed those witnesses, as well as Mr. Murjani, plaintiff's principal who testified as a fact and expert witness on this issue, and defendants retained two rebuttal experts on this point with the concomitant work involved. This issue was also inquired into at numerous depositions of fact witnesses. Numerous document requests pertained to this issue as well. Finally, a significant amount of time at trial was spent on this issue through the testimony of both fact and expert testimony.

22.   The Court flatly rejected the claim for a Licensing Package. (Opinion and Order, p. 25, ¶8.) Plaintiff simply did not prevail on that claim.

23.   Plaintiff argues that it prevailed on its claim for breach of the contract obligation to provide samples. This was not the claim it alleged or tried. Moreover, even on this issue, plaintiff's "victory" is far from clear. Plaintiff's position ignored the "best efforts" limitation in ¶15.11. The Court reaffirmed it. (Id., p. 23, ¶4.) Plaintiff sought the production of every iteration of samples from the first prototype to the final item sold at retail. The Court held that only salesman samples or samples of GLORIA VANDERBILT trademarked product actually sold at retail were encompassed by the provision. (Id., p. 27, ¶12.) Plaintiff claimed it was entitled to samples of both the GLORIA VANDERBILT and GLO line of product. The Court

rejected this interpretation. (Id., p. 26, ¶9.) Plaintiff asserted at trial that there was an obligation

on JICO to negotiate terms in license agreements to provide for the provision of samples. The

Court held that JICO had the obligation only to use its best efforts to provide salesman or

production samples which are actually accessible to it and had no obligation to specifically take

any steps to procure such samples. (Id., p. 25, ¶4.) The Court found, as well, that JAG had no

obligations at all under the agreement. (Id., p. 3, ¶6.)

24.     Further, plaintiff failed to establish it actually suffered any damage as a result of

defendants' action. Indeed, the Court found, that, contrary to allegation of the Amended

Complaint, there was "no evidence that any prospective licensee would have signed a contract

with plaintiff had defendants complied with their limited obligations under ¶15.11." (Order, p.

30, ¶19.) Plaintiff offered two theories of damages, both of which the Court rejected. First, it

relied on the testimony of its expert Patti Disner about her estimate of the approximate $2 million

annual cost to independently create a line of GLORIA VANDERBILT apparel. Second, plaintiff

sought to recover the alleged $2.3 million costs of plaintiff's own European GLORIA

VANDERBILT line.

25.     The Court rejected the Disner damages estimate stating that it was "premised on

an exercise that is extremely expensive and, in plaintiff's own view, worthless. It does not

represent an appropriate measure of any damage to plaintiff." (Order, p. 33, ¶27.)

26.     The Court also rejected damages based on the European line costs, holding that

there was no evidence that compliance with the actual limited requirements of ¶15.11 would

have reduced costs or eliminated the need to attempt the European line, which plaintiff in any

event failed to prove was created as a result of defendant's breach. (Order, p. 30, ¶¶21-22.)

27.     Plaintiff's claim that it was the prevailing party in this cause of action is based on the Court's finding that there had been a breach of the much narrower requirements of ¶15.11 as determined by the Court, an award of specific performance of those much narrower obligations and a monetary award of $1.00 - - .000006% of the $15 million in damages it sought under the Disner analysis.

28.     Plaintiff's demand for $1 million in fees and disbursements is as overreaching as its proposed interpretation of the requirements of ¶15.11. It is simply unreasonable in light of what it actually achieved and it should be rejected.

29.     Further, the larger amount of damages stubbornly sought by plaintiff on this claim, and its unfounded expansive interpretation of what was called for under ¶15.11, were the primary stumbling block preventing the settlement of this action before trial. I was personally involved in the attempts to mediate this action first through the efforts of the Court appointed mediator, before whom plaintiff declined to proceed, and through the efforts of Magistrate Judge Debra Freeman. Plaintiff's seven figure demand, based presumably on the concept of an expansive Licensing Package, was a key factor in preventing a settlement from being reached in mediation. Even after that process failed, Netherby persisted in demanding in settlement an amount many, many times what it received in the litigation.

30.     For this reason as well, it would be unreasonable to award plaintiff its fees.

### Plaintiff's Fifth Cause of Action for Specific Performance

31.     Plaintiff's Fifth Cause of Action sought specific performance of certain specified alleged obligations under the 1988 Agreement.

32.     Plaintiff sought an order requiring compliance with the obligations of ¶15.11 to keep plaintiff generally informed of the activities of licensees and to provide license agreements.

The Court granted the request for an order requiring the production of only GLORIA

VANDERBILT, and not GLO, license agreements.  It denied the claim for an order enforcing the

obligation to keep Netherby "generally informed."  (Order, pp. 6-7, ¶¶5, 7.)

33.    Finally, plaintiff sought an order of specific performance requiring the provision

to it of a Licensing Package.  As described in greater detail above, the Court granted the request

for an order but only to the extent of requiring production of (only) GLORIA VANDERBILT

samples as described above.  The Court flatly rejected the concept that a Licensing Package was

required.  (Id., p. 38, ¶5.)

34.  At best, plaintiff "success" on this Cause of Action was a mixed bag.  It is submitted

that its request for $1,000,000 in fees and expenses is not reasonable.

### Plaintiff's Sixth Cause of Action for a Declaratory Judgment (The "GLO Claims")

35.    Like its claim for specific performance, plaintiff's Sixth Cause of Action for a

Declaratory Judgment asserted multiple theories and resulted in mixed results for plaintiff

insufficient to support its claim for fees.  Plaintiff sought and obtained a declaration that GLO is

encompassed in definition of "Marks" in 1988 Agreement.  (Id., p. 21, ¶36.)  However, it also

sought a declaration that the registration of GLO outside Five Countries is a breach of 1988

Agreement.  The Court held that there was no basis in the 1988 Agreement supporting such a

declaration and rejected that part of plaintiff's claim.  (Id., p. 22, ¶37.)  Similarly, while finding it

was implicit in its decision, the Court declined to grant plaintiff a declaration that the use of GLO

outside Five Countries is a breach of the 1988 Agreement.  (Id., p. 21, ¶36.)  This "victory" does

not support plaintiff's request for fees.

11

<u>Plaintiff's Seventh Cause of Action for Royalties on GLO (The "GLO Claims")</u>

36.     In its Seventh Cause of Action, plaintiff sought damages for breach of the

obligation to make Contingent Payments in respect of defendant JICO's use of the GLO

Trademarks in Canada.  Plaintiff succeeded on this claim.  Through the date of trial, its damages

on this claim, agreed to by the parties, total approximately $133,000, exclusive of interest.  In the

year since the trial, an additional approximately $100,000 in Canadian Contingent Payments has

accrued and been paid.  While plaintiff is correct in pointing out that it will be entitled to

Canadian Contingent Payments until October of 2009 and to additional payments should GLO be

sold or licensed into Australia, New Zealand or Brazil, there seems to be little likelihood of the

latter.  Indeed, neither JICO nor its predecessors (nor, upon information and belief, Netherby),

ever did business in GLORIA VANDERBILT trademarked products in those territories.  Mr.

Murjani conceded that those territories were of little value.  (Tr. Transcript, p. 76-78.)

37.     It is respectfully submitted that this recovery does not support an award of

$1,000,000 in fees and disbursements, particularly since much of those fees and disbursements

were incurred in pursuing other unsuccessful theories and claims.

<u>Plaintiff's Eighth Cause of Action for a Permanent Injunction (The "GLO Claims")</u>

38.     In its Eighth Cause of Action, plaintiff sought a permanent injunction enjoining

defendant from attempting to register or use GLO outside of Five Countries or otherwise violate

the 1988 Agreement.  This cause of action was denied.  Plaintiff did not prevail on this claim.

(Order, p. 21, ¶36.)

<u>Plaintiff Failed to Succeed Against JAG</u>

39.     In addition to the above, plaintiff also failed to prevail on its claims against

defendant Jones Apparel Group, Inc. and persisted in its efforts to prosecute its suit against that

entity even after documents were produced to it at the very beginning of discovery demonstrating that JICO and not JAG owned the rights to the GLORIA VANDERBILT Trademarks and so was the only entity bound by the 1988 Agreement. (Order, p. 3, ¶6.)

40.   In sum:

- - plaintiff lost all claims against JAG;

- - lost or abandoned its First and Second Cause of Action;

- - lost two of three theories supporting its Third Cause of Action,

- - had the Court reject the expansive interpretation of the "generally informed language of ¶15.11,

- - obtained specific fee performance and a single dollar in damages on the portion of the Third Cause of Action on which it succeeded,

- - had the Court reject its overreaching demand for a Licensing Package;

- - had the Court reject its claim for $15 million in damages based on the Disner estimate;

- - had the Court reject its claim for $2.3 million in damages based on the European Line Estimate;

- - had the Court limit what samples it is entitled to under ¶15.11;

- - had the Court limit the samples to those of the GLORIA VANDERBILT line only;

- - had the Court find a breach of the limited obligations it found to exist under ¶15.11 and award specific performance and $1.00 in damages;

- - lost its request for specific performance requiring production of quarterly reports;

- - obtained a declaration that the GLO trademarks are encompassed by the 1988 Agreement, a finding of breach of the obligation to make Contingent Payment thereon and damages of approximately $133,000;

- - lost its claim for a declaratory judgment on two other issues pertaining to GLO; and lost its claim for a permanent injunction.

41.    Plaintiff succeeded on only a small fraction of the claims it asserted and obtained an infinitesimally small monetary award on those claims as compared to what it sought. It should not be considered the prevailing party. At the very least, its demand for $1,000,000 in attorneys' fees, even compared to the recovery it did obtain on the GLO claims, is simply not reasonable and should not be awarded.

42.    Plaintiff claims that awarding it its fees will provide "Jones and its counsel with more reason to comply with Jones' contractual obligations in the future." (Hall Decl., ¶14.) This is absurd. First, Jones was never before accused of breaching the terms of the 1988 Agreement. (Indeed, there is no finding that JAG breached any agreement.) Second, since plaintiff had such an incorrect and overreaching interpretation of the requirements of the Agreement, even if JICO had performed by regularly providing available GLORIA VANDERBILT trademarked salesman samples and line books from its own line and that of its licensees, if any, plaintiff would still have believed JICO was in breach.

43.    Plaintiff seems to assert that its overblown interpretation of ¶15.11 was due to a faulty memory which would not have happened if defendants complied with their obligations (Hall Decl., ¶13.) However, shortly after the 1995 Modification Agreement was executed, when memories should have been fresh, samples were sent to Netherby and Netherby did not voice any objection. (Tr. Transcript, pp. 55-57.) At his deposition and at trial, Mr. Murjani claimed they were worthless.

44.    Plaintiff's overblown interpretation of ¶15.11 either demonstrates that there was no meeting of the minds between the parties about that provision or demonstrates that plaintiff made a calculation that it would not have to pay its own fees and that it was "worth a shot" to

create a wish list "Licensing Package."   Awarding defendants their fees, or at least, denying

plaintiff's demand, is likely to incentivize plaintiff to keep its demands in the world of reality.

45.     Finally, plaintiff's overbroad reading of the Agreement carries over to its

interpretation of the attorneys' fees provision in the Agreement.   Nothing in ¶17 makes any

reference to an entitlement to recover disbursements or the fees of any other persons such as

experts.   Yet, plaintiff seeks over $160,000 in disbursements, including nearly $25,000 for the

expert fees of its experts whose testimony was offered only to unsuccessfully support plaintiff's

claim for breach of obligation to provide a "Licensing Package".   There is no support for the

award of disbursements.

### The Fees and Disbursements Sought by Plaintiff

46.     As noted above, defendants submit that plaintiff should not be awarded any fees

or disbursements in this action.   In the alternative, defendants submit that the fees sought are

unreasonably disproportionate to the recovery achieved by plaintiff and should be significantly

reduced in a wholesale fashion.

47.     Plaintiff did not satisfy its burden of identifying hours attributable to its

"successful" claims.   It is difficult, if not impossible, to completely parse plaintiff's billing

records and tease out hours spent only on each individual and independent claim it asserted.   As

set forth in full in the accompanying memorandum of law, in such a case the Court can seek to

identify hours properly excluded from any award or rely on its knowledge of the action to fix

fees.   Defendants' respectfully submit that any detailed examination of plaintiff's time records

for the purpose of excluding time from any award, should, without limitation, exclude the

following areas:

a. pre-litigation time. That time is not properly recompensed under the clear language of ¶17 which calls for the reimbursement of fees incurred "in an action." Moreover, the ongoing nature of the parties' relationship by definition involves communications back and forth about, for example, questions Netherby may have about the reports sent to it, etc. These costs of doing business, included in plaintiff's time sheets, should simply not be compensable. The first reference in plaintiff's time sheets to the complaint is on August 10, 2004. Prior expenses should not be included;

b. time spent by Mr. Graif (and others) of Chadbourne in connection with the cease and desist letter sent to defendants regarding the registration of GLO outside the Five Countries and in considering seeking a preliminary injunction. The Court did not grant plaintiff relief on this claim at trial. (See, Hall Decl., Exhibit A, time entries for November and December, 2004, January, February, March and April, 2005);

c. time spent in taking discovery of Zellers in Canada. (See, Hall Decl., Exhibit A, time entries of June 4, 2004 and in December, 2004, February, May, June, July, August, September, October, November, December of 2005 and January of 2006);

d. time spent on discovery from other third party licensees and retailers. (See, Hall Decl., Exhibit A, time entries of January, February, March, April, May, June, July, August, October, November 2005 and January 2006);

e. time spent on the Court appointed mediation cancelled by plaintiff. (See, Hall Decl., Exhibit A, time entries of March and April, 2005);

16

f. time spent in pursuing a "Licensing Package" and in connection with calculating damages for the failure to provide such a package. (See, Hall Decl., Exhibit A, time entries for February, March, April, May and December, 2005, January, February, March, April, May and June, 2006);

g. time spent in connection with the expert reports and testimony of Patti Disner. (See, Hall Decl., Exhibit A, time entries for September, October and December, 2005, January, February and March, 2006);

h. time spent in connection with the expert reports and testimony of Andrew Jassin. (See, Hall Decl., Exhibit A, time entries for October, November and December 2005 and March 2006);

i. time spent in connection with damages based on the European line of Gloria Vanderbilt. (See, Hall Decl., Exhibit A, time entries for April, 2006); and

j. to the extent not covered in the above, time spent in preparation for trial, at trial and on post-trial submissions in connection with the claims on which plaintiff failed as set forth in full above and in the accompanying memorandum of law.

48.     Plaintiff also seeks to recover the fees of its Canadian counsel. (See, Declaration of Tracy L. Wynne, dated April 27, 2007 (the "Wynne Decl.").) The efforts of that counsel pertained to the discovery plaintiff obtained from Zellers. This discovery went primarily to the Royalties Claim on which plaintiff failed to succeed. None of that time should be recovered by plaintiff. In support of these fees, plaintiff claims that this time was necessarily spent because it allegedly failed to get information about Zellers from defendants prior to the commencement of

this action. This claim is completely belied by the fact that the Court found that defendants had not breached their obligation under ¶15.11 to keep plaintiff "generally informed" of the activities of its licensees. (See also, fn. 4.)[8]

49.     Plaintiff also seeks to recover its disbursements for the expert fees of $24,411.82 paid to its experts Patti Disner and Andrew Jassin. Ms. Disner work was limited to her calculation of the damages sought by plaintiff. This Court totally rejected that analysis stating: "Disner's proposed estimate is flawed for numerous reasons, many of which are set forth in defendants' post-trial brief." (Order, p. 31, ¶24.) The Court concluded: "The Disner calculation is thus premised on an exercise that is extremely expensive and, in plaintiff's own view, worthless. It does not represent an appropriate measure of any damage to plaintiff." (Id., p. 33, ¶28.) Defendants, who defeated plaintiff's claim for damages, should not be responsible for this cost.

50.     Similarly, Mr. Jassin's expertise related solely to the question of whether there is such a thing in the industry as a Licensing Package, what it might include, and whether or not it is a good idea to have one. Since the Court rejected the idea that a Licensing Package was required in this action, there is no basis for this cost to be imposed on defendant.

51.     In addition, in the event the Court is inclined to make an award to plaintiff of any of its disbursements, it is submitted the following disbursements or categories of disbursements should be targeted for exclusion:

---

[8]     In addition, the records of Canadian counsel often contain impermissibly vague references to "conferences" without detail about their subject matter and include communications apparently on the subject of getting Canadian counsel's bills paid. These charges are not reasonably imposed on defendants in any event.

a. disbursements incurred pre-litigation. (See, Hall Decl. Exhibit G, statements dated November 12, 2003, February 13, 2003, March 8, 2004, June 11, 2004, July 20, 2004 and August 30, 2004);

b. disbursements incurred in connection with the discovery taken from Zellers and other third party licensees and retailers. This would include travel to Canada (Hall Decl., Exhibit B, "long distance travel"), costs of court reporters and videographers, and disbursements for service of third party subpoenas. (See, id., Exhibits B and E.) This also includes the disbursements billed by Canadian counsel (See, Wynne Decl.); and

c. to the extent not covered in the above, disbursements incurred in preparation for trial, at trial and on post-trial submissions in connection with the claims on which plaintiff failed as set forth in full above and in the accompanying memorandum of law.

### Defendants' Fees and Disbursements

52.    The converse of all of the above, is that defendants are the prevailing party on many of the claims asserted in this action. Indeed, the Court held that JAG should not be held liable and it is not included in the draft judgment submitted by plaintiff to the Court. As set forth above, plaintiff was denied relief on many claims and the relief it achieved on two claims was a tiny fraction of the relief it sought. Defendants should recover at least a portion of their fees.

53.    The total amount of fees reasonably and actually incurred in connection with this firm's representation of defendants in this action, through April 30, 2007, is $932,730.06, consisting of fees of $806,977.50 and disbursements of $ 125,752.56. This amount is calculated based on our customary hourly rates and customary disbursement charges. As of the date hereof, all of these bills, except the last bill, have been actually paid in full. It is understood that that invoice will be paid as well in the ordinary course of business.

54.    Attached hereto as Exhibit C are copies of this firm's bills to defendants.  These materials are attached without waiver of any attorney-client, work product or other privilege that may exist.

55.    As noted above, I was primarily responsible for the representation of defendants in this action.  I also represented defendants' predecessors in earlier litigations between them and Netherby.  In addition to myself, other personnel from this firm who had significant involvement in this action were Rose Halligan, Fran Nissim, Adrianne Valencia and paralegal Laurence Edwards.  Also involved to a somewhat lesser extent were partners Greg Gulia and Maria Cilenti, associates C.S. Kim, Sandra Torget, and Jeun Yeum, and paralegals Matthew Stowell, Kenneth MacCardle, Lorna Woodham and Charity Henson.  I worked directly with each of these individuals and supervised the work they did on this matter.[9]

56.    The time spent on this matter by each of these individuals is set forth in the attached bills.  I have reviewed these entries and believe them to be reasonable in both the number of hours and billing rates.

57.    Annexed hereto as Exhibit D is a chart listing the attorneys and support personnel involved in this action, their billing rates, the number of hours they recorded and the time value of their contributions.  The hours spent by our paralegals are billed separately to our clients and are not included in the overhead of the firm.  I believe, based on my experience and knowledge of the profession, that all these fees are customary in the legal community in New York City.

---

[9]    Other individuals had more minor involvement in this matter such as members of our managing attorneys' office (Cathy Smith and LaKeisha Hemingway) and litigation support team (Mr. Kreuger, Ms. Klingman and Ms. Funchion).  The small amount of time spent by my assistant, Janice Font, and by managing partner's of this firm, Michael Margulies and Robert Hasday (totalling approximately $500) may be excluded.

58.    Some of the time spent on behalf of the defendants in this action is attributable to all of the claims asserted in the action, for example, time spent in answering the complaint or drafting discovery requests, in preparing for fact depositions, in research for and drafting the pre- and post-trial briefs, and in preparing for trial. Defendants submit they should recover a portion of that time because of their successes in defeating plaintiff's claims as described above

59.    In other cases, it is somewhat easier to identify time specifically spent in defending individual claims. Hours expended specifically on behalf of defendants' defense of the Royalty Claims are set forth in the statements dated November and December, 2004; January, April, May, June, July, August, September, October and November 2005; and January and February, 2006.

60.    Hours expended specifically on behalf of defendants' defense of the ¶15.11 Claims are set forth in the statements dated July, August, September, October and November 2005; and January, February, April, May, June, July, August and September, 2006.

61.    Similarly, certain disbursements expended in the representation of defendants pertain in general to all of the issues raised in the case, for example, computer research, copying, court fees, (some) court reporter fees, messengers, and postage. Defendants submit that they should recover a portion of these expenses because of their successes in defeating plaintiff's claims as described above. Attached hereto as Exhibit E is a computer generated statement of the disbursements charged to defendants in this case together with the back-up for these disbursements arranged by category. Disbursements described below are not included in this back-up. These disbursements are charged to the clients of this firm and are not included in our overhead. I believe this is customary in the legal community in New York City.

62.     In other cases, it is somewhat easier to identify disbursements specifically incurred in defending individual claims. These disbursements include the payment of defendants' experts ($69,634.27) and court reporter fees for the depositions of plaintiff's experts and of Zellers ($2569.05). The back-up for these disbursements is annexed as Exhibit F.

63.     In addition, to the above, defendants directly paid certain of the bills of our experts, Roger Milgram ($11,727.06) , Antonio Sarabia ($29.980.65) and Jeffrey Samuels ($9,792.74), and the cost of my travel to Canada for the Zellers deposition. (See, Exhibit G.) Mr. Milgrim and Mr. Sarabia testified primarily on the issue of plaintiff's entitlement to a full blown "Licensing Package".

64.     It is submitted that defendants are entitled to recover these specific disbursements and other disbursements and fees attributed to the claims on which it prevailed.

I declare under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated:  May 25, 2007



                          s/ Karen S. Frieman
                          KAREN S. FRIEMAN

DM1\1114839.3